**2019-1671**

# United States Court of Appeals for the Federal Circuit

**VIRNETX INC.,**
*Appellant*

*v.*

**CISCO SYSTEMS, INC.,**
*Appellee*

**KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,**
*Intervenor*

*Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 95/001,679.*

## OPENING BRIEF FOR APPELLANT VIRNETX INC.

Naveen Modi
Joseph E. Palys
Stephen B. Kinnaird
Igor V. Timofeyev
Daniel Zeilberger
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C. 20036
Tel.: (202) 551-1700

June 23, 2022

*Counsel for Appellant VirnetX Inc.*

## REPRESENTATIVE CLAIM AT ISSUE

## U.S. PATENT No. 6,502,135
## (emphasis added)

**Claim 1:**

A method of transparently creating *a virtual private network (VPN)* between *a client computer and a target computer*, comprising the steps of:

(1) generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer;

(2) determining whether the DNS request transmitted in step (1) is requesting access to a secure web site; and

(3) in response to determining that the DNS request in step (2) is requesting access to *a secure target web site*, automatically initiating the VPN between *the client computer and the target computer*.

# CERTIFICATE OF INTEREST

Counsel for Appellant VirnetX Inc. certifies the following:

| 1. Full name of party represented by me | 2. Name of real party in interest represented by me | 3. Parent corporations and publicly held companies that own 10% or more of stock in the party |
|---|---|---|
| VirnetX Inc. | VirnetX Inc. | VirnetX Inc. is a wholly owned subsidiary of VirnetX Holding Corporation. |

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

None.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

*VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*, No. 20-2271 (Fed. Cir.);

*VirnetX Inc., Leidos, Inc. v. Apple Inc.*, No. 21-1672 (Fed. Cir.);

*VirnetX Inc. v. Apple Inc.*, No. 22-1523 (Fed. Cir.);

*VirnetX Inc. v. Apple Inc.*, No. 6:13-cv-00211 (E.D. Tex.).

6. Information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases.

Not Applicable

Dated: June 23, 2022

/s/ Naveen Modi
Naveen Modi

*Counsel for Appellant VirnetX Inc.*

# TABLE OF CONTENTS

**Page**


STATEMENT OF RELATED CASES ....................................................... vi

INTRODUCTION ....................................................... 1

JURISDICTION ....................................................... 3

ISSUES PRESENTED ....................................................... 4

STATEMENT OF THE CASE ....................................................... 4

I. THE TECHNOLOGY AT ISSUE. ....................................................... 4

II. THE ’135 PATENT. ....................................................... 6

III. THE ASSERTED REFERENCES. ....................................................... 10

A. The Kiuchi Reference ....................................................... 10

B. The Solana Reference ....................................................... 15

IV. PROCEDURAL BACKGROUND. ....................................................... 16

A. The *Inter Partes* Reexamination Proceedings Below ....................... 16

B. The Board’s Decision ....................................................... 18

C. This Court’s Remand Under *Arthrex* and Proceedings on Remand ....................................................... 21

SUMMARY OF ARGUMENT ....................................................... 22

ARGUMENT ....................................................... 26

I. STANDARD OF REVIEW ....................................................... 26

II. THE BOARD’S FINDING THAT KIUCHI ANTICIPATES THE ’135 PATENT CONTRAVENES THIS COURT’S *MANGROVE* DECISION. ....................................................... 26

A. The Board Erred in Refusing To Consider VirnetX’s Construction of “Client Computer,” and in Mapping the “Client Computer” onto Kiuchi’s Client-Side Proxy. ....................................... 27

B. The Board Erred in Concluding that Kiuchi’s Server-Side Proxy Is the Target Computer for Which a VPN Is Established. ......33

C. The Board Erred in Rejecting the “Direct Communication” Requirement Established in *Mangrove*, and Alternatively By Finding It Satisfied By Proxy-to-Proxy Communication .................36

III. THE BOARD'S OBVIOUSNESS REJECTIONS BASED IN PART ON KIUCHI SHOULD BE SET ASIDE. ....42

A. The Obviousness Rejections Based on Kiuchi and Solana Cannot Be Maintained. ....42

B. The Obviousness Rejections Based on a Combination of Kiuchi or Kiuchi and Solana with Other References Cannot Be Maintained. ....48

IV. THE APPOINTMENTS CLAUSE, THE SUPREME COURT'S *ARTHREX* DECISION, AND THE FVRA REQUIRE A REMAND TO A PERMANENT PTO DIRECTOR. ....49

CONCLUSION ....50

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
--- F.4th ----, 2022 WL 1696322 (Fed. Cir. May 27, 2022) ........................25, 50

*Arthrex, Inc. v. Smith & Nephew, Inc.*,
941 F.3d 1320 (Fed. Cir. 2019) ........................................................*passim*

*In re Biedermann*,
733 F.3d 329 (Fed. Cir. 2013) ........................................................45

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016) ........................................................26

*EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*,
859 F.3d 1341 (Fed. Cir. 2017) ........................................................26

*In re Fritch*,
972 F.2d 1260 (Fed. Cir. 1992) ........................................................46

*Honeywell International Inc. v. Mexichem Amanco Holding S.A. DE C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) ........................................................48

*Iancu v. Luoma*,
141 S. Ct. 2845 (2021)........................................................3

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) ........................................................29

*In re Kotzab*,
217 F.3d 1365 (Fed. Cir. 2000) ........................................................47

*In re Leithem*,
661 F.3d 1316 (Fed. Cir. 2011) ........................................................45

*In re NuVasive, Inc.*,
841 F.3d 966 (Fed. Cir. 2016) ........................................................45

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ....................46, 48

*Pers. Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ....................45

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................31

*Polaris Industries, Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ....................47

*Power Integrations, Inc. v. Lee*,
797 F.3d 1318 (Fed. Cir. 2015) ....................26, 44

*U.S. Shoe Corp. v. United States*,
296 F.3d 1378 (Fed. Cir. 2002) ....................26

*United States v. Arthrex, Inc.*,
141 S. Ct. 1970 (2021)....................3, 21, 49

*VirnetX Inc. v. Cisco Sys., Inc.*,
957 F.3d 1383 (Fed. Cir. 2020) ....................3

*VirnetX Inc. v. Cisco Sys., Inc.*,
958 F.3d 1333 (Fed. Cir. 2020) ....................3, 33, 42

*VirnetX Inc. v. Cisco Sys., Inc.*,
No. 19-1671, 2020 WL 2511116 (Fed. Cir. Jan. 24, 2020)....................3

*VirnetX Inc. v. The Mangrove Partners Master Fund, Ltd.*,
778 F. App'x 897 (Fed. Cir. 2019) ....................*passim*

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ....................*passim*

**Statutes**

5 U.S.C. § 3345 ....................22

5 U.S.C. §§ 3345(a) ....................49

5 U.S.C. §3348(a)-(b) ....................49

5 U.S.C. § 3348(d)(1) .......... 50

28 U.S.C. § 1295(a)(4)(A) .......... 3

35 U.S.C. § 141(b) .......... 3

**Administrative Decision**

*Mangrove Partners Master Fund, Ltd. v. VirnetX Inc.*,
IPR2015-01046, Paper 112 (P.T.A.B. July 14, 2020) .......... 29, 32

## STATEMENT OF RELATED CASES

This is an appeal from an *inter partes* reexamination proceeding before the Patent Trial and Appeal Board ("the Board") following a remand from this Court. In the proceeding below, the Board issued a decision finding claims 1-9 and 13-18 of U.S. Patent No. 6,502,135 ("the '135 patent") unpatentable. On appeal, this Court vacated the Board's decision and remanded for further proceedings under its decision in *Arthrex*. *See VirnetX Inc. v. Cisco Sys., Inc.*, No. 19-1671, 2020 WL 2511116 (Fed. Cir. Jan. 24, 2020) (O'Malley, J., joined by Moore and Chen, JJ.). The Court then denied rehearing, 958 F.3d 1333 (Fed. Cir. 2020), and rehearing en banc, 957 F.3d 1383 (Fed. Cir. 2020) (per curiam).

The Supreme Court granted certiorari, vacated this Court's judgment, and remanded for further consideration in light of its own decision in *Arthrex*. *See Iancu v. Luoma*, 141 S. Ct. 2845 (2021). On remand, this Court vacated its January 24, 2020 order, *see VirnetX Inc. v. Cisco Sys., Inc.*, No. 19-1671, Docket No. 57, at 2 (Fed. Cir. Aug. 17, 2021) (per curiam), and remanded the appeal to allow VirnetX "the opportunity to request Director rehearing of the final written decision," *id.*, Docket No. 63, at 2 (Fed. Cir. Oct. 5, 2021) (per curiam). VirnetX filed its request for Director rehearing on November 4, 2021. On January 10, 2022, Andrew Hirshfeld, Commissioner for Patents and the Official Performing the Functions and Duties of the Director, denied VirnetX's request.

There are several other (prior or pending) appeals involving the patent at issue (the ’135 patent). In No. 17-1368, the Court considered an appeal from the Board’s decision in an *inter partes* review proceeding that found several claims of the ’135 patent (and those of a related patent) to be invalid over the same Kiuchi reference that is at issue in this appeal. This Court held that the Board erred in mapping the claim term “client computer” in the ’135 patent to Kiuchi’s client-side proxy without considering VirnetX’s proposed construction of “client computer.” *VirnetX Inc. v. The Mangrove Partners Master Fund, Ltd.*, 778 F. App’x 897, 908-09 (Fed. Cir. 2019) (Moore, J., joined by Prost, C.J., and Reyna, J.). The Court also held that the Board improperly refused to give effect to VirnetX’s prosecution disclaimer when construing the term “virtual private network” in the ’135 patent. *Id.* at 910. The Court vacated the Board’s unpatentability findings and remanded to the Board with instruction “to assess Kiuchi’s disclosure in light of the proper construction.” *Id.*

On remand, the Board agreed with VirnetX’s proposed construction of “client computer,” and accepted that, under this Court’s ruling in *Mangrove*, the term “virtual private network” must be interpreted to exclude non-direct communications. The Board, however, nevertheless found the claims at issue to be unpatentable. VirnetX’s appeal from that decision is pending before this Court as No. 20-2271.

The ’135 patent was also at issue in an *inter partes* reexamination proceeding No. 95/001,682, initiated by Apple. In that proceeding, the Board found claims 15

and 16 of the '135 patent patentable but claims 10-14, 17, and 18 unpatentable. VirnetX appealed that decision to this Court, and that appeal is currently pending as No. 22-1523.

This Court also considered (or is considering) several appeals from district court proceedings that involved the '135 patent (and related patents). The first appeal (No. 13-1489) was from a judgment by the United States District Court for the Eastern District of Texas in an infringement proceeding initiated by VirnetX in 2010. After a jury trial, the district court entered a judgment upholding the asserted claims against an invalidity challenge, but finding that Appellee Cisco Systems, Inc. ("Cisco") did not infringe the asserted patents. The jury found, however, that Cisco's co-defendant—Apple Inc. ("Apple")—infringed the patents-in-suit, and awarded damages. *VirnetX Inc. v. Apple Inc.*, 925 F. Supp. 2d 816 (E.D. Tex. 2013). This Court affirmed-in-part, reversed-in-part, vacated-in-part, and remanded for further proceedings. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014) (Prost, C.J., joined by Chen, J.).

On remand, after another jury trial, the district court entered a judgment again finding infringement by Apple (Cisco was no longer a party) and awarding damages. In a subsequent appeal (No. 18-1197), this Court affirmed that judgment under Federal Circuit Rule 36. *VirnetX Inc. v. Cisco Sys., Inc.*, 748 F. App'x 332 (Fed. Cir. 2019) (per curiam) (Prost, C.J., Moore and Reyna, JJ.). The Supreme Court

denied a petition for a writ of certiorari. *Apple Inc. v. VirnetX Inc.*, 140 S. Ct. 1122 (2020).

This Court also considered an appeal from another infringement proceeding VirnetX initiated against Apple in the United States District Court for the Eastern District of Texas in 2012, asserting the ’135 patent (and three other patents). In that proceeding, the district court granted VirnetX a summary judgment on invalidity, finding that Apple was precluded from raising its invalidity challenges because of prior litigation. After a jury trial, the district court entered a judgment for VirnetX finding infringement by Apple and awarding damages. *VirnetX Inc. v. Apple Inc.*, No. 12-cv-00855, 2018 WL 10048706 (E.D. Tex. Aug. 30, 2018). On appeal (in No. 19-1050), this Court upheld the district court’s ruling that Apple was precluded from making its invalidity challenges and upheld the finding of infringement as to the ’135 patent (and one related patent). The Court, however, reversed the judgment of infringement as to the other two patents at issue, and therefore vacated the damages award and remanded. *VirnetX Inc. v. Apple Inc.*, 792 F. App’x 796 (Fed. Cir. 2019) (Taranto, J., joined by Mayer and Lourie, JJ.).

On remand, the district court held a new trial on damages. The jury awarded VirnetX over $502 million in damages for Apple’s infringement of the ’135 patent (and a related patent), and the district court entered a final judgment. Apple’s appeal from that judgment is currently pending before this Court as No. 21-1672.

## INTRODUCTION

In a prior appeal involving an *inter partes* review of VirnetX's '135 patent, the Board found the challenged claims unpatentable over the asserted Kiuchi reference. This Court held that the Board had "erred" by "declin[ing] to construe 'client computer'" and "latching onto ... out-of-context language" to map the claimed "client computer" to Kiuchi's "client-side proxy." *VirnetX Inc. v. The Mangrove Partners Master Fund, Ltd.*, 778 F. App'x 897, 908-09 (Fed. Cir. 2019). The Court also rejected the Board's construction of the term "virtual private network" ("VPN"), finding that VirnetX's "prosecution disclaimer" required the term to be construed to require direct communication between the client and target computers. *Id.* at 910.

In the decision below, addressing an *inter partes* reexamination of the same claims of the '135 patent based on the same Kiuchi reference, the Board—lacking the benefit of this Court's guidance in *Mangrove*—repeated the exact same errors and then refused to correct them. The Board again refused to consider VirnetX's proposed construction of the term "client computer." Instead, the Board equated that term with Kiuchi's client-side proxy—a finding at odds not only with this Court's observations in *Mangrove*, but also the Board's own decision on remand in *Mangrove*. And it directly conflicts with this Court's finding, in another appeal involving the '135 patent, that the "client computer" in Kiuchi is "distinguishable

from the client-side proxy." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1324 (Fed. Cir. 2014).

The Board also asserted that the '135 patent "does not recite a 'directly communicating'" limitation—a finding flatly contrary to this Court's claim construction in *Mangrove*. The Board then opined that Kiuchi discloses that limitation regardless because "the client-side proxy and the server-side proxy" communicate directly. That finding similarly cannot be reconciled with this Court's instruction that VirnetX's disclaimer "requires direct communication between *the client and target computers*," *Mangrove*, 778 F. App'x and 910 (emphasis added)—*not* between Kiuchi's separate proxy components.

The Board also rejected a partially overlapping set of claims based on Kiuchi in combination with another reference, Solana. These rejections suffer from the same problems as those based on Kiuchi alone, since the Board relied on the same disclosures of Kiuchi to address the claimed client and target computers. These Kiuchi-Solana rejections, moreover, have additional defects: The Board neglected to consider all of VirnetX's arguments, failed to explain adequately the rejections, and improperly reformulated the rejections.

This Court should vacate the Board's erroneous decision.

## JURISDICTION

The Board issued its final decision in the *inter partes* reexamination below on February 6, 2018, Appx1-31, and denied rehearing on January 18, 2019, Appx32-38. VirnetX timely appealed to this Court on March 18, 2019. Appx2361-2364. On January 24, 2020, this Court vacated the Board's decision and remanded for further proceedings under *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019). *See VirnetX Inc. v. Cisco Sys., Inc.*, No. 19-1671, 2020 WL 2511116 (Fed. Cir. Jan. 24, 2020). The Court then denied rehearing, 958 F.3d 1333 (Fed. Cir. 2020), and rehearing en banc, 957 F.3d 1383 (Fed. Cir. 2020) (per curiam). The Supreme Court then granted certiorari, vacated this Court's judgment, and remanded for further consideration in light of its own decision in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021). *See Iancu v. Luoma*, 141 S. Ct. 2845 (2021).

On remand, this Court vacated its prior remand order, remanded the appeal so VirnetX could "request Director rehearing of the final written decision," and otherwise retained jurisdiction. *See* Docket No. 57, at 2; Docket No. 63, at 2. On January 10, 2022, Andrew Hirshfeld, Commissioner for Patents and the Official Performing the Functions and Duties of the Director, denied VirnetX's request. Appx39-42. On March 8, 2022, VirnetX filed an amended notice of appeal. Appx7432-7436. This Court has jurisdiction under 35 U.S.C. § 141(b) and 28 U.S.C. § 1295(a)(4)(A).

## ISSUES PRESENTED

1. Whether the Board's unpatentability findings must be reversed or vacated because:

   a. the Board failed to construe the disputed term "client computer," and incorrectly equated it with Kiuchi's client-side proxy; and

   b. the Board incorrectly concluded that Kiuchi's server-side proxy is the "target computer";

   c. the Board incorrectly held that communication between Kiuchi's client-side and server-side proxies discloses the claimed direct communication between "client computer" and "target computer."

2. Whether the Board's unpatentability findings based on a combination of Kiuchi and Solana must be vacated on additional procedural grounds.

3. Whether the denial of VirnetX's request for Director rehearing under *Arthrex* violated the Appointments Clause and the Federal Vacancies Reform Act of 1998.

## STATEMENT OF THE CASE

### I. THE TECHNOLOGY AT ISSUE.

The invention at issue relates to secure Internet communications. Communications are sent using an Internet Protocol (IP) address, a four-segment string of binary numbers (often represented in decimal form, e.g., "19.28.37.456"). Appx104 (37:22-29). When one device sends data to another over the Internet, the

data is broken up into "packets." The packets are labeled with the IP addresses associated with the sending and destination computers. The packets travel across the Internet using a series of specialized devices called "routers," which direct traffic over the networks comprising the Internet. Appx51 (Fig. 1). Each router checks the packet's destination IP address against internal tables, and passes the packet to the next router. Packets traverse the Internet's hierarchy of networks and routers until they are ultimately delivered to the destination computer.

Internet communications are ordinarily nonsecure. Packets can be intercepted during routing by hackers, who can then read the data within. Appx104 (37:40-49). The meteoric upswing in Internet use in the late 1990s generated demand for easy and secure network communications. Appx86 (1:10-13, 1:16-18).

Before VirnetX's inventions, reliable secure communications were primarily achieved through encrypted Virtual Private Networks ("VPNs"). Appx5994-5995. VPNs, however, were cumbersome to use. VPN users had to be trained to set up encryption keys used to scramble and unscramble the data, and the sender and the receiver had to configure multiple parameters for the VPN link. VPN remote access was "a nightmare for [IP] support desks." Appx5994. The complexity of VPNs presented an unintended security risk from incorrect use. Appx5994-5995.

The '135 patent provided an innovative alternative that generated VPNs automatically. The inventors looked to the domain name system, which translates

user-friendly "domain names," such as "yahoo.com," into IP addresses that routers can use to direct data to a device, such as "98.137.11.163." For example, when a user types a domain name into a web browser, the user's device sends a request to a Domain Name Server ("DNS"). The DNS responds with the IP address corresponding to that domain name, which allows the user's device to connect with the target computer. Appx104 (37:22-29). VirnetX's inventions allow users to employ familiar techniques—typing a domain name into the browser—whereupon the system seamlessly establishes a secure VPN between two devices. These inventions provided an easy method of ensuring data security, particularly for business travelers or between private networks. *See, e.g.*, Appx86 (2:62-64); Appx88 (6:1-3).

## II. THE '135 PATENT.

The '135 patent relates to a system and method in which a DNS proxy automatically and transparently creates a VPN in response to a DNS lookup. *See Cisco*, 767 F.3d at 1315; Appx104-105 (37:17-39:1); Appx79-80 (Figs. 26-27).




FIG. 26




FIG. 27

As shown in Figures 26 and 27, browser (2605) within user computer (2601) generates a DNS request for an IP address corresponding to a domain name of a target computer, such as secure target site 2604 and/or unsecure target site 2611. Appx104-105 (38:23-39:6). Instead of a conventional DNS server (2609) receiving the request, DNS proxy (2610) intercepts the request and determines whether it is for a secure website. Appx104-105 (38:23-25, 39:2-3). According to a preferred embodiment, the determination is made by checking the domain name against domain name tables. Appx104 (38:23-30).

If the domain name is listed therein, DNS proxy (2610) determines that the user computer is requesting access to a secure site, and may determine whether the

user and/or computer 2601 is authorized to access the secure web site. Appx104-105 (38:23-30, 39:7-20). If so, DNS proxy (2610) automatically initiates a VPN between browser (2605) and secure target site (2604). Appx104 (38:25-33).

If the domain name is *not* listed in the domain name table, DNS proxy (2610) determines that the request is *not* seeking access to a secure site and forwards the request to conventional DNS (2609) without initiating a VPN. Appx104-105 (38:43-47, 39:3-6). This contrasts with a situation where, for example, an unauthorized user has requested lookup of a secure site, which would instead cause the DNS proxy to return a "host unknown" error to the user. Appx104 (38:47-50).

One embodiment for encrypting VPNs is the Tunneled Agile Routing Protocol ("TARP"). A client directly addresses a target using the IP address of the target. Appx89 (7:40-8:36). To avoid detection during routing, however, this target IP address "is concealed behind an outer layer of encryption generated using a link key." Appx89 (7:59-60). TARP routers sit between the client and target and "can use [a] link key to reveal the true destination of a TARP packet." Appx89 (7:40-8:1). Based on a "time to live counter" designed to "help foil traffic analysis," a TARP router "determine[s] … whether it should forward the TARP packet [] to another TARP router [] or to the destination TARP terminal." Appx89 (8:16-36).

During prosecution, VirnetX disclaimed any VPN that does not require direct communication. As this Court previously observed, VirnetX distinguished "a

system in which a client computer communicates with an intermediate server via a singular, point-to-point connection," whereby "[t]hat intermediate server then relays the data to a target computer on the same private network on which the server resides." *Mangrove*, 778 F. App'x at 910. VirnetX explained that, because in such a system "the computers 'do not communicate directly with each other' and '[t]he client cannot open a connection with the target itself,' the computers are not on the same VPN." *Id.* (citation omitted). This disclaimer, the Court concluded, "clearly and unmistakably states that a 'VPN between the client computer and the target computer' requires direct communication between the client and target computers." *Id.*

Claim 1 of the '135 patent is representative, and recites:

> A method of transparently creating a virtual private network (VPN) between a client computer and a target computer, comprising the steps of:
>
> > (1) generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer;
> >
> > (2) determining whether the DNS request transmitted in step (1) is requesting access to a secure web site; and
> >
> > (3) in response to determining that the DNS request in step (2) is requesting access to a secure target web site, automatically initiating the VPN between the client computer and the target computer.

Appx109 (47:20-32).

## III. THE ASSERTED REFERENCES.

### A. The Kiuchi Reference

The primary asserted reference is a 1996 publication by Takahiro Kiuchi and Shigekoto Kaihara, *C-HTTP—The Development of a Secure, Closed HTTP-Based Network on the Internet*, Proceedings of the Symposium on Network and Distributed System Security, IEEE 64-75 (1996) ( "Kiuchi"). *See* Appx4386-4398. Kiuchi describes a system, "closed HTTP" ("C-HTTP"), that allows a "user agent" to securely access resources on an "origin server" in a "closed" network, such as a network connecting hospitals. Appx4387. In Kiuchi, the user agent and origin server do not communicate directly, but instead communicate with proxies that sit between the user agent and origin server, which in turn "communicate with each other using a secure, encrypted protocol" called C-HTTP. *Id.*

Kiuchi's proxy-based system involves five different entities. A user agent requests information, such as patient data, residing in an "origin server." Appx4387-4390. A "client-side proxy" sits between the user agent and the Internet, while a "server-side proxy" sits between the Internet and the origin server. Appx4387. Finally, a "C-HTTP name server" facilitates exchange of necessary encryption keys between the client-side and server-side proxy. Appx4387-4388; Appx6010 (¶ 22); Appx6105 (¶ 18).

Communications in Kiuchi involves multiple separate connections, using two different protocols. The user agent and client-side proxy communicate with each other using the conventional "HTTP/1.0" protocol, as do the server-side proxy and the origin server. Appx4387. The client-side proxy and server-side proxy "communicate with each other using a secure, encrypted protocol" called "C-HTTP." Appx4387 (abstract) (italics omitted). The client-side and server-side proxies communicate with the "C-HTTP name server" in C-HTTP protocol as well. Appx4391. Kiuchi makes clear that secure "C-HTTP-based communications is performed *only* between two types of C-HTTP proxies and between a C-HTTP proxy and C-HTTP name server"—not between the user agent and the origin server. Appx4391 (emphasis added). The proxies "*do not* communicate directly" with the user agent or origin server using C-HTTP. Appx4391 (emphasis added); *see also* Appx4390-4391; Appx6010-6011 (¶ 23).

Communications in Kiuchi involve nine steps. *See* Appx4388-4391. Step (1) is "[c]onnection of a client to a client-side proxy." Appx4388. A user requests a resource using a URL. The user agent sends the request to the client-side proxy, including the URL and a host name (and a connection ID if a C-HTTP session has already been established). Appx4388; Appx6105 (¶ 18); *see also* Appx6010 (¶ 23).

In step (2), the "client-side proxy asks the C-HTTP name server whether it can communicate with the host specified in a given URL." Appx4388; *see also*

Appx6010 (¶ 23); Appx6105-6106 (¶ 20). The C-HTTP name server determines whether the server-side proxy associated with the origin server is registered in the closed network and permitted to accept the connection from the client-side proxy; if so, the C-HTTP name server returns the server-side proxy's IP address (not that of the origin server). Appx6010 (¶ 23). If the connection is not permitted, the C-HTTP name server "sends a status code which indicates an error," causing the client-side proxy to "perform[] DNS lookup, behaving like an ordinary HTTP/1.0 proxy." Appx4388.

In step (3), the "client-side proxy sends a request for connection to the server-side proxy," which is encrypted. Appx4388; *see also* Appx6010 (¶ 23). Then in step (4), "[w]hen a server-side proxy accepts a request for connection from a client-side proxy, it asks the C-HTTP name server whether the client-side proxy is an appropriate member of the closed network." Appx4388-4389; *see also* Appx6010 (¶ 23). If so, the name server returns the client-side proxy's IP address. Appx4389; Appx6010 (¶ 23).

In step (5), the server-side proxy then generates a connection ID and sends it with other information to the client-side proxy. Appx4389; Appx6010 (¶ 23). "When the client-side proxy accepts and checks [the information from the server-side proxy], the connection is established." Appx4389.

In step (6), the "client-side proxy forwards HTTP/1.0 requests from the user agent in encrypted form using C-HTTP format" to the server-side proxy, since the C-HTTP name server previously provided the IP address of the server-side proxy for purposes of communication. Appx4389.

In step (7), "[u]sing HTTP/1.0, [the] server-side proxy communicates with [the] origin server inside the firewall" by forwarding requests to the origin server. Appx4389. But "[f]rom the view of the user agent or client-side proxy, all resources appear to be located in [the] server-side proxy" (since only its address is provided by the C-HTTP name server). Appx4389.

In step (8), the origin server sends an HTTP/1.0 response, which the server-side proxy then encrypts in C-HTTP format and forwards to the client-side proxy. "Then, in the client-side proxy, the C-HTTP response is decrypted and the HTTP/1.0 response extracted" and sent to the client. Appx4389; *see also* Appx6010-6011 (¶ 23). Figure b shows an HTML document from the origin server "rewritten and forwarded" by the client-side proxy to the user agent. Appx4389.

In step (9), "[a] client-side proxy can send a request for closing the connection." Appx4390. This nine-step process is repeated for each request made by the user agent. *Id.*

The chart below from a Kiuchi presentation shows the separate requests and responses (between user-agent and client-side proxy; between the proxies and the

name server; between the server-side proxy and the origin server) involved in the Kiuchi system:

## C-HTTP-based communication (1)

## Overview

**NS: C-HTTP name server, CP: Client-side proxy,
SP: Server-side proxy, OS: Origin server, UA: User agent**

| | Type | From | To | Explanation |
|---|---|---|---|---|
| 1. | HTTP request | UA | CP | Resource in the closed network requested |
| 2. | C-HTTP name request | CP | NS | Request for SP information |
| 3. | C-HTTP nam response | NS | CP | SP information returned if available |
| 4. | C-HTTP request | CP | SP | Request for connection |
| 5. | C-HTTP name request | SP | NS | Request for CP information |
| 6. | C-HTTP nam response | NS | SP | CP information |
| 7. | C-HTTP response | SP | CP | Connection acknowledged |
| 8. | C-HTTP request | CP | SP | Object requested |
| 9. | HTTP request | SP | OS | Object requested |
| 10. | HTTP response | OS | SP | Object sent |
| 11. | C-HTTP response | SP | CP | Object sent |
| 12. | HTTP response | CP | UA | Object sent |
| | | | | |
| | | | | |
| 19. | HTTP request | UA | CP | Object requested |
| 20. | C-HTTP request | CP | SP | Object requested |
| 21. | HTTP request | SP | OS | Object requested |
| 22. | HTTP response | OS | SP | Object sent |
| 23. | C-HTTP response | SP | CP | Object sent |
| 24. | HTTP response | CP | UA | Object sent |
| | | | | |
| 31. | HTTP request | UA | CP | Object not in closed network requested |
| 32. | C-HTTP request | CP | SP | Request for disconnection |
| 33. | C-HTTP response | SP | CP | Disconnection acknowledged |
| 34. | HTTP request | CP | OS | Ordinary HTTP/1.0 request |

Appx5621-5622; *see also* Appx5616.

Kiuchi explained that its "proxy-proxy" design is "fundamentally different" from protocols that seek to "assure 'end-to-end' security" for direct communication between a user agent and origin server, Appx4390-4391, and has resulting benefits. First, because encrypted communications only occur between proxies, "HTTP/1.0 compatible servers and clients can be used as they are," without modification to support security. Appx4391. Second, the multiplicity of connections in the proxy-proxy approach makes eavesdropping difficult. An outsider would have to (a) "find the IP address and port number of a server-side proxy"; (b) "get the public key of the server-side proxy in order to send a valid C-HTTP request for C-HTTP connection"; (c) "make a TCP connection to a target server-side proxy using a certain client-side proxy's IP address"; and (d) obtain the private key and C-HTTP hostname of the client-side proxy to prove its legitimacy to the server-side proxy. Appx4391.

**B. The Solana Reference**

The other asserted reference is a 1997 publication by Eduardo Solana and Jurgen Harms, *Flexible Internet Secure Transactions Based on Collaborative Domains*, Security Protocols Workshop (1997) ("Solana"). Solana is an article directed to a cryptographic scheme that published during "[t]he emergence of cryptosystems based on public key technology," a technology that "remov[ed] the need of a mutual agreement on [an] encryption key." Appx4423. Solana recognized

that "the certificate structures that bind a user to his public key are difficult to deploy especially in inter-domain environments," and thus "propose[d] a novel approach for simplifying key manageability relying on the notion of security domains." Appx4423. Solana thus describes a unique arrangement of components for managing encryption keys intended to achieve that objective. Appx6028-6030 (¶¶ 81-85).

## IV. PROCEDURAL BACKGROUND.

### A. The *Inter Partes* Reexamination Proceedings Below

On July 8, 2011, Cisco requested *inter partes* reexamination of claims 1-18 of the '135 patent. *See* Appx3. The Examiner rejected claims 1-9 and 13-18 over several asserted references, including Kiuchi. Appx5. VirnetX appealed those rejections to the Board. Appx3. On appeal, the Board affirmed the rejections of claims 1-9, 13-14, and 17-18 on the basis of Kiuchi, alone or together with additional references. Appx29. Specifically, the Board found that claims 1-4, 7, 13-14, and 17 were anticipated by Kiuchi, and claims 1-9 and 18 were rendered obvious by Kiuchi combined with other references. Appx29.[1]

Among the claims terms at issue in the proceeding before the Board were "client computer" and "virtual private network (VPN)." *See* Appx16-17; Appx18-

[1] The Board also upheld the rejections of claims 13-17 on the basis of other references. Appx29.

19. VirnetX proposed a construction for each of these terms and argued that Kiuchi does not disclose either limitation, properly construed. Appx2095-2101; Appx2277-2280.

For "client computer," VirnetX argued that the term should be defined to mean "a 'user's computer.'" Appx16 (quoting Appx2096); *see also* Appx2277. VirnetX then explained that Kiuchi does not disclose a "user's computer" and that the Examiner erred in relying on Kiuchi's client-side proxy for the disclosure of the claimed "client computer" because the client-side proxy has no end-user. Appx16; Appx2097-2098; Appx2278-2279. And VirnetX argued that only Kiuchi's origin server could serve as the claimed "target computer," because (among other things) the only secure target websites accessed in Kiuchi reside on the origin server. Appx2098-2105.

For "VPN," VirnetX argued that this term must be construed to encompass only "interconnected computers that can directly communicate with one another." Appx2099. During the prosecution of the '135 patent VirnetX "unambiguously disclaimed VPNs that do not involve direct communication." Appx2099-2101; *see also* Appx2279; Appx19. As VirnetX noted, in a prior district court proceeding, "Cisco itself previously acknowledged that the prosecution history demonstrates that there is a 'clear mandate to the Patent Office that computers in a "virtual private network" communicate directly with each other, and that absent direct

communication between the computers, there is no virtual private network.'" Appx2279 (citations omitted).

VirnetX also responded to Cisco's argument (eventually adopted by the Board) that "'[e]ven if 'direct communication' were required, *Kiuchi's* client-side and server-side proxies *do* communicate directly." Appx2279 (quoting Appx2219) (internal quotation marks omitted). As VirnetX explained, "this argument ignores the fact that the C-HTTP client-side and server-side proxies do not disclose the claimed client computer and target computer, respectively, and moreover these C-HTTP proxies preclude the user agent and origin server (the true client and target) from directly communicating with one another as in a network." Appx2279-2280 (citations omitted).

### B. The Board's Decision

The Board rejected VirnetX's arguments. With respect to "client computer," the Board refused to construe the term. Instead, the Board asserted that, "[e]ven assuming that claim 1 recites a 'user's computer' (instead of a 'client computer,' which claim 1 actually recites) that generates a Domain Name Service (DNS) request … [VirnetX] does not demonstrate persuasively that the hypothetical 'user's computer' (renamed from 'client computer') differs from the client-side proxy of Kiuchi." Appx16. The Board acknowledged VirnetX's argument that "the client-side proxy of Kiuchi differs from the claimed 'client computer,'" and that "Kiuchi

discloses a 'user agent' that corresponds to the claimed 'client computer' such that Kiuchi's client-side proxy cannot *also* correspond to the claimed 'client computer.'" Appx16-17 (emphasis in original). The Board opined, however, that it "need not consider whether or not Kiuchi's 'user agent' … discloses the claimed 'client computer'" because "Kiuchi's client-side proxy (equated to the claimed 'client computer' by the Examiner) … performs th[e] recited function" of "generat[ing] a Domain Name Service (DNS) request." Appx17.

The Board likewise rejected VirnetX's argument that "Kiuchi discloses 'separate references to the "client" and "client-side proxy" … [and] demonstrates that the client-side proxy is not the client itself' such that '*Kiuchi* … distinguishes between a "client," where an end-user sits, and a "client-side proxy," which has no end user.'" Appx17 (quoting Appx2097-2098) (alterations in original). The Board asserted that "Claim 1 does not … recite that the client computer must have an 'end-user' or that the client computer must be 'where an end-user sits.'" Appx17. Further, the Board agreed with the Examiner and Cisco that Kiuchi's server-side proxy, not the origin server, was the "target computer," even though no "secure target website" resides on the server-side proxy. Appx.18-21.

The Board also rejected VirnetX's argument that the claimed VPN should be limited to computers that directly communicate with each other. The Board first asserted—without even acknowledging VirnetX's disclaimer argument—that

"[c]laim 1 does not recite a 'directly communicating'" limitation. Appx19. The Board then stated that "[e]ven assuming that claim 1 recites this hypothetical limitation," it is met because "the client-side proxy and the server-side proxy (equated by the Examiner to the client and target computers, respectively)" communicate directly. Appx19.

The Board also rejected claims 1-9 and 18 as obvious based on the combination of Kiuchi and Solana. Appx29.[2] In adopting this rejection, the Board deviated from the theory of unpatentability advanced by the Examiner. In particular, the Examiner relied on Solana for purportedly teaching "generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer," as claimed. Appx2043; Appx4978-4980; Appx4995-4997. Apparently as a result of problems with Solana identified by VirnetX, Appx2133-2135, however, the Board took a different tack in the final written decision and explained that "Patent Owner argues that Solana fails to disclose generating a DNS request … but does not persuasively argue that Kiuchi also fails to disclose this feature." Appx28. The Board never

[2] The Board also relied on additional references, not relevant to this appeal, to reject some of these claims. Appx29. Moreover, the Board also rejected claims 13-17 based on Solana alone or together with other references. Given that none of those claims are asserted in co-pending district court litigation, in the interest of judicial efficiency VirnetX does not challenge the Board's determination regarding claims 13-17 in this appeal.

explained in its decision how or why Kiuchi would be combined with Solana in the manner it suggested.

The Board upheld the Examiner's anticipation and obviousness rejections based on Kiuchi. *See* Appx27-29. The Board then denied rehearing. *See* Appx38. VirnetX timely appealed the Board's decisions to this Court on March 18, 2019. Appx2361-2364.[3]

### C. This Court's Remand Under *Arthrex* and Proceedings on Remand

On November 7, 2019, prior to filing its opening brief, VirnetX sought vacatur and remand under this Court's decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019). *See* Docket No. 23. This Court granted that request on January 24, 2020. *See* Docket No. 45.[4] The PTO then sought certiorari. On October 5, 2021, following the Supreme Court's decision in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021), this Court ordered a limited remand to the Board

---

[3] Prior to filing its appeal, on February 5, 2019, VirnetX requested that the Board re-designate its decision denying rehearing as a new decision, because it contained an entirely new analysis of secondary considerations of non-obviousness. The Board dismissed that request on April 2, 2019, on the grounds that VirnetX's appeal (filed two weeks earlier) divested the Board of jurisdiction. *See* Appx7413-7414.

[4] Previously, on August 23, 2019, VirnetX filed a motion to remand this appeal for reconsideration in light of this Court's intervening claim construction rulings in *Mangrove*. *See* Docket No. 19. On October 1, 2019, the motions judge declined to remand the appeal at that time, "deem[ing] it the better course for the parties to address the issue in their merits briefs." Docket No. 22.

authorizing VirnetX to file a request seeking Director rehearing of the Board's earlier decision. *See* Docket No. 63.

VirnetX timely filed a request for Director rehearing on November 4, 2021. In its request, VirnetX argued that the Board's decision is contrary both to this Court's decision in *Mangrove* and to the Board's own final decision issued on remand from this Court in the *Mangrove* proceedings. *See* Appx7418-7428. VirnetX also urged the PTO to await the appointment and confirmation of a permanent Director before deciding VirnetX's request, in order to comply with the Appointments Clause, the Supreme Court's *Arthrex* decision, and the Federal Vacancies Reform Act, 5 U.S.C. § 3345, *et seq*. *See* Appx7426-7428.

On January 10, 2022, Andrew Hirshfeld, Commissioner for Patents and the Official Performing the Functions and Duties of the Director, denied VirnetX's rehearing request. Appx39-42. The order provided no reasons for the denial.

## SUMMARY OF ARGUMENT

**1.** The Board committed the same errors in the decision below that led this Court to overturn the Board in *VirnetX Inc. v. The Mangrove Partners Master Fund, Ltd.*, 778 F. App'x 897 (Fed. Cir. 2019). In that case—which addressed *the same* key terms of *the same* patent over *the same* primary reference—this Court held that the Board erred in mapping the claim term "client computer" in the '135 patent to Kiuchi's client-side proxy without considering VirnetX's proposed construction of

"client computer." The Court also held that the Board had improperly refused to apply VirnetX's unambiguous prosecution-history disclaimer of any claimed "virtual private network" ("VPN") that did not require direct communication between the client and target computers.

The Board repeated those mistakes here. The Board refused to consider VirnetX's proposed construction of the term "client computer." Instead, the Board equated that term with Kiuchi's client-side proxy because it purportedly performed the same function as that performed by the client computer of generating a DNS request. Appx17. The Board's finding is irreconcilable not only with the proper claim construction of "client computer," but with Kiuchi's disclosure and with the Board's own decision on remand in *Mangrove*. This finding is also in direct conflict with this Court's own observation, in another appeal involving the '135 patent, that the "client computer" in Kiuchi is "distinguishable from the client-side proxy," *Cisco*, 767 F.3d at 1324—which the Board disregarded under the mistaken impression that it involved "a different patent with a different mapping of Kiuchi." Appx18. The only viable construction of "client computer" is user computer, and only Kiuchi's "user agent" corresponds to the claimed "client computer." Regardless, at a minimum the Board could not reject VirnetX's position without resolving the claim construction dispute.

The Board also did not meaningfully address VirnetX's arguments that the "target computer" in Kiuchi is the origin server, and its meager analysis falls short. Claim 1 recites a method whereby if it is determined that a DNS request is for "access to a secure *target* website," then a VPN is automatically initiated "between the client computer and the *target* computer." Appx109 (47:29-32) (emphasis added). The only "secure target websites" that are accessed in Kiuchi reside on the origin server, and thus the origin server in Kiuchi is necessarily the "target computer." The Board's conclusory determination that the server-side proxy is the target computer cannot stand.

The Board was similarly indifferent to this Court's construction of the term "VPN." The Board asserted that the '135 patent "does not recite a 'directly communicating'" limitation—an erroneous construction this Court corrected in *Mangrove*. The Board then opined that Kiuchi discloses that limitation regardless because "the client-side proxy and the server-side proxy" communicate directly. That finding cannot be reconciled with this Court's instruction that VirnetX's disclaimer "requires direct communication between *the client and target computers*," *Mangrove*, 778 F. App'x at 910 (emphasis added)—*not* between Kiuchi's separate proxy components.

**2.** The Board's rejections based on the combination of Kiuchi and Solana fare no better. Specifically, the Kiuchi-Solana rejections fall together with the

Kiuchi-alone rejections since the Board relied on Kiuchi, even in the context of the Kiuchi-Solana rejections, to address the claimed client and target computers. Moreover, the Board purported to modify Solana with completely different teachings of Kiuchi than those upon which Cisco and the Examiner relied. Vacatur is thus necessary since the Board materially changed the thrust of the rejection adopted by the Examiner, yet neglected to provide VirnetX with a fair opportunity to respond. Furthermore, the Board conducted no analysis (much less the thorough and searching analysis this Court's precedents require) of the motivation of an artisan of ordinary skill to combine the relevant teachings of Solana and Kiuchi in the manner it posited.

**3.** Finally, the Appointments Clause, the Supreme Court's *Arthrex* decision, and the Federal Vacancies Reform Act of 1998 barred Commissioner Hirshfeld from exercising the Director's exclusive authority to issue final decisions on rehearing. VirnetX acknowledges that this argument is foreclosed by this Court's recent decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, --- F.4th ----, 2022 WL 1696322 (Fed. Cir. May 27, 2022), but raises this argument here to preserve it for potential review by this Court en banc or the Supreme Court.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews the Board's legal conclusions de novo and its factual findings for substantial evidence. *EmeraChem Holdings, LLC v. Volkswagen Grp. of Am., Inc.*, 859 F.3d 1341, 1345 (Fed. Cir. 2017). Anticipation is a fact question reviewed for substantial evidence. *Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323 (Fed. Cir. 2015). Factual findings underlying obviousness are also reviewed for substantial evidence, while the ultimate question of obviousness is reviewed de novo. *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1298 (Fed. Cir. 2016). This Court reviews de novo questions of statutory or constitutional interpretation. *U.S. Shoe Corp. v. United States*, 296 F.3d 1378, 1381 (Fed. Cir. 2002).

## II. THE BOARD'S FINDING THAT KIUCHI ANTICIPATES THE '135 PATENT CONTRAVENES THIS COURT'S *MANGROVE* DECISION.

The Board's decision below defies this Court's authoritative instruction in *Mangrove*. In *Mangrove*, this Court considered *the same* claim construction arguments with respect to *the same* claim terms that are in issue here, and vacated the Board's invalidity findings with respect to claims of *the same* patent against *the same* reference. The Court held that the Board erred by failing to consider VirnetX's proposed construction of "client computer" (and by "rely[ing] exclusively on Kiuchi's client-side proxy for the claimed 'client'"), *Mangrove*, 778 F. App'x at 907-08, and by failing to recognize that "[t]he statements VirnetX made during

reexamination [of the ’135 patent] constitute disclaimer” that “clearly and unmistakably states that a ‘VPN between the client computer and the target computer’ requires direct communication between the client and target computer,” *id.* at 910.

*Mangrove* compels the same outcome here. The Board below similarly failed to consider VirnetX’s proposed construction of the term “client computer” (instead simply equating that term with Kiuchi’s client-side proxy, without properly considering whether it met VirnetX’s construction of the term), *see* Appx16-17, and refused to recognize VirnetX’s clear and unambiguous prosecution-history disclaimer when construing the term “VPN,” Appx19. Applying the same claim construction rejected in *Mangrove*, the Board invalidated the same claims of the same ’135 patent (or claims containing an identical limitation) as anticipated or rendered obvious by Kiuchi.

The Board’s decision below issued prior to this Court’s *Mangrove* opinion. But the Board refused to correct its errors when asked to do so in VirnetX’s request for Director review of the Board’s decision. This Court should do so now.

### A. The Board Erred in Refusing To Consider VirnetX’s Construction of “Client Computer,” and in Mapping the “Client Computer” onto Kiuchi’s Client-Side Proxy.

In *Mangrove*, as here, the Board “declined to construe ‘client computer,’” asserting instead that “Kiuchi’s client-side proxy is a client even under VirnetX’s

construction." 778 F. App'x at 908. This Court explained that the Board's failure to consider VirnetX's proposed construction of "client computer" on the grounds that Kiuchi's client-side proxy was the claimed "client computer" was error:

> To the extent the Board intended to rely exclusively on Kiuchi's client-side proxy for the claimed "client," we *agree with VirnetX that the Board erred in failing to resolve the claim construction dispute as to the meaning of "client."* VirnetX's proposed construction of a "client" was a "user's computer." In its patent owner response, it argued that "[t]here is no question that Kiuchi's client-side proxy is not a user's computer. Kiuchi does not disclose any user associated with the client-side proxy … . In Kiuchi, the user's computer is the user agent, not the client-side proxy."

*Id.* (citation omitted) (emphasis added).[5] For that reason, the Court held, "[i]t was improper" for the Board not to "analyz[e] the language of [VirnetX's] proposed construction, which the patent owner response makes clear does not cover the client-side proxy." *Id.*

Here, the Board went similarly astray. The Board asserted that, "[e]ven assuming that claim 1 recites a 'user's computer' (instead of a 'client computer,' which claim 1 actually recites) that generates a Domain Name Service (DNS) request … [VirnetX] does not demonstrate persuasively that the hypothetical 'user's

---

[5] The Court's discussion refers to "client" instead of "client computer" because the Court first analyzed the issue with respect to an analogous term "client" in a related patent. The Court adopted that reasoning with respect to the term "client computer" in the '135 patent. *Mangrove*, 778 F. App'x at 908-09.

computer' (renamed from 'client computer') differs from the client-side proxy of Kiuchi." Appx16; *see also* Appx17 ("we need not consider whether or not Kiuchi's 'user agent' … discloses the claimed 'client computer'" because "Kiuchi's client-side proxy (equated to the claimed 'client computer' by the Examiner) … performs th[e] recited function"). In doing so, the Board committed the same error that led this Court to overturn the Board in *Mangrove*. The Board "erred in failing to resolve the claim construction dispute as to the meaning of 'client.'" 778 F. App'x at 908. Just as in *Mangrove*, VirnetX's proposed construction made clear that it did "not cover the client-side proxy." *Id.* As the Court emphasized, "VirnetX's proposed construction is a user's computer, not any device that is associated with a user, however indirectly." *Id.*

Indeed, the Board reached a different conclusion in the *inter partes* review proceeding on remand in *Mangrove*. There, the Board agreed with VirnetX's construction of "'client computer' as 'user's computer,'" *Mangrove Partners Master Fund, Ltd. v. VirnetX Inc.*, IPR2015-01046, Paper 112 at 11 (P.T.A.B. July 14, 2020), and held that under such a construction Kiuchi's client-side proxy *cannot* map to the claimed "client computer," *id.* at 19-20. The Board's decision below is thus not only contrary to this Court's guidance, but is also plainly inconsistent with another Board decision considering precisely the same claim term and claim limitation. "Claim construction is ultimately a question of law," *Intel Corp. v.*

*Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021), and the Board cannot resolve the exact same question of law differently in different proceedings. This direct conflict between the Board's decision below and the Board's remand decision in *Mangrove* further illustrates the Board's error in applying the term "client computer" to Kiuchi.

The Board's reasons for evading resolving the claim construction dispute are fallacious. *First*, the Board reasoned that it is enough to find that Kiuchi's client-side proxy generates a DNS request. The Board declared that

> [w]e need not consider whether or not Kiuchi's "user agent" also discloses the claimed "client computer," as Patent Owner appears to contend, because Patent Owner does not demonstrate persuasively that Kiuchi's client-side proxy (equated to the claimed "client computer" by the Examiner) does not generate a Domain Name Service (DNS) request, as recited in claim 1. As noted above, Kiuchi discloses that the client-side proxy performs this recited function.

Appx17. But the claims are not satisfied by showing that any component of Kiuchi generates a DNS request. Claim 1 requires "generating *from the client computer* a Domain Name Service (DNS) request," Appx109 (47:23-26) (emphasis added), which is the same "client computer" for which a VPN is established with the target computer. So the Board had to construe "client computer" to determine whether it is limited to a user's computer.

*Second*, the Board never actually conducted claim construction by the

necessary process of interpreting the claims in light of the intrinsic evidence. *See, e.g.*, *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316-17 (Fed. Cir. 2005) (en banc). Instead the Board looked only to whether VirnetX's proposed construction of a user computer was expressly "recited" in the claims. The Board declared: "Claim 1 does not also *recite* that the client computer must have an 'end-user' or that the client computer must be 'where an end-user sits.' Indeed, claim 1 does not *recite* an 'end-user' at all. For at least this reason, we are not persuaded by Patent Owner's argument." Appx17 (emphasis added). But claim construction does not end with what is expressly recited in the claims or not.

Had the Board properly addressed the intrinsic evidence to construe the term "claim computer," it should have concluded that "client computer" means "user computer." The specification of the '135 patent supports this construction by explaining that the VPN is created between the user's computer 2601 and the target, Appx104 (38:30-33), which parallels the claim language that recites creating a VPN between a client computer and a target computer, Appx109 (claim 1). The '135 patent also explains that "[a] *user's computer* 2501 includes a *client* application." Appx104 (37:30-32) (emphasis added); *see also* Appx104 (38:15-16) ("A *user's computer* 2601 includes a conventional *client* (e.g., a web browser) … .") (emphasis added). Thus, the '135 patent equates the user's computer 2601 with the "client computer" in the claims. Similarly, in other embodiments, the '135 patent discloses

that a determination is made as to whether "*client* 3103 is a validly registered *user*," Appx108 (45:8-9), and "client computer 801" is depicted as a user's computer, for instance a laptop device, Appx59 (Fig. 8); Appx93 (16:16-17).

The '135 specification provides further guidance as to the "client computer" being a user's computer by explaining that its inventions allow for secure communications between a user's computer and a target computer. For instance, in the "Background of the Invention," the specification explains the importance of securing communications between an originating terminal 100 at which a user is located and a destination terminal 110 that hosts a web site. Appx86 (1:15-31). The "Summary of the Invention" likewise explains that an originating terminal in a TARP VPN embodiment is a notebook computer used by an executive and that a destination terminal is a server. Appx87-88 (4:59-5:12). The "Detailed Description of the Invention" also explains that a VPN is created between a user's computer at which a web browser is located and a secure target site. Appx104 (38:13-33.) And on remand from this Court in *Mangrove*, after detailed consideration of the specification, the Board in fact adopted VirnetX's construction because it "is consistent with the Specification's description that the VPN extends from a user's computer to a desired target site." *Mangrove Partners*, IPR2015-01046, Paper 112 at 11.

*Third*, as VirnetX pointed out, this Court had already held, in another decision

that predated the Board's decision below, that there was "evidence that the 'client' of Kiuchi is actually a web browser, a component that is distinguishable from the client-side proxy." Appx2098 (citing *Cisco*, 767 F.3d at 1324); *see also* Appx17. The Board dismissed this finding because it believed "the discussed proceeding involved a different patent with a different mapping of Kiuchi to its distinct claim limitations," Appx17-18, but that is simply incorrect. The *Cisco* case involved the very same '135 patent and the very same Kiuchi reference as here. *See, e.g.*, *Cisco*, 767 F.3d at 1324 (providing the preceding analysis of Kiuchi "[w]ith respect to the '135 … patent[]").

For all the foregoing reasons, this Court should vacate and remand the final written decision for the Board to construe the term "client computer"—taking into account the intrinsic evidence, its interpretation of the same term in the *Mangrove* IPR, and this Court's interpretation in *Cisco*—and apply that construction to Kiuchi.

### B. The Board Erred in Concluding that Kiuchi's Server-Side Proxy Is the Target Computer for Which a VPN Is Established.

Claim 1 requires creating a VPN "between a client computer and a *target* computer"; generating a DNS request for "an IP address corresponding to a domain name associated with the *target* computer," where the request "is requesting access to a secure website"; and if it is determined that the DNS request "is requesting access to a secure *target* website, automatically initiating the VPN between the client computer and the *target* computer." Appx109 (47:20-32) (emphasis added). The

Board never properly addressed VirnetX's arguments that the target computer in Kiuchi is the origin server, not the server-side proxy. Appx2098-2102; Appx6105-6106. VirnetX explained that "the client-side proxy receives a URL associated with the origin server from the client and subsequently asks the C-HTTP name server whether it can communicate with the origin server, not the server-side proxy." Appx2098, Appx2102; Appx6107. Because in Kiuchi, the domain name *requested* is that of a resource on the origin server, and thus there must be access to (and retrieval of the requested information from) the origin server, the website on the origin server is the "secure *target* website" for which "access is sought," and the origin server is therefore the "*target* computer" with which a connection is established. Appx2104-2105; Appx6107-6108; Appx5619 (examples of domain names); Appx5625; Appx5627-5628. This parallels the disclosures of the '135 patent, where proxies are merely "intermediate server[s] interposed between client and destination server[s]." Appx86 (1:51-55, 2:28-30).

The Board did not address these arguments in any meaningful way, and its scant analysis is lacking. The Board simply posited that "Kiuchi discloses a requested 'URL' that 'specifies' a 'host,' the 'host' being 'the requested server-side proxy [that] is registered in the ... network.'" Appx18 (citing Appx4838). VirnetX disputes that "host" in Kiuchi refers to the server-side proxy rather than the origin server, Appx2102-2103, but the dispute is ultimately immaterial. Kiuchi also

requires a "firewall gateway" to have a "hostname." Appx4388. So even if *arguendo* the request to the C-HTTP name server in Kiuchi specifies the server-side proxy, and the domain name is associated with the server-side proxy as well as the origin server, the server-side proxy has no "website" containing the desired resources. Appx2104-2105; Appx6108. Although "from the view of the user agent or client-side proxy, all resources *appear* to be located in a server-side proxy on the firewall," Kiuchi instructs that "[i]n reality, the server-side proxy forwards requests to the origin server" where the resources are located. Appx4389 (emphasis added). There are no websites containing resources on the server-side proxy, simply "virtual directories" that map to the actual directories on the origin server(s). Appx4389; Appx2104-2105; Appx6108. When a request is forwarded by the server-side proxy, the origin server accesses the appropriate website for the resource (such as an HTML document), and sends "responses to the user agent through the server-side and client-side proxies." Appx4389 & Fig. a (HTML document is "sent from an origin server"); Appx5621 (Steps 21 and 22). The "secure *target* website" for which the client computer is "requesting access" indisputably resides on the origin server in Kiuchi, and thus the origin server is the "*target* computer" within the meaning of the claims. Appx2103-2105; Appx6108; Appx109 (47:20-32). Indeed, the '135 patent discloses that a VPN is established between the "the user's computer and the secure target site." Appx105 (39:24-25, 34-38). Thus, regardless of the construction of

"client computer," only the origin server in Kiuchi can be the "target computer."

The Board's only rejoinder to this point is its conclusory statement that, beyond "requir[ing] that the domain name is associated with a[] target computer," "Claim 1 does not also require that the target computer is 'one or more web pages at a location on the World Wide Web,'" Appx20-21, even though that was Cisco's and the Examiner's definition of a "website," Appx2103; Appx4877. But the Board simply ignores that Claim 1 requires a determination that the DNS request is for "access to a secure *target* website," and "automatically initiating the VPN between the client computer and the *target* computer." Appx109 (47:20-32). The secure target website is on the target computer, and the VPN with the target computer is established to access the secure target website. For all the foregoing reasons, however "client computer" is construed, the final written decision should be remanded for a determination whether in Kiuchi a VPN is established with the origin server, the only possible "target computer."

### C. The Board Erred in Rejecting the "Direct Communication" Requirement Established in *Mangrove*, and Alternatively By Finding It Satisfied By Proxy-to-Proxy Communication

In *Mangrove*, this Court ruled that the '135 patent claims "require[] direct communication between the client and target computers." 778 F. App'x at 910. The claims exclude systems where "the client cannot open a connection with the target itself," such as those that only communicate directly with an "intermediate server

[that] then relays the data to [the] target computer." *Id.* (citation omitted). Under that claim construction, Kiuchi plainly does not disclose direct communication. *See Cisco*, 767 F.3d at 1324. The Board's conclusion otherwise—on the basis of Kiuchi's proxy-to-proxy connection—cannot stand.

In the decision below, the Board erroneously rejected VirnetX's argument that "VPN," as claimed, must be construed to encompass only "interconnected computers that can directly communicate with one another." Appx2099-2101; *see also* Appx2279; Appx19. The Board stated that "[c]laim 1 does not recite a 'directly communicating'" limitation. Appx19.

This Court's *Mangrove* decision is directly to the contrary. In *Mangrove*, this Court ruled VirnetX had unambiguously disclaimed indirect-communication VPNs in distinguishing a prior-art system, Aventail. 778 F. App'x at 909. Aventail disclosed "a system in which a client computer communicates with an intermediate server via a singular, point-to-point connection." *Id.* at 910. The "intermediate server then relays the data to a target computer." *Id.* VirnetX had distinguished its invention from Aventail on the basis that, in Aventail, "[the] computers … do not communicate directly with each other" because "the client cannot open a connection with the target itself." *Id.* at 909 (internal quotation marks omitted). This Court held that these statements constituted a clear and unmistakable "disclaimer" of systems that do not involve direct communication between the client and the target

computers. *Id.* at 910.

> VirnetX described a system in which a client computer communicates with an intermediate server via a singular, point-to-point connection. That intermediate server then relays the data to a target computer on the same private network on which the server resides. VirnetX stated that because the computers "do not communicate directly with each other" and "[t]he client cannot open a connection with the target itself," the computers are not on the same VPN. This *clearly and unmistakably states* that a "VPN between the client computer and the target computer" *requires direct communication between the client and target computers*.

*Id.* (citations omitted) (emphasis added).[6] *Mangrove* thus sets clear bounds for what qualifies as "direct communication." The client must be able to "open a connection with the target itself." *Id.* Systems where the client's connection is with an "intermediate server" that "relays the data" to the target server are outside the claims. *Id.*

The Board went on to say that, "[e]ven assuming" that claim 1 recites the directly communicating limitation, VirnetX "does not demonstrate persuasively that the client-side proxy and the server-side proxy … do not 'directly communicate.'" Appx19. In doing so (as explained above), the Board erroneously relied on Kiuchi's client-side proxy as the "client computer," and failed to consider VirnetX's argument

[6] The Court in *Mangrove* quoted VirnetX's Response to Office Action in *inter partes* re-examination of the '135 patent, Control No. 95/001,269. In this appeal, VirnetX relied on the exact same disclaimer. Appx3308-3324.

that Kiuchi's server-side proxy cannot be mapped to the claimed "target computer." Appx2098-2099. This is because the server-side proxy is not the target at all. The server-side proxy (and client-side proxy) are simply intermediary devices that allow the specialized C-HTTP connection described in Kiuchi to work. Appx4388-4389. Thus, the Board must resolve the claim construction dispute over "client computer," and then determine whether there is direct communication between the client computer and the "target computer" (Kiuchi's origin server).

Under *Mangrove*'s claim construction, Kiuchi does not teach the required "direct communication between a client computer and a target computer." Kiuchi's "client" (the user agent) establishes a "connection ... to a client-side proxy"—not to the origin server. Appx4388. The client and the client-side proxy communicate using unencrypted HTTP/1.0 communications. Appx4388. A second "connection is established" between the client-side proxy and the server-side proxy. Appx4389. The client-side proxy then "forwards" the user agent's request to the server-side proxy, using a C-HTTP encryption protocol. Appx4389. The server-side proxy creates a third connection, to the origin server, and "forward[s]" the user agent's request using unencrypted HTTP/1.0. Appx4389. The response is sent back the same way: "An HTTP/1.0 response sent from the origin server to the server-side proxy is encrypted in C-HTTP format by the server-side proxy, and is forwarded to the client-side proxy. Then, in the client-side proxy, the C-HTTP response is

decrypted and the HTTP/1.0 response extracted. ... The resulting HTTP/1.0 response is sent to the user agent." Appx4389.

Kiuchi's client cannot "'open a connection with the target itself,'" as the '135 patent claims require. *Mangrove*, 778 F. App'x at 910 (citation omitted). Kiuchi features, instead, three intermediate connections: one from the client to the client-side proxy; one from the client-side proxy to the server-side proxy; and one from the server-side proxy to the origin server. Appx4388-4390. Because Kiuchi involves three separate connections with proxy intermediaries, the client does not open a connection with the target, as required by the claims.

Kiuchi is also clear that the client-side and server-side proxies function as terminal points for their connections with the user agent and origin server, respectively, and rewrite the data passing through them before forwarding it using a new connection. For example, an HTML document received from the origin server is "rewritten" by the client-side proxy before being returned to the user agent. Appx4388-4389 & Fig. b. The client- and server-side proxies also encrypt and decrypt the data. As this Court explained, "[a]ll encryption and decryption occur at the proxies, and the user agent and origin server receive the relevant decrypted information from their respective proxies." *Mangrove*, 778 F. App'x at 905.

As VirnetX's expert observed, "by stopping communications at the proxies, wrapping/unwrapping messages, encrypting/decrypting their contents, re-

formatting, and ultimately re-sending messages," the proxies "preclude the true client and the target [the user agent and the origin server] from directly communicating with one another." Appx6106 (¶ 22). Kiuchi's reliance on proxies to relay information by separate, rewritten requests over multiple point-to-point connections takes it outside the claims' scope.

*Mangrove*'s holding that Aventail does not teach direct communication compels the conclusion that Kiuchi does not either. 778 F. App'x at 909. This Court held that Aventail does not teach direct communication because the "connection at the socket layer" is between the "client" and the "SOCKS server"; the SOCKS server "relays that data to a target computer" over a different connection. *Id.* A SOCKS server is a proxy. In Kiuchi, the client (user agent) is connected to the client-side proxy, and two additional connections are required to "forward" the data to the origin server and receive data in return. The Court also found it relevant that, in Aventail, the "communications between the client and target stop and start at the intermediate SOCKS server." *Mangrove*, 778 F. App'x at 909 (citation omitted). Likewise in Kiuchi, connections stop at the client-side and server-side proxies, which encrypt/decrypt the data and can rewrite the request before forwarding it further in a new request. *See* Appx4388-4391; Appx6106-6107 (¶ 22). Kiuchi's communications is even less "direct" than in Aventail, for it uses two intermediate proxy servers, rather than one.

For those reasons, the Court in *Cisco* upheld the jury determination that Kiuchi does not feature "direct communication." 767 F.3d at 1323-24. The Court relied on the aforementioned trial evidence that the "client-side and server-side proxies terminate the connection, process information, and create a new connection." *Id.* Those "actions," it held, "are not 'direct' within the meaning of the asserted claims." *Id.* While not formally binding on the Board, *Cisco* clearly articulated this Court's view of "direct communication": sending data through proxies, which terminate the connections and forward modified data using new connections and separate requests/responses, is "not 'direct' within the meaning of the claims." *Id.* Under *Mangrove* and *Cisco*, Kiuchi's proxy-to-proxy communication does not disclosed the claimed direct communication between "a client computer and target computer." The Board's rulings that Claim 1 does not require direct communication, and its alternative holding that proxy-to-proxy communication would constitute direct communication, should be reversed or, at a minimum, vacated and remanded for the application of proper claim construction.

## III. THE BOARD'S OBVIOUSNESS REJECTIONS BASED IN PART ON KIUCHI SHOULD BE SET ASIDE.

### A. The Obviousness Rejections Based on Kiuchi and Solana Cannot Be Maintained.

The Board rejected claims 1-9 and 18 as obvious based on the combination of Kiuchi and Solana (either by themselves or together with additional references).

Appx29. These rejections cannot serve as an independent basis to affirm the Board's erroneous unpatentability determinations.

In advancing these rejections, Cisco and the Examiner relied on Solana for purportedly teaching "generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer," as claimed. Appx2043; Appx4978-4980; Appx4995-4997. Cisco and the Examiner had relied upon Kiuchi as a modification of Solana only for steps [2] and [3] of Claim 1. Appx2043; Appx4980-4983.

After VirnetX identified numerous problems with their reliance upon Solana, Appx2133-2135, however, the Board took a different tack in the final written decision. Specifically, the Board explained that "Patent Owner argues that Solana fails to disclose generating a DNS request … *but does not persuasively argue that Kiuchi also fails to disclose this feature*." Appx28 (citation omitted) (emphasis added). By failing to address the dispute as to Solana's disclosure, however, the Board appears to have relied exclusively on Kiuchi for this claim feature. As such, the same deficiencies discussed above with respect to relying on Kiuchi's proxies as disclosing the claimed client computer and target computer apply with equal force here. *Supra* at 27-36; *see also* Appx109 (claim 1 reciting "generating from *the client computer* a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with *the target computer*") (emphasis

added). That alone is grounds for remand.

Additional context further confirms that the Board relied on Kiuchi in this way for the Kiuchi-Solana rejections. Specifically, in addition to arguing that Solana did not disclose "generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer," Appx2133-2134, VirnetX also argued that the Examiner and Cisco had improperly addressed the "determining" limitation by relying on a determination made on a request sent by a component in Solana that was not mapped to the claimed "client computer." Appx2134-2135. The Board did not even address this argument—which itself mandates at least vacatur, *see Power Integrations, Inc. v. Lee*, 797 F.3d 1318, 1323-26 (Fed. Cir. 2015)—presumably because it was no longer relying on Solana's client computer as the source of the DNS request.

Moreover, VirnetX never had a fair opportunity to respond to the new grounds of rejection embraced by the Board. As indicated above, prior to the Board's decision, the Examiner and Cisco relied on Solana, *not* Kiuchi, for purportedly teaching "generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer," as claimed. Appx2043; Appx4978-4980; Appx4995-4997. The Board's final written decision was the first instance of a shift to a theory that a

person of ordinary skill in the art would be motivated to modify Solana in light of Kiuchi's teaching with regard to the generation of a DNS request from a client computer. Appx29. The Board's rejection was thus materially new, and VirnetX never had a fair opportunity to respond. *See In re Biedermann*, 733 F.3d 329, 337 (Fed. Cir. 2013) ("When considering whether the Board issued a new ground of rejection, the 'ultimate criterion of whether a rejection is considered "new" in a decision by the Board is whether applicants have had fair opportunity to react to the thrust of the rejection.'") (quoting *In re Leithem*, 661 F.3d 1316, 1319 (Fed. Cir. 2011)); *In re NuVasive, Inc.*, 841 F.3d 966, 972 (Fed. Cir. 2016) ("[W]e have relied on the APA's requirements to find a 'new ground' where 'the thrust of the rejection' has changed, even when the new ground involved the same prior art as earlier asserted grounds of invalidity. … Here, the assertion about Figure 18 on which the Board ultimately relied is sufficiently distinct from Medtronic's other assertions about Michelson that NuVasive was entitled to the APA-required opportunity to respond to it.") (citing *Leithem*, 661 F.3d at 1319).

Not only was the Board's reliance on a different modification of Solana by Kiuchi's teachings procedurally improper, but the Board did not make the requisite findings. As an initial matter, "the Board nowhere clearly explained, or cited evidence showing, *how* the combination of the two references was supposed to work." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 994 (Fed. Cir. 2017).

For instance, the Board did not explain *how* Kiuchi's purported DNS request would or could have been incorporated into Solana's system.

Furthermore, this Court's "precedent dictates that the PTAB must make a finding of a motivation to combine when it is disputed." *In re Nuvasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016). "The factual inquiry whether to combine references must be thorough and searching and the need for specificity pervades our authority on the findings on motivation to combine." *Id.* at 1381-82 (internal quotation marks and citation omitted). The Board cannot address motivation to combine in general; it must show that the artisan of ordinary skill would be motivated "to combine *the relevant teachings* of the references." *In re Fritch*, 972 F.2d 1260, 1265 (Fed. Cir. 1992) (emphasis added).

The Board here did not adequately explain how Kiuchi and Solana could have been combined in the manner it suggested, much less why there would have been motivation to do so. The Board addressed (obliquely) only the motivation-to-combine reasoning of the Examiner that pertained to whether an artisan of ordinary skill would modify Solana in light of Kiuchi to achieve Step 3 of Claim 1 (the "determining" step), and even there the Board's reasoning was inadequate. Solana's system provides "end-to-end confidentiality." Appx4431-4432. Indeed, Cisco and the Examiner declared that "[a]ll transmissions within Solana's system are secure" Appx2043; Appx4980. Citing expert testimony, Appx6085-6086 (¶ 14), VirnetX

argued that, if so, "then there would have been no reason to modify the Solana system to determine whether a DNS request is requesting access to a secure web site since any transmission to the site would already be secure." Appx2135.

The Board stated that the Examiner could find a modification obvious without being necessary, and "one of ordinary skill in the art would not have known whether or not a network entity is secure, not having determined if the entity is secure in the first place, and would not have ascertained whether or not the communication itself is secure." Appx28. But the only reason that the proxies in Kiuchi determine whether the target website being accessed is secure is to determine whether a special secure C-HTTP connection should be set up, see Appx4387-4398; that would be a meaningless step in a system where all communications are secure.

Regardless, the Board's cursory motivation-to-combine analysis has nothing to do with the novel modification the Board posited: namely, that an artisan of ordinary skill would be motivated to modify Solana with the supposed DNS-request generation disclosure of Kiuchi that maps to Step 1 of Claim 1. "The Board must explain why a person of ordinary skill in the art 'would have selected *these components* for combination in the manner claimed.'" *Polaris Industries, Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 n.4 (Fed. Cir. 2018) (emphasis added) (quoting *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000)). In an *inter partes* reexamination involving obviousness, "the burden is on the Examiner to show that

one of ordinary skill would have had a motivation to combine the references with a reasonable expectation of success." *Honeywell International Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348, 1355 (Fed. Cir. 2017) (emphasis omitted). Neither the Examiner nor the Board ever addressed whether and why such a motivation would exist, much less engaged in the "thorough and searching" factual inquiry with the "specificity" that this Court's precedents demand. *In re Nuvasive*, 842 F.3d at 1381-82.

Thus, this Court should set aside the Board's findings of unpatentability over Kiuchi and Solana, and remand for a (1) revision of its findings under a proper construction of the term "claim computer"; (2) resolution of VirnetX's unaddressed arguments that Kiuchi's origin server (not its server-side proxy) map to the "target server" and "secure target website" of the claims; and (3) proper briefing and findings on motivation to combine the relevant teachings of Kiuchi and Solana.

### B. The Obviousness Rejections Based on a Combination of Kiuchi or Kiuchi and Solana with Other References Cannot Be Maintained.

The Board also affirmed the Examiner's rejection of claims 5-6, 8-9, and 18 as unpatentable for obviousness over Kiuchi, or Kiuchi and Solana, in combination with other references (Dalton, Martin, and Bellovin). Appx29. For those combinations, the Examiner and the Board relied on those additional references only for limitations of dependent claims. *See* Appx24-26; Appx2039-2042; Appx2052-2054. Thus, those obviousness findings must likewise be set aside for the reasons

given above.

## IV. THE APPOINTMENTS CLAUSE, THE SUPREME COURT'S *ARTHREX* DECISION, AND THE FVRA REQUIRE A REMAND TO A PERMANENT PTO DIRECTOR.

The Appointments Clause and the Supreme Court's *Arthrex* decision require a presidentially appointed, Senate-confirmed principal officer to make a final decision for the PTO. Commissioner Hirshfeld, however, was appointed as an inferior officer by the Secretary of Commerce—just like the other Board members who lack the power under the Constitution to issue final decisions for the Executive Branch. *Arthrex*, 141 S. Ct. at 1987. Permitting an inferior officer to have the Executive's final say contravenes *Arthrex*'s express holding that "*[o]nly* an officer properly *appointed to a principal office* may issue a final decision." *Id.* at 1985 (emphasis added).

The FVRA independently barred Commissioner Hirshfeld from exercising the Director's exclusive authority to issue final decisions on rehearing. When a principal office is vacant, any functions or duties "required by statute to be performed by the [principal] officer (and only that officer)" may be performed *only* by (1) the officer's "first assistant" or (2) someone directed by "the President (and only the President)" to perform them. 5 U.S.C. §§ 3345(a), 3348(a)-(b). Under *Arthrex*, singlehanded review of Board decisions is a function or duty *only* the Director may perform. Commissioner Hirshfeld was not the Deputy Director (i.e.,

"first assistant"), and he has not been directed by the President to perform the Director's functions and duties. Under the FVRA, Commissioner Hirshfeld's denial of rehearing is "of no force and effect." 5 U.S.C. § 3348(d)(1).

VirnetX acknowledges that this argument is foreclosed by this Court's recent decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, --- F.4th ----, 2022 WL 1696322 (Fed. Cir. May 27, 2022). VirnetX raises this argument here solely to preserve it for potential review by this Court en banc or the Supreme Court.

**CONCLUSION**

The Board's final written decisions should be reversed or, at a minimum, vacated and remanded.

Respectfully submitted,

Dated: June 23, 2022

/s/Naveen Modi
Naveen Modi
Joseph E. Palys
Stephen B. Kinnaird
Igor V. Timofeyev
Daniel Zeilberger
PAUL HASTINGS LLP
2050 M Street, N.W.
Washington, D.C. 20036
Tel.: (202) 551-1700

*Counsel for Appellant VirnetX Inc.*

# ADDENDUM TABLE OF CONTENTS


| Date | Description | Page No. |
|---|---|---|
| 2/6/2018 | Decision on Appeal | Appx1-31 |
| 1/18/2019 | Decision on Rehearing | Appx32-38 |
| 1/10/2022 | Order Denying Director Review | Appx39-42 |
| | U.S. Patent No. 6,502,135 | Appx49-120 |

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,679 | 07/08/2011 | 6502135 | 43614.92 | 9786 |

22852 7590 02/06/2018
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
901 NEW YORK AVENUE, NW
WASHINGTON, DC 20001-4413

| EXAMINER | |
|---|---|
| PEIKARI, BEHZAD | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/06/2018 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CISCO SYSTEMS, INC.,
Requester,

v.

VIRNETX INC.,
Patent Owner.

---

Appeal 2017-011862
Reexamination Control 95/001,679
Patent 6,502,135 B1
Technology Center 3900

---

Before STEPHEN C. SIU, DENISE M. POTHIER, and JEREMY J. CURCURI, *Administrative Patent Judges*.

SIU, *Administrative Patent Judge*

DECISION ON APPEAL

VirnetX, Inc. ("Patent Owner") appeals under 35 U.S.C. §§ 134 and 315 the Examiner's rejections of claims 1–9 and 13–18 over various references. App. Br. 3.[1] Claims 10–12 are not subject to this reexamination proceeding. *See id.* at vi. We have jurisdiction under 35 U.S.C. §§ 134 and 315.

STATEMENT OF THE CASE

This proceeding arose from a July 8, 2011 request by Cisco Systems, Inc. ("Requester") for an *inter partes* reexamination of claims of U.S. Patent 6,502,135 B1, titled "Agile Network Protocol for Secure Communications with Assured System Availability" and issued to Edmund Colby Munger, Douglas Charles Schmidt, Robert Dunham Short, III, Victor Larson, and Michael Williamson, on December 31, 2002 ("the '135 patent").

The '135 patent describes a method and system for communicating over the internet. Spec. 2:66.

Claim 1 reads as follows:

> 1. A method of transparently creating a virtual private network (VPN) between a client computer and a target computer, comprising the steps of:
>
> (1) generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer;
>
> (2) determining whether the DNS request transmitted in step (1) is requesting access to a secure web site; and

[1] Patent Owner's Appeal Brief, filed December 15, 2015 (App. Br.).

(3) in response to determining that the DNS request in step (2) is requesting access to a secure target web site, automatically initiating the VPN between the client computer and the target computer.

The cited references are as follows:

| | | |
|---|---|---|
| Wesinger | US 5,898,830 | April 27, 1999 |
| Aziz | US 6,119,234 | Sept. 12, 2000 |
| Karr | US 7,764,231 B1 | July 27, 2010 |

D.E. Denning & G.M. Sacco, "Timestamps in Key Distribution Protocols," Communications of the ACM, Vol. 24, No. 8, August 1981 ("Denning").

Steven M. Bellovin & Michael Merritt, "Encrypted Key Exchange: Password-Based Protocols Secure Against Dictionary Attacks," 1992 IEEE Symposium on Security and Privacy, 1992 ("Bellovin").

Takahiro Kiuchi & Shigekoto Kaihara, "C-HTTP – The Development of a Secure, Closed HTTP-based Network on the Internet," Proceedings of SNDSS, 1996 ("Kiuchi").

C.I. Dalton & J.F. Griffin, "Applying Military Grade Security to the Internet," Proceedings of the 89th Joint European Networking Conference (JENC 8), May 1997 ("Dalton").

Eduardo Solana & Jurgen Harms, "Flexible Internet Secure Transactions Based on Collaborative Domains," Security Protocols Workshop, 1997 ("Solana").

David M. Martin, "A Framework for Local Anonymity in the Internet," Boston University, February 21, 1998 ("Martin").

Patent Owner appeals the Examiner's rejection of claims as follows:

1. Claims 1–4, 7, 13, 14, and 17 under 35 U.S.C. § 102(b) over Kiuchi;
2. Claims 1–5, 7-9, 13, and 18 under 35 U.S.C. § 102(e) over Wesinger;
3. Claims 1–5, 7, 8, and 18 under 35 U.S.C. § 103 over Solana and Kiuchi;
4. Claims 1–5, 7, and 18 under 35 U.S.C. § 102(e) over Aziz;
5. Claims 5, 8, and 18 under 35 U.S.C. § 103 over Kiuchi and any one of either Dalton or the combination of Dalton and Solana;
6. Claim 6 under 35 U S.C. § 103 over (a) the combination of Kiuchi and Martin with or without Solana, (b) the combination of Wesinger and Martin, or (c) the combination of Aziz and Martin;
7. Claim 9 under 35 U.S.C. § 103 over the combination of Bellovin and any one of (a) Kiuchi, (b) Aziz or (c) the combination of Solana, Kiuchi, and Dalton;
8. Claim 13 under 35 U.S.C. § 103 over Aziz and Kiuchi;
9. Claims 13–15 under 35 U.S.C. § 102(b) over Solana;
10. Claim 16 under 35 U.S.C. § l03 over Solana and Karr;
11. Claim 17 under 35 U.S.C. § 103 over Solana and Denning;

ISSUE

Did the Examiner err in rejecting claims 1–9 and 13–18?

ANALYSIS

*Prior art references*

Martin

Patent Owner argues that although the Martin reference indicates a publication date of "'21st February 1998' on its first page, nowhere in *Martin* is there any indication as to what that date means." App. Br. 4. However, Patent Owner does not argue persuasively that one of skill in the art, when confronted with a date of "21st February 1998" on a first page of a publication, would need further explanation within the reference as to "what that date means." Rather, one of skill in the art, being of ordinary creativity and not being an automaton would have understood that "21st February 1998" is a date that specifies the 21st day in the month of February and in the year of 1998. Further, one of skill in the art, being of ordinary creativity and not being an automaton would have understood the context of a date printed on the face of a reference article as being the date on which the date was published. Therefore, we are not persuaded by Patent Owner's implication that because the Martin reference allegedly lacks a detailed explanation as to "what that date means," that Requester provided an insufficient showing that the Martin reference was published (and publicly available) on the indicated date.

In any event, Requester provides further evidence supporting the contention that the Martin reference was publicly available by the indicated date of "21st February 1998." In particular, Requester provides a document

"available through the Wayback Machine" that "establishes that the *Martin* paper was cataloged in the Boston University Technical Reports Archive and available to the public via the Internet even earlier than the February 21, 1998 date" and a "German thesis, unambiguously dated 1999 . . . cites the *Martin* paper at page 77." 3PR Resp. Br. 3.[2] Patent Owner does not appear to dispute the contents of Requester's submitted evidence with respect to this issue.

Patent Owner argues that Requester's evidence with respect to this issue "should be rejected and . . . not be considered" and "it is not a 'rebuttal' because Patent Owner contended only that Cisco had failed to satisfy its burden in its request." App. Br. 5. In other words, Patent Owner now argues that Patent Owner never argued that the Martin reference was not publicly available as of the critical date. Assuming Patent Owner's contention to be correct that Patent Owner never raised the issue of public availability of the Martin reference, then we need not further consider the issue of public availability of the Martin reference, the public availability of the Martin reference not now or ever having been at issue in this proceeding.

Lastly, the Manual of Patent Examining Procedure (MPEP) § 2646(II) states:

> [N]either the patent owner nor the third party requester has the right to . . . request reconsideration of, a finding that the prior art patents or printed publications raise a SNQ/RLP . . . Where the examiner determines that a reference is a printed publication (i.e., that the criteria for publication has been satisfied), . . .

---

[2] Third Party Requester Cisco Systems, Inc.'s Corrected Respondent Brief, filed February 9, 2016 ("3PR Resp. Br.").

> [t]hese matters cannot be questioned with respect to vacating the order granting reexamination."

MPEP § 2646(II), Rev. 07.2015 (Oct. 2015). Thus, to the extent the above Patent Owner's arguments asserting Requester's purported failure "to satisfy its burden in its request" (App. Br. 5) contends that Martin fails to raise a SNQ/RLP and this reexamination proceeding should not vacated on these grounds, Patent Owner is not permitted to question these matters. *See id.; see also* 35 U.S.C. § 312 (pre-AIA).

Dalton

Patent Owner argues that Requester "provided no evidence that *Dalton* was publicly accessible as of the alleged date [of October 30, 1998]." App. Br. 5. To the extent that Patent Owner argues that the Dalton reference was not publicly accessible "as of the alleged date [of October 30, 1998]," Requester provides further evidence supporting the contention that the Dalton reference was publicly available prior to the priority date of the '135 patent. In particular, Requester argues that "[t]he *Dalton* paper was originally disseminated with the Proceedings of the 8th Joint European Networking Conference (JENC 8) held May 12-15, 1997" and provides "a copy of the Dalton reference as it was published by Elsevier, indicating on its face that the *Dalton* paper was received on July 1, 1997 and republished in Volume 29 of the journal in 1997 at pages 1799-1808." 3PR Resp. Br. 3–4. Requester also "provides an E2S Consortium publication, unambiguously dated 1997, that cites the Dalton paper at page 67." 3PR

Resp. Br. 3–4. Patent Owner does not appear to dispute the contents of Requester's submitted evidence with respect to this issue.

Patent Owner argues that Petitioner's "evidence should have been provided with Cisco's Request" but does not explain sufficiently why Requester's evidence pertaining to the public availability of the Dalton reference should have been submitted prior to the point in time of the proceeding at which Patent Owner allegedly raised the issue. App. Br. 5. To the extent that Patent Owner now argues that Patent Owner never raised the issue of public availability of the Dalton reference in the course of this proceeding, we need not further address this "issue," the "issue" never having been raised in the first place.

Solana

Patent Owner argues that Requester "provided no evidence that *Solana* was publicly accessible more than one year prior to the alleged earliest effective date of Feb. 25, 2000." App. Br. 6. To the extent that Patent Owner argues that the Solana reference was not publicly accessible as of "the alleged earliest effective date of Feb. 25, 2000," Requester provides further evidence supporting the contention that the Solana reference was publicly available prior to the priority date of the '135 patent. In particular, Requester argues that "[t]he Solana reference was made available to the public in 1997 as part of the proceedings of the 5th International Workshop on Security Protocols" and

> provides a copy of the cover of the bound volume for the 5th Internet Workshop on Security Protocols, indicating that the proceedings occurred in April 1997; a title page from the bound

> volume indicating that the 5th International Workshop was held in Paris, France from April 7-9, 1997; a copyright page that includes ISBN number 3-540-64040-1 which corresponds to a February, 1998 publication date for the bound volume; . . . the table of contents showing the Solana paper begins on page 37 . . . [; and] a copy of the ISBN number search results which indicate that ISBN number 3-540-64040-1 corresponds to a publication date of February 1998.

3PR Resp. Br. 4. Patent Owner does not appear to dispute the contents of Requester's submitted evidence with respect to this issue.

Patent Owner argues that Petitioner's "evidence should have been provided with Cisco's Request" but does not explain sufficiently why Requester's evidence pertaining to the public availability of the Dalton reference should have been submitted prior to the point in time of the proceeding at which Patent Owner allegedly raised the issue. App. Br. 6. To the extent that Patent Owner now argues that Patent Owner never raised the issue of public availability of the Solana reference in the course of this proceeding, we need not further address this "issue," the "issue" never having been raised in the first place.

*Solana (claims 13–15); Solana and Dalton (claim 16); Solana and Denning (claim 17)*

Claim 13 recites a "central computer" receiving "a request to establish a connection." We agree that Solana discloses general methods to "provide Internet transactions with adequate security features" including "the provision of secure end-to-end transactions" in which an "initiator generates a session key . . . a header containing the session key . . . the UNI of the

responder . . . [and a] header." Solana 37, 43, 45. Hence, Solana discloses a method for establishing a secure connection (i.e., a "secure end-to-end transaction") in which an initiating device sends data that results in the formation of the secure connection.

Patent Owner argues that Solana discloses a "packet shown arriving at the D-DBS' in Figure 2a" but that this "packet" "does not include a request to establish a connection." App. Br. 41. Patent Owner also argues that Solana discloses a "destination address and a session key" and a "header" but that "the mere inclusion of a destination address in the header . . . does not transform the packet into a request for connection." App. Br. 41. We are not persuaded by Patent Owner's argument at least because Patent Owner does not explain persuasively how the initiating device sending data that results in establishing a secure connection differs from a "request" to do so. In both cases, an initiating device provides a transmission that results in the establishment of a secure connection.

Claim 13 recites a method involving a computer that maintains "authentication tables each corresponding to one of the client computers" and authenticating "with reference to one of the . . . authentication tables." Patent Owner argues that Solana discloses a Local Authentication Database (i.e., "LAD") but fails to disclose "authentication tables," as recited in claim 13. App. Br. 42. Hence, Patent Owner argues that the Local Authentication Database of Solana differs materially from the claimed authentication table.

Solana discloses a Local Authentication Database (LAD) "that will contain for each principal (UNI) the local authentication credentials" in which reference to an LAD "verif[ies] the identity of [the] principals inside

its domain." Solana 43–44. Hence, Solana discloses an LAD that contains authentication data *for each* "principal" (e.g., an index/table). Similarly, claim 13 recites an authentication table corresponding to a client computer (or corresponding to a principal) and authenticating a computer (or principal) with reference to one of the authentication tables (or with reference to a corresponding LAD in Solana). Patent Owner fails to explain sufficient distinguishing characteristics between the claimed "authentication table" and the "LAD" of Solana.

Patent Owner argues that Solana fails to disclose "that the alleged request to establish a connection . . . is authenticated using the LAD entries." App. Br. 43. As Patent Owner points out, claim 13 recites "authenticating, with reference to one of the . . . authentication tables, that the request received in step (1) is from an authorized client." App. Br. 43. As previously discussed, Solana discloses this feature. For example, Solana discloses that reference to an LAD "verif[ies] the identity of the principals in its domain." Solana 43–44. In other words, Solana discloses authenticating (or "verifying") that the request is from an authorized client with reference to an authentication table (or with reference to an "LAD"), as recited in claim 13.

Patent Owner also argues that Solana fails to disclose each element of claim 13 because, according to Patent Owner, Requester has combined elements from two different embodiments of Solana (namely one embodiment illustrated in Figure 2a of Solana and a second embodiment illustrated in Figure 3a of Solana), which Patent Owner argues is impermissible in establishing anticipation of a claimed invention over a prior

art reference. App. Br. 44–45. Requester argues that both Figure 2a of Solana and Figure 3a of Solana describe "different tasks" for the same "overall approach 'to achieve ***confidentiality and authentication***.'" 3PR Resp. 18 (citing Solana 37). Solana discloses that it was known in the art to "provide[] a proof of identity of the entity originating the transaction" and illustrates "different kinds of authentication [that] are possible" in Figure 3a. Solana 46–47. Solana also discloses that it was known in the art to "achieve end-to-end confidentiality using domain collaborations" and describes alternatives "to achieve end-to-end confidentiality using domain collaborations." Solana 45, Fig. 2a. We agree with Requester that Solana discloses a method of establishing a secure connection between entities in which it was known to those of skill in the art that such a system and method would achieve both "authentication" and "confidentiality" using known methods as disclosed by Solana in Figures 3a and 2a, respectively.

In response, Patent Owner reiterates that Requester "impermissibly combine[s] the teachings of two distinct embodiment for an anticipation rejection" because "Figures 2a and 3a represent distinct embodiments in *Solana* with Figure 2a directed solely to confidential communications, and Figure 3a directed solely to authenticated communications." Reb. Br. 21. However, Patent Owner does not explain persuasively how Solana's disclosure of the establishment of a confidential communication link between entities in which users are authenticated constitute "two distinct embodiments." Rather, Solana disclose potentially multiple approaches to achieving the establishment of a confidential communication link between authenticated entities.

Dependent claim 15 recites comparing an Internet Protocol (IP) address in a header of each data packet to a table of valid IP addresses maintained in a table in the second computer. Patent Owner does not dispute that Solana discloses a "responder" (i.e., second computer) that "verifies the identity (the UNI) of the initiator," which "include[s] an IP address" but contends that Solana fails to explicitly disclose that the responder (or second computer) maintains a table of IP addresses, as recited in claim 15. App. Br. 45–47. However, Patent Owner does not explain persuasively that one of skill in the art would not have understood Solana's computer that verifies the identity of another network entity via identification of an IP address would include the IP address being identified. We agree with the Examiner and Requester that one of skill in the art, given the knowledge that a "responder" uses a corresponding IP address to identify a network entity, would have recognized Solana's computer included the IP address with which to identify the network entity in some type of data structure (e.g., a table). Otherwise, the responder would have been unable to identify the network entity with the corresponding IP address, the responder not having the corresponding IP address with which to identify the network entity. This would have been in direct contrast to the explicit teaching of Solana that the responder, in fact, identifies the network entity via the corresponding IP address.

Patent Owner does not provide further arguments in support of claim 14 with respect to this issue. The Examiner did not err in rejecting claims 13–15 as anticipated by Solana.

Dependent claim 16 recites "a moving window of valid IP addresses." The Examiner finds that "Solana teaches . . . valid IP addresses" and that Karr discloses a "moving window of information." RAN 29 (quoting 3PR April 9, 2014 Response, p. 34).[3] Hence, the Examiner finds that one of skill in the art would have known that such information may be used in a "moving window." *See id.* Given this teaching, it would have been obvious that information, including known "valid IP address" as disclosed in Solana, would have been provided in a known "moving window," as taught by Karr.

Patent Owner argues that Karr fails to disclose "a moving window of valid IP addresses," as recited in claim 16. However, as discussed above, the Examiner relies on the combination of Solana and Karr as disclosing or suggesting a "moving window of valid IP addresses" and not on Karr alone. Therefore, even assuming Patent Owner to be correct that Karr, in isolation, fails to disclose or suggest a "moving window of valid IP addresses," Patent Owner does not assert or demonstrate sufficiently that the combination of Solana and Karr also fails to disclose or suggest the disputed claim limitation.

Patent Owner does not provide additional arguments in support of dependent claim 17 with respect to Denning.

The Examiner did not err in rejecting claims 13–15 as anticipated by Solana, claim 16 as unpatentable under 35 U.S.C. § 103(a) over Solana and Karr, or claim 17 as unpatentable under 35 U.S.C. § 103(a) over Solana and Denning.

---

[3] Right of Appeal Notice, dated September 15, 2015 ("RAN").

*Kiuchi (claims 1–4, 7, 13, 14, and 17); Kiuchi and Solana (claims 1–5, 7, 8, and 18); Kiuchi and Dalton (claims 5 and 8); Kiuchi, Solana, and Dalton (claims 5, 8, and 18); Kiuchi and Martin (claim 6); Kiuchi and Bellovin (claim 9)*

Patent Owner argues that Kiuchi discloses a "client-side proxy" and a "server-side proxy" but fails to disclose a "client computer" or a "target computer," respectively, as recited in claim 1.

Claim 1 recites creating a network between a client computer and a target computer and generating from the client computer a Domain Name Service (DNS) request. Patent Owner argues that the claimed "client computer" must be a "user's computer" and that Kiuchi fails to disclose a "user's computer." App. Br. 10. However, Patent Owner does not explain sufficiently how Kiuchi fails to disclose a "client computer," which claim 1 recites. As the Examiner points out, Kiuchi discloses a client-side proxy that generates a Domain Name Service (DNS) request. Even assuming that claim 1 recites a "user's computer" (instead of a "client computer," which claim 1 actually recites) that generates a Domain Name Service (DNS) request, as Patent Owner appears to allege, Patent Owner does not demonstrate persuasively that the hypothetical "user's computer" (renamed from "client computer") differs from the client-side proxy of Kiuchi, which also generates a Domain Name Service (DNS) request. See e.g., Kiuchi 64–65.

Patent Owner argues that the client-side proxy of Kiuchi differs from the claimed "client computer" because "Kiuchi discloses a communication system in which . . . a 'user agent,' at one institution is able to securely

access its target." App. Br. 11. In other words, Patent Owner argues that Kiuchi discloses a "user agent" that corresponds to the claimed "client computer" such that Kiuchi's client-side proxy cannot *also* correspond to the claimed "client computer." We need not consider whether or not Kiuchi's "user agent" also discloses the claimed "client computer," as Patent Owner appears to contend, because Patent Owner does not demonstrate persuasively that Kiuchi's client-side proxy (equated to the claimed "client computer" by the Examiner) does not generate a Domain Name Service (DNS) request, as recited in claim 1. As noted above, Kiuchi discloses that the client-side proxy performs this recited function.

Patent Owner argues that Kiuchi discloses "separate references to the 'client' and 'client-side proxy' . . . [and] demonstrates that the client-side proxy is not the client itself" such that "*Kiuchi* . . . distinguishes between a 'client,' where an end-user sits, and a 'client-side proxy,' which has no end-user." App. Br. 11–12. In other words, Patent Owner argues that Kiuchi discloses that the "client-side proxy" "has no end-user" and fails to disclose that the "client-side proxy" is "where an end-user sits." Claim 1 recites "generating from the client computer a Domain Name Service (DNS) request. Claim 1 does not also recite that the client computer must have an "end-user" or that the client computer must be "where an end-user sits." Indeed, claim 1 does not recite an "end-user" at all. For at least this reason, we are not persuaded by Patent Owner's argument.

Patent Owner argues that the Federal Circuit has held that there was "evidence" that a "web browser" of Kiuchi is "distinguishable from the client-side proxy [of Kiuchi]." App. Br. 12. However, Patent Owner does

not indicate the probative value of the "evidence" or whether the same evidence is before us. More importantly, the discussed proceeding involved a different patent with a different mapping of Kiuchi to its distinct claim limitations and does not demonstrate persuasively that the "client-side proxy" of Kiuchi is "distinguishable from" the *claimed* "client computer" in claim 1 of the '135 patent based on the evidence in the instant record. For at least these reasons, we are not persuaded by Patent Owner's argument.

Claim 1 recites requesting an IP address corresponding to a domain name associated with the target computer. Patent Owner argues that Kiuchi discloses a "URL associated with the origin server . . . not the server-side proxy." App. Br. 12. However, contrary to Patent Owner's assertion, Kiuchi discloses that the requested URL is associated with the server-side proxy. For example, Kiuchi discloses a requested "URL" that "specifies" a "host," the "host" being "the requested server-side proxy [that] is registered in the . . . network." Kiuchi 65. We are not persuaded by Patent Owner's argument.

Claim 1 recites a "VPN." Patent Owner argues that Kiuchi fails to disclose a "VPN" because claim 1 supposedly requires the ability "to communicate with the other devices within that same VPN," that the VPN must be "scalable," and that devices in the VPN must be "able to communicate with one another without having to discontinue an existing connection or initiate another one." App. Br. 13. However, Patent Owner does not assert or demonstrate persuasively that claim 1, for example, recites that devices must be "scalable" or must be able to communicate without having to discontinue an existing connection or initiate another one. In any

event, even assuming that claim 1 recites these hypothetical claim limitations, Patent Owner does not demonstrate persuasively that the devices of Kiuchi are not "scalable" and do not communicate without having to discontinue an existing connection or initiate another one. Rather, Patent Owner contends that Kiuchi discloses a device that allegedly disconnects when the "session is finished." App. Br. 14. One of skill in the art would have understood that discontinuing a connection after a session is "finished" is distinguishable from discontinuing a connection in order to communicate at all—the two concepts being unrelated to each other.

Patent Owner argues that Kiuchi fails to disclose a "VPN" because Kiuchi discloses devices that "do not communicate directly" and fails to disclose devices "directly communicating." App. Br. 14. Claim 1 does not recite a "directly communicating." Even assuming that claim 1 recites this hypothetical limitation, Patent Owner does not demonstrate persuasively that the client-side proxy and the server-side proxy (equated by the Examiner to the client and target computers, respectively) do not "directly communicate." We are not persuaded by Patent Owner's argument.

Claim 1 recites an IP address corresponding to a domain name associated with a target computer. Patent Owner argues that Kiuchi fails to disclose this feature because, according to Patent Owner, the IP address of Kiuchi corresponds to the "origin server" and not the "server-side proxy," which is equated to the claimed "target computer" by the Examiner. *See* App. Br. 15–16. We are not persuaded by Patent Owner's argument. As already noted above, Kiuchi discloses a requested "URL" that "specifies" a "host," the "host" being "the requested server-side proxy [that] is registered

in the . . . network." Kiuchi 65. In any event, even assuming that the "URL" of Kiuchi corresponds directly to the "origin server," as Patent Owner appears to allege, Patent Owner does not assert or demonstrate persuasively that the "URL" is not "associated with" the server-side proxy. Regardless, Kiuchi discloses that the server-side proxy communicates with the origin server inside the firewall. Kiuchi 66. Hence, Kiuchi's server-side proxy is "associated with" the origin server and its associated "URL."

Patent Owner argues that Kiuchi fails to disclose determining whether the DNS request is requesting access to a secure web site, as recited in claim 1, because the "server-side proxy" of Kiuchi is supposedly not a "secure web site." App. Br. 17. Kiuchi discloses that a "connection is established" between the client-side proxy and the server-side proxy in which "a client-side proxy forwards . . . requests [to the server-side proxy] in encrypted form using C-HTTP format" and that the "server-side proxy communicates with an origin server inside the firewall" (Kiuchi 66), such that communication between the client-side proxy and the server-side proxy is encrypted and the server-side proxy communicates with devices (e.g., origin server) behind the firewall. One of skill in the art would have understood that a device that communicates with encrypted transmissions and communicates with devices behind a firewall would be secure.

Patent Owner argues that Kiuchi fails to disclose that the server-side proxy is a secure web site because the server-side proxy of Kiuchi, according to Patent Owner is not "one or more web pages at a location on the World Wide Web." App. Br. 17–18. Claim 1 recites a domain name associated with at target computer. Hence, claim 1 requires that the target

computer is associated with a domain name. Claim 1 does not also require that the target computer is "one or more web pages at a location on the World Wide Web." Hence, we are not persuaded by Patent Owner's contention.

Patent Owner argues that Kiuchi fails to disclose a "DNS request." App. Br. 19. Claim 1 recites a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer. Kiuchi discloses that a "client-side proxy asks the . . . name server whether it can communicate with the host specified in a given URL . . . (and if) the connection is permitted, the . . . name server sends the [requested] IP address . . . ." Kiuchi 65. In other words, Kiuchi discloses a "request" (i.e., "asks" the server) for an IP address (i.e., the requested "IP address" of Kiuchi) associated with the target computer (i.e., "server-side proxy").

Patent Owner argues that "*Kiuchi* does not expressly disclose the 'DNS request' . . . [because] *Kiuchi* . . . repeatedly differentiates its C-HTTP features from DNS," that "*Kiuchi* explains that the C-HTTP name service is used 'instead of DNS,'" that "the 'DNS name service is not used for hostname resolution,'" and that "a 'DNS lookup' is only performed after a permission request to the C-HTTP name server fails." App. Br. 19. However, Patent Owner does not explain persuasively how the request of Kiuchi (i.e., "asks" the server) differs from the claimed "DNS request" that, like Kiuchi, requests an IP address corresponding to a desired domain name.

Dependent claim 2 recites that "steps (2) and (3) [of claim 1] are performed at a DNS server separate from the client computer" and claim 1

recites "automatically initiating the VPN between the client computer and the target computer." As the Examiner explains, Kiuchi discloses that the "client-side proxy asks the C-HTTP name server whether it can communicate" and "[i]f the connection is permitted, the C-HTTP name server sends the IP address and public key of the server-side proxy and . . . Nonce values" and that, subsequently, "the connection is established." Kiuchi 65, 66. In other words, Kiuchi discloses that a "client-side proxy" sends a request to a C-HTTP name server for a secure connection with a target computer (i.e., "asks" the name server) and, in response, the C-HTTP name server "initiates" the connection (i.e., sends the IP address, public key, and Nonce values prior to "the connection [being] established").

Patent Owner argues that Kiuchi fails to disclose "automatically initiating the VPN," as recited in claim 2 (and claim 1) because "[t]he mere sending of Nonce values by the C-HTTP name server to the client-side proxy does not initiate a VPN <u>between the client-side and server-side proxies</u>." App. Br. 20. However, Patent Owner does not explain persuasively how the "C-HTTP name server" performing a step (i.e., sending values) that subsequently results in "the connection [being] established" differs from the claim feature of automatically initiating a connection. In both cases, a step is performed by a server that results in the subsequent formation of a secure connection between devices.

Dependent claim 3 recites returning the IP address in response to determining that the DNS request in step (2) is not requesting access to a secure target web site. As the Examiner points out, Kiuchi discloses a "client-side proxy asks . . . whether it can communicate" and "[i]f the

connection is permitted, the C-HTTP name server sends the IP address." Kiuchi 65. Hence, Kiuchi discloses returning a requested IP address in response to determining that the connection is permitted (i.e., not requesting access to a secure target web site). One of skill in the art would have understood that a user without access to a secure site would not be permitted to access the secure site, the user not having access to the secure site in the first place. Since Kiuchi discloses returning the requested IP address "if the connection is permitted," one of skill in the art would have understood that the "permitted" connection is not to a secure site to which the user is not permitted access.

Regarding dependent claim 4, Patent Owner reiterates arguments that Kiuchi supposedly fails to disclose a "client computer." We are not persuaded by Patent Owner's arguments for at least the previously discussed reasons.

Claim 13 recites a method involving a computer that maintains "authentication tables each corresponding to one of the client computers" and authenticating "with reference to one of the . . . authentication tables." As the Examiner explains, Kiuchi discloses a method involving a computer (i.e., a "C-HTTP name server") that sends an "IP address" corresponding to a request. One of skill in the art would have understood that in order to send an IP address corresponding to a request, the C-HTTP name server would maintain the IP address data with corresponding (requested) domain names. Otherwise, the C-HTTP name server would not maintain such data and would not be capable of returning the desired IP address. This would be

contrary to Kiuchi's explicit disclosure that the desired IP address is, in fact, returned.

Patent Owner argues that Kiuchi fails to disclose a "table," as recited in claim 13. App. Br. 22. As previously discussed, claim 13 requires that an "authentication table" corresponds to one of the client computers and authenticating is "with reference to" one of the authentication tables. Kiuchi discloses that IP address data and corresponding (requested) domain names are maintained by the C-HTTP name server and that authentication is with reference to the requested domain name and corresponding IP address data. Patent Owner does not explain a sufficient difference between the "table," as recited in claim 13 and the data maintained by the C-HTTP name server of Kiuchi, both of which are maintained by a "computer" and both of which are "referenced" in the process of authenticating.

Patent Owner appears to argue that the data maintained by Kiuchi differs from the claimed "tables" because Kiuchi fails to disclose the precise term "table." We are not persuaded by Patent Owner. For a prior art reference to anticipate in terms of 35 U.S.C. § 102, every element of the claimed invention must be identically shown in a single reference. However, this is not an "ipsissimis verbis" test. *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990). Therefore, it is immaterial whether or not Kiuchi discloses the term "table" or not.

Patent Owner argues that Kiuchi fails to disclose a "central computer" that "receives a request to establish a connection," as recited in claim 13. App. Br. 24. Specifically, Patent Owner argues that Kiuchi discloses a client-side proxy "sends a request for connection to the server-side proxy"

but that the request is not "received at the C-HTTP name server (the alleged 'central computer')." App. Br. 24. As previously discussed, Kiuchi discloses that the "client-side proxy asks the C-HTTP name server whether it can communicate . . . ." Kiuchi 65. One of skill in the art would have understood that when a device "asks" another device, the device would be sending a "request" to the other device. Hence, we are not persuaded by Patent Owner's argument that Kiuchi supposedly fails to disclose that a request is "received at the C-HTTP name server (the alleged 'central computer')."

Patent Owner argues that Martin fails to disclose an "IP address hopping scheme," as recited in dependent claim 6, because, according to Patent Owner, Martin discloses that "the client chooses an address at the outset that does not change." App. Br. 27. Claim 6 recites an "IP address hopping scheme" but does not appear to also recite that a client must not choose an address at the outset that does not change. In fact, claim 6 does not appear to recite changing an address at all. Therefore, we need not consider whether or not Martin discloses this hypothetical claim limitation.

Patent Owner also argues that Martin discloses "selection and use of an address" but fails to disclose "any 'hops' at all." App. Br. 27. However, Patent Owner does not explain a sufficient difference between choosing "a random source address/port pair" (that Patent Owner alleges Martin discloses) and the claimed IP address hopping scheme. App. Br. 27.

Dependent claim 5 recites determining whether the client computer is authorized to resolve addresses of non secure target computers and, if not so authorized, returning an error from the DNS request. Patent Owner argues

that Kiuchi discloses "a 'closed group of institutions on the Internet' for C-HTTP connections" and Dalton discloses "that some clients may have access to resources outside the system." Patent Owner further extrapolates Dalton's disclosure to solely include "open-access system[s]" and argues that "*Kiuchi* does not contemplate an open-access system such as [systems disclosed by] *Dalton*." App. Br. 25.

To the extent that Patent Owner argues that Kiuchi teaches away from Dalton (or vice versa), we are not persuaded by Patent Owner's arguments for at least the reasons set forth by Requester. 3PR Resp. Br. 10–11. For example, Kiuchi discloses a network in which users may communicate via secure communications. *See,* e.g., Kiuchi 64 ("[a] client-side proxy and server-side proxy communicate with each other using a secure, encrypted protocol"). Dalton also discloses network communication "*that is secure enough to implement services that are accessed over the Internet.*" Dalton Abstract. In other words, both Kiuchi and Dalton disclose network systems in which users communicate via secure communications. Patent Owner does not adequately explain how one network system for secure communications (e.g., Dalton) "teaches away" from another network system for secure communications (e.g., Kiuchi). In both cases, a network system is provided in which users communicate securely.

To the extent that Patent Owner argues that Kiuchi discloses a "closed system," that Dalton discloses an "open system" and that it would not have been obvious to one of skill in the art to have bodily incorporated the alleged "open system" of Dalton with the alleged "closed system" of Kiuchi, we note that "[t]he test for obviousness is not whether the features of a

secondary reference may be bodily incorporated into the structure of the primary reference; . . . Rather, the test is what the combined teachings of those references would have suggested to those of ordinary skill in the art." *In re Keller,* 642 F.2d 413, 425 (CCPA 1981). Hence, we are not persuaded by Patent Owner's argument.

Patent Owner does not provide additional arguments in support of claims 7, 8, 14, or 17 or arguments with respect to the Examiner's rejection of claim 9 under 35 U.S.C. 103(a) as unpatentable over Kiuchi and Bellovin. App. Br. 24, 26. The Examiner did not err in rejecting claims 1–4, 7, 13, 14, and 17 as anticipated by Kiuchi, claims 5 and 8 as unpatentable over Kiuchi and Dalton, claim 6 as unpatentable over Kiuchi and Martin, or claim 9 as unpatentable over Kiuchi and Bellovin.

Patent Owner argues that it would not have been obvious to one of ordinary skill in the art to have combined the teachings of Kiuchi with that of Solana because, according to Patent Owner, "[a]ll transmissions" of Solana are secure and, therefore, "it would have been unnecessary to modify the Solana system . . . to determine whether a . . . request is requesting access to a secure web site." App. Br. 49–50. However, the Examiner's rejection of the disputed claims is based on whether it would have been *obvious* to one of ordinary skill in the art to have combined Kiuchi's and Solana's teachings and not whether it would have been *necessary* to one of ordinary skill in the art to do so. Thus, even assuming Patent Owner's contention to be correct that it would not have been necessary to determine if a web site is secure, Patent Owner does not argue persuasively that it would also not have been *obvious* based on references' teachings to determine if a

web site is secure. Given that both Kiuchi and Solana disclose secure communications, we agree with the Examiner and Requester that it would have been obvious to one of ordinary skill in the art to have determined if an entity in a secure communication is secure or not. Otherwise, one of ordinary skill in the art would not have known whether or not a network entity is secure, not having determined if the entity is secure in the first place, and would not have ascertained whether or not the communication itself is secure, not having ascertained whether or not the entities involved in the communication themselves are secure.

Patent Owner also argues that it would not have been *obvious* to one of ordinary skill in the art to have combined the teachings of Kiuchi and Solana because, according to Patent Owner, it would not have been *necessary* to combine the references given that the "initiator" allegedly "*already has* the . . . UNI when it sends the query." App. Br. 48. We are not persuaded by Patent Owner's arguments for reasons previously discussed above.

Patent Owner argues that Solana fails to disclose generating a DNS request (App. Br. 48) but does not persuasively argue that Kiuchi also fails to disclose this feature. Thus, even assuming Patent Owner's contention that Solana fails to disclose this feature, we are not persuaded by Patent Owner that the combination of Kiuchi and Solana also fails to disclose this feature for at least the reasons previously discussed above.

Patent Owner does not provide additional arguments in support of claims 5, 8, and 18 with respect to Dalton; claim 9 with respect to Bellovin and/or Dalton; or claim 6 with respect to Martin. The Examiner did not err

in rejecting claims 1–5, 7, 8, and 18 as unpatentable under 35 U.S.C. § 103(a) over Kiuchi and Solana; claims 5, 8, and 18 as unpatentable under 35 U.S.C. § 103(a) over Kiuchi, Solana, and Dalton; claim 9 as unpatentable under 35 U.S.C. § 103(a) over Kiuchi, Solana, Dalton, and Bellovin; and claim 6 as unpatentable under 35 U.S.C. § 103(a) over Kiuchi, Solana, and Martin.

In view of the above, we need not consider the propriety of the Examiner's non-adoption of the rejection of claims based on other grounds. *Cf. In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009).

## DECISION

We affirm the Examiner's rejection of claims 1–4, 7, 13, 14, and 17 35 U.S.C. § 102 as anticipated by Kiuchi; claims 5 and 8 under 35 U.S.C. § 103(a) as unpatentable over Kiuchi and Dalton; claim 6 under 35 U.S.C. § 103(a) as unpatentable over Kiuchi and Martin; claim 9 under 35 U.S.C. § 103(a) as unpatentable over Kiuchi and Bellovin; claims 13–15 under 35 U.S.C. § 102 as anticipated by Solana; claims 1–5, 7, 8, and 18 under 35 U.S.C. § 103(a) as unpatentable over Kiuchi and Solana; claims 5, 8, and 18 under 35 U.S.C. § 103(a) as unpatentable over Kiuchi, Solana, and Dalton; claim 9 under 35 U.S.C. § 103(a) as unpatentable over Kiuchi, Solana, Dalton, and Bellovin; claim 6 under 35 U.S.C. § 103(a) as unpatentable over Kiuchi, Solana, and Martin; claim 16 under 35 U.S.C. § 103(a) as unpatentable over Solana and Karr; and claim 17 under 35 U.S.C. § 103(a) as unpatentable over Solana and Denning.

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956. *See* 37 C.F.R. § 41.79.

In the event neither party files a request for rehearing within the time provided in 37 C.F.R. § 41.79, and this decision becomes final and appealable under 37 C.F.R. § 41.81, a party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office. *See* 37 C.F.R. §§ 90.1 and 1.983.

AFFIRMED

PATENT OWNER:

FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER LLP
901 NEW YORK AVENUE, NW
WASHINGTON DC 20001-4413

THIRD PARTY REQUESTER:

SIDLEY AUSTIN LLP
2001 ROSS AVENUE
SUITE 3600
DALLAS, TX 75201

kis

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,679 | 07/08/2011 | 6502135 | 43614.92 | 9786 |

137313 7590 01/18/2019
PAUL HASTINGS LLP
875 15th Street, NW
Washington, DC 20005

| EXAMINER | |
|---|---|
| PEIKARI, BEHZAD | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/18/2019 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CISCO SYSTEMS, INC.,
Requester,

v.

VIRNETX INC.,
Patent Owner.

---

Appeal 2017-011862
Reexamination Control 95/001,679
Patent 6,502,135 B1
Technology Center 3900

---

Before STEPHEN C. SIU, DENISE M. POTHIER, and JEREMY J. CURCURI, *Administrative Patent Judges*.

SIU, *Administrative Patent Judge*

DECISION ON REHEARING

In papers filed March 6, 2018, Patent Owner requests a rehearing under 37 C.F.C. §§ 41.77(b)(2) and 41.79(a)(1) from the Decision ("Dec." or "Decision") of the Patent Trial and Appeal Board (hereinafter Board), dated February 6, 2018 ("Req. Reh'g"). Requester filed a response on April 5, 2018. Third Party Requester's Comments in Response to Patent Owner's Request for Rehearing Pursuant to 37 C.F.R. 41.79(c) ("3PR Comments").

Patent Owner argues that Kiuchi fails to disclose "determining whether the client computer is authorized to establish a VPN with the target computer," as recited in claim 4. Req. Reh'g. 2–3 (citing PO App. Br. 21). In particular, Patent Owner argues that Kiuchi discloses whether a "server-side proxy is registered in the network, not whether a purported 'client computer' is authorized to establish a VPN" and that "whether the server-side proxy is permitted to connect says nothing as to the client computer's authorization." PO App. Br. 21.

We are not persuaded by Patent Owner's arguments for at least the reasons set forth by Requester. 3PR Comments 3–10. For example, as Requester points out, Patent Owner states that Kiuchi discloses that "a determination is made of whether 'the server-side proxy . . . is permitted ***to accept the connection from the client-side proxy***.'" 3PR Comments 7 (citing PO App. Br. 21).[1] Patent Owner does not point out any specific differences between Kiuchi's disclosure and "determining whether the client

[1] Requester also indicates another panel states "[o]ne skilled in the art would have understood that a client that is determined to be 'permitted to connect' also would be determined to be 'authorized' to do so. Otherwise, the client would not be permitted to connect with the server[.]" 3PR Comments 4 (quoting IPR2015-01046, Paper 71 at 19). We agree.

computer is authorized to establish a VPN with the target computer," as recited in claim 4. In both cases, an authorized device (e.g., a "client computer" or a "client-side proxy") connects with another device (e.g., a "target device" or a "server-side proxy").

Patent Owner argues that determining whether a server-side proxy of Kiuchi "is permitted to connect" with a client-side proxy "says nothing" about determining whether a client-side proxy "is permitted to connect" with a server-side proxy. We disagree with Patent Owner's argument for at least the reasons set forth by Requester. 3PR Comments 8–10. For example, as Requester points out, Patent Owner "fails to explain the distinction." We do not independently identify a distinction given that, as previously discussed, in both Kiuchi and the present claims, a device (e.g., a client-side proxy or client computer) that is "authorized" (i.e., permitted) to connect with another device (e.g., a server-side proxy), in fact, connects with the device – if authorized or permitted to do so – and a secure communication link is established between an authorized client computer (i.e., a client-side proxy) and a target computer (i.e., a server-side proxy).

Also, we address the above passage in Kiuchi when discussing steps (2) and (3) in claim 1, from which claim 4 depends. *See also* Dec. 20 and 21–22 (both quoting Kiuchi 65). Claim 4 recites more details of step (3)'s "automatically initiating the VPN" step. Thus, although not explicitly discussing Patent Owner's contention when discussing claim 4 (Dec. 22), we addressed that Kiuchi fails to teach "determining whether the client computer is authorized to establish a VPN with the target computer" as

recited in claim 4 indirectly when discussing claim 1. Thus, Patent Owner's argument was not overlooked or misapprehended.

Although not argued in the Request for Rehearing, we note Patent Owner contended that "claims 1–9 and 13–18" would not have been obvious to one of ordinary skill in the art because of "[s]econdary considerations supporting nonobviousness include long-felt need, failure of others, skepticism, commercial success, and praise and acceptance by others in the field." PO App. Br. 68. In particular, Patent Owner argues that there was "a long-felt need . . . to easily and conveniently establish secure communication links" and to "initiate a VPN between a client computer and a target computer," that "others attempted to create easy-to-enable secure communications [but] failed," that of various alleged "prestigious organizations," "none of them came up with a solution" to "easily set up secure communications over the Internet," that a specific "DARPA program manager" allegedly "informed" a "co-inventor . . . that [the] technology . . . would never be adopted," that "multiple companies" "entered into a portfolio license" or "licensed the patents," that various companies allegedly "demonstrat[ed] praise through their conduct" of "investing" and "spend[ing] . . . on internal research and development efforts" or "would have invested but for a[n adverse] change in circumstances," PO App. Br. 68–71.

Hence, Patent Owner argues that it would not have been obvious to one of ordinary skill in the art to have combined any of the cited references because the claimed feature of "establishing a secure communication link between a client computer and a target computer" (as the alleged "nexus"

between the claimed invention and the alleged secondary considerations) resulted in satisfaction of a "long-felt need," was the subject of alleged "praise" by others in the field, was supposedly the reason (or "nexus") for alleged licenses, reported to have enjoyed commercial success, that one particular "DARPA program manager" allegedly express skepticism that a secure communication link between a client computer and a target computer could ever be accomplished "by regular computer users," and that, at the time of the invention, those of skill in the art had attempted to establish a secure communication link between a client computer and a target computer (i.e., the alleged "nexus") but failed to do so successfully.

We are not persuaded by Patent Owner's argument at least because the prior art reference, such as Kiuchi, discloses establishing a secure communication link between a client computer and a target computer, which Patent Owner relies on as a "nexus" between the claimed invention and each of the alleged objective indicia of non-obviousness. It would not make logical sense to conclude that establishing a secure communication link disclosed by Kiuchi, for example, was somehow *not* disclosed by Kiuchi because Patent Owner's *subsequent* establishing of a secure communication link allegedly satisfied a long-felt need, met with skepticism by a "DARPA project manager," enjoyed commercial success, was supposedly praised, or was the subject of alleged licenses. All evidence of secondary considerations stem from what was known in the prior art (e.g., Kiuchi) so that there can be no nexus. *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011).

We have granted the Request for Rehearing to the extent that we have reconsidered the Decision, but we deny the request for rehearing with respect to making any changes to the grounds of rejection.

REHEARING DENIED

jagr

For Patent Owner:

PAUL HASTINGS LLP
875 15TH STREET, NW
Washington, DC 20005

For Third Party Requester:

SIDLEY AUSTIN LLP
2001 ROSS AVENUE
SUITE 3600
Dallas, TX 75201

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,679 | 07/08/2011 | 6502135 | 43614.92 | 9786 |

137313 7590 01/10/2022
PAUL HASTINGS LLP
2050 M. Street NW
Washington, DC 20036

| EXAMINER | |
|---|---|
| PEIKARI, BEHZAD | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/10/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

CISCO SYSTEMS, INC.,
Requester

v.

Patent of VIRNETX INC.,
Patent Owner and Appellant

Appeal 2017-011862
Reexamination Control 95/001,679
Patent 6,502,135 B1
Technology Center 3900

Before ANDREW HIRSHFELD, *Commissioner for Patents, Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

# ORDER

The Office has received a request for Director review of the Decision on Rehearing and the Decision on Appeal in the above-captioned case. *See* Reexamination Control No. 95/001,679, Request dated November 4, 2021. The Patent Trial and Appeal Board ("Board") referred VirnetX's request to Mr. Hirshfeld, Commissioner for Patents, Performing the Functions and Duties of the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

It is ORDERED that the request for Director review is denied; and

FURTHER ORDERED that the Board's Decision on Rehearing in this case is the final decision of the agency.

For Patent Owner:

PAUL HASTINGS LLP
2050 M STREET NW
WASHINGTON, DC 20036

For Third Party Requester:

HAYNES AND BOONE, LLP
IP SECTION
2323 VICTORY AVENUE, SUITE 700
DALLAS, TX 75219

US006502135B1

(12) **United States Patent**
**Munger et al.**

(10) **Patent No.: US 6,502,135 B1**
(45) **Date of Patent: Dec. 31, 2002**

(54) **AGILE NETWORK PROTOCOL FOR SECURE COMMUNICATIONS WITH ASSURED SYSTEM AVAILABILITY**

(75) Inventors: **Edmund Colby Munger**, Crownsville, MD (US); **Douglas Charles Schmidt**, Severna Park, MD (US); **Robert Dunham Short, III**, Leesburg, VA (US); **Victor Larson**, Fairfax, VA (US); **Michael Williamson**, South Riding, VA (US)

(73) Assignee: **Science Applications International Corporation**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/504,783**

(22) Filed: **Feb. 15, 2000**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/429,643, filed on Oct. 29, 1999

(60) Provisional application No. 60/106,261, filed on Oct. 30, 1998, and provisional application No. 60/137,704, filed on Jun. 7, 1999.

(51) **Int. Cl.**7 .............................................. **G06F 15/173**

(52) **U.S. Cl.** ........................ **709/225**; 709/229; 709/245

(58) **Field of Search** ................................ 709/249, 223, 709/225, 229, 245; 713/201

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,933,846 A 6/1990 Humphrey et al.

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 0 838 930 | 12/1999 |
| DE | 199 24 575 | 12/1999 |
| EP | 2 317 792 | 4/1998 |
| EP | 0 858 189 | 8/1998 |
| GB | 0 814 589 | 12/1997 |
| WO | WO 98/27783 | 6/1998 |
| WO | WO 98 59470 | 12/1998 |
| WO | WO 99 38081 | 7/1999 |
| WO | WO 99 48303 | 9/1999 |
| WO | WO 00/70458 | 11/2000 |
| WO | WO 01 50688 | 7/2001 |

OTHER PUBLICATIONS

Fasbender, Kesdogan, and Kubitz: "Variable and Scalable Security: Protection of Location Information in Mobile IP", IEEE publication, 1996, pp. 963–967.

(List continued on next page.)

*Primary Examiner*—Krisna Lim
(74) *Attorney, Agent, or Firm*—Banner & Witcoff, Ltd.

(57) **ABSTRACT**

A plurality of computer nodes communicate using seemingly random Internet Protocol source and destination addresses. Data packets matching criteria defined by a moving window of valid addresses are accepted for further processing, while those that do not meet the criteria are quickly rejected. Improvements to the basic design include (1) a load balancer that distributes packets across different transmission paths according to transmission path quality; (2) a DNS proxy server that transparently creates a virtual private network in response to a domain name inquiry; (3) a large-to-small link bandwidth management feature that prevents denial-of-service attacks at system chokepoints; (4) a traffic limiter that regulates incoming packets by limiting the rate at which a transmitter can be synchronized with a receiver; and (5) a signaling synchronizer that allows a large number of nodes to communicate with a central node by partitioning the communication function between two separate entities.

**17 Claims, 35 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,588,060 | A | | 12/1996 | Aziz | |
| 5,689,566 | A | | 11/1997 | Nguyen | |
| 5,796,942 | A | | 8/1998 | Esbensen | |
| 5,805,801 | A | | 9/1998 | Holloway et al. | |
| 5,842,040 | A | | 11/1998 | Hughes et al. | |
| 5,878,231 | A | * | 3/1999 | Baehr et al. | 709/243 |
| 5,892,903 | A | | 4/1999 | Klaus | |
| 5,898,830 | A | * | 4/1999 | Wesinger et al. | 709/225 |
| 5,905,859 | A | | 5/1999 | Holloway et al. | |
| 6,006,259 | A | | 12/1999 | Adelman et al. | |
| 6,016,318 | A | * | 1/2000 | Tomoike | 370/338 |
| 6,052,788 | A | | 4/2000 | Wesinger, Jr. et al. | |
| 6,079,020 | A | * | 6/2000 | Liu | 713/201 |
| 6,119,171 | A | | 9/2000 | Alkhatib | |
| 6,178,505 | B1 | * | 1/2001 | Schneider et al. | 713/168 |
| 6,226,751 | B1 | * | 5/2001 | Arrow et al. | 370/351 |
| 6,243,749 | B1 | | 6/2001 | Sitaraman et al. | |
| 6,286,047 | B1 | * | 9/2001 | Ramanathan et al. | 345/733 |
| 6,330,562 | B1 | * | 12/2001 | Boden et al. | 707/10 |
| 6,332,158 | B1 | * | 12/2001 | Risley et al. | 709/219 |
| 6,353,614 | B1 | * | 3/2002 | Borella et al. | 370/389 |

OTHER PUBLICATIONS

Linux FreeS/WAN Index File, printed from http://liberty-.freeswan.org/freeswan__trees/freeswan–1.3/doc/ on Feb. 21, 2002, 3 pages.

J. Gilmore, "Swan: Securing the Internet against Wiretapping", printed from http://liberty.freeswan.org/freeswan__trees/freesswan–1.3/doc/rationale.html on Feb. 21, 2002, 4 pages.

Glossary for the Linux FreeS/WAN project, printed from http://liberty.freeswan/org/freeswan__trees/freeswan–1.3/doc/glossary.html on Feb. 21, 2002, 25 pages.

Alan O. Frier et al., "The SSL Protocol Version 3.0", Nov. 18, 1996, printed from http://www.netscape.com/eng/ss13/draft302.txt on Feb. 4, 2002, 56 pages.

Reiter, Michael K. and Rubin, Aviel D. (AT&T Labs—Research), "Crowds: Anonymity for Web Transactions", pp. 1–23.

Dolev, Shlomi and Ostrovsky, Rafail, "Efficient Anonymous Multicast and Reception" (Extended Abstract), 16 pages.

Rubin, Aviel D., Geer, Daniel, and Ranum, Marcus J. (Wiley Computer Publishing), "Web Security Sourcebook", pp. 82–94.

Shree Murthy et al., "Congestion–Oriented Shortest Multipath Routing", Proceedings of IEEE INFOCOM, 1996, pp. 1028–1036.

Jim Jones et al., "Distributed Denial of Service Attacks: Defenses", Global Integrity Corporation, 2000, pp. 1–14.

Search Report (dated Jun. 18, 2002), International Application No. PCT/US01/13260.

Search Report (dated Jun. 28, 2002), International Application No. PCT/US01/13261.

Donald E. Eastlake, "Domain Name System Security Extensions", DNS Security Working Group, Apr. 1998, 51 pages.

D. B. Chapman et al., "Building Internet Firewalls", Nov. 1995, pp. 278–297 and pp. 351–375.

P. Srisuresh et al., "DNS extensions to Network Address Translators", Jul. 1998, 27 pages.

Laurie Wells, "Security Icon", Oct. 19, 1998, 1 page.

W. Stallings, "Cryptography And Network Security", 2nd Edition, Chapter 13, IP Security, Jun. 8, 1998, pp. 399–400.

W. Stallings, "New Cryptography and Network Security Book", Jun. 8, 1998, 3 pages.

* cited by examiner


100
ORIGINATING TERMINAL
107
40
IP PACKET
31
IP ROUTER
22
IP ROUTER
23
IP ROUTER
30
IP ROUTER
24
IP ROUTER
29
IP ROUTER
25
IP ROUTER
INTERNET
32
IP ROUTER
28
IP ROUTER
27
IP ROUTER
26
IP ROUTER
48
ENCRYPTION KEY
110
DESTINATION TERMINAL

FIG. 1



100
TARP TERMINAL
140
TARP PACKET
146
LINK KEY
107
131
IP ROUTER
122
TARP ROUTER
LINK KEY
123
TARP ROUTER
LINK KEY
130
IP ROUTER
124
TARP ROUTER
128
IP ROUTER
129
IP ROUTER
125
TARP ROUTER
INTERNET
132
IP ROUTER
LINK KEY
127
TARP ROUTER
126
TARP ROUTER
LINK KEY
148
SESSION KEY
LINK KEY
TARP PACKET
140
110
TARP TERMINAL


FIG. 2



207a
207b
207c
207d
IP 1 2 3 IP 4 5 6 IP 7 8 9
DATA STREAM 300
1 2 3 4 5 6 7 8 9
1 4 7
2 5 8
3 6 9
A
B
C
INTERLEAVED PAYLOAD DATA 320
INTERLEAVE WINDOW 320
SESSION-KEY-ENCRYPTED PAYLOAD DATA 330
$IP_T$ A
$IP_T$ B
$IP_T$ C
TARP PACKET WITH ENCRYPTED PAYLOADS 340
LINK-KEY-ENCRYPTED TARP PACKETS 350
$IP_C$ A
$IP_C$ B
$IP_C$ C
IP PACKETS W/ ENCRYPTED TARP PACKETS AS PAYLOAD 360
TARP ROUTER 1
TARP ROUTER 2
TARP ROUTER 7
TARP ROUTER 3
TARP ROUTER 5
TARP ROUTER 6
TARP ROUTER 4
TARP DESTINATION


FIG. 3A



207a
207b
207c
207d
DATA STREAM 300
IP
IP
IP
BLOCK-ENCRYPTED (SESSION-KEY) PAYLOAD SEQUENCE 520
DUMMY BLOCKS OR DATA MAY BE ADDED
1 2 3
4 5 6
7 8 9
ENCRYPTED BLOCK DIVIDED INTO PAYLOADS 522
1 4 7
2 5 8
3 6 9
A
B
C
ENCRYPTED BLOCK DIVIDED INTO PAYLOADS INTERLEAVED 523
INTERLEAVE WINDOW 517
A
B
C
ENCRYPTED BLOCK DIVIDED INTO PAYLOADS INTERLEAVED 523
IPT A
IPT B
IPT C
TARP PACKETS WITH ENCRYPTED PAYLOADS 340


FIG. 3B


TARP TRANSCEIVER 405
NETWORK (IP) LAYER 410
IP
415
TARP LAYER 420
IP C
A
DATA LINK LAYER 430
ONE ALTERNATIVE TO COMBINE TARP PROCESSING WITH O/S IP PROCESSOR
OTHER ALTERNATIVE TO COMBINE TARP PROCESSING WITH D.L. PROCESSOR (E.G., BURN INTO BOARD PROM)
IP C
A
DATA LINK PROTOCOL WRAPPER 450

FIG. 4


BACKGROUND LOOP-DECOY GENERATION
S0
AUTHENTICATE TARP PACKET
S2
OUTER LAYER DECRYPTION OF TARP PACKET USING LINK KEY
S3
CHECK FOR DECOY AND INCREMENT PERISHABLE DECOY COUNTER AS APPROPRIATE
S4
S6
DUMP DECOY
NO
TRANSMIT DECOY?
S5
YES
NO
DECREMENT TTL TTL > 0?
S7
YES
S9
DETERMINE DESTINATION TARP ADDRESS AND STORE LINK KEY AND IP ADDRESS
GENERATE NEXT-HOP TARP ADDRESS AND STORE LINK KEY AND IP ADDRESS
S8
GENERATE NEXT-HOP TARP ADDRESS AND STORE LINK KEY AND IP ADDRESS
S10
GENERATE IP HEADER AND TRANSMIT
S11

FIG. 5


BACKGROUND LOOP-DECOY GENERATION
S20
GROUP RECEIVED IP PACKETS INTO INTERLEAVE WINDOW
S21
DETERMINE DESTINATION TARP ADDRESS, INITIALIZE TTL, STORE IN TARP HEADER
S22
RECORD WINDOW SEQ. NOS. AND INTERLEAVE SEQ. NOS IN TARP HEADERS
S23
CHOOSE FIRST HOP TARP ROUTER, LOOK UP IP ADDRESS AND STORE IN CLEAR IP HEADER, OUTER LAYER ENCRYPT
S24
INSTALL CLEAR IP HEADER AND TRANSMIT
S25

FIG. 6


S40
BACKGROUND LOOP-DECOY GENERATION
S42
AUTHENTICATE TARP PACKET RECEIVED
S43
DECRYPT OUTER LAYER ENCRYPTION WITH LINK KEY
S44
INCREMENT PERISHABLE COUNTER IF DECOY
S45
THROW AWAY DECOY OR KEEP IN RESPONSE TO ALGORITHM
S46
CACHE TARP PACKETS UNTIL WINDOW IS ASSEMBLED
S47
DEINTERLEAVE PACKETS FORMING WINDOW
S48
DECRYPT BLOCK
S49
DIVIDE BLOCK INTO PACKETS USING WINDOW SEQUENCE DATA, ADD CLEAR IP HEADERS GENERATED FROM TARP HEADERS
S50
HAND COMPLETED IP PACKETS TO IP LAYER PROCESS

FIG. 7


TARP
ROUTER
811
SSYN PACKET 821
SSYN ACK PACKET 822
SSYN ACK ACK PACKET 823
SECURE SESSION INITIATION 824
SECURE SESSION INITIATION ACK 825
CLIENT TERMINAL
801

FIG. 8


CLIENT 1
901
TARP ROUTER
911
TRANSMIT TABLE 921
131.218.204.98 - 131.218.204.65
131.218.204.221 - 131.218.204.97
131.218.204.139 - 131.218.204.186
131.218.204.12 - 131.218.204.55
RECEIVE TABLE 922
131.218.204.161 - 131.218.204.89
131.218.204.66 - 131.218.204.212
131.218.204.201 - 131.218.204.127
131.218.204.119 - 131.218.204.49
RECEIVE TABLE 924
131.218.204.98 - 131.218.204.65
131.218.204.221 - 131.218.204.97
131.218.204.139 - 131.218.204.186
131.218.204.12 - 131.218.204.55
TRANSMIT TABLE 923
131.218.204.161 - 131.218.204.89
131.218.204.66 - 131.218.204.212
131.218.204.201 - 131.218.204.127
131.218.204.119 - 131.218.204.49

FIG. 9


1011
1012
1013
ISP A
TARP
ROUTER
ISP B
TARP
ROUTER
ISP C
TARP
ROUTER
1021
1022
1023
CLIENT
1001

FIG. 10


1160
1104
1105
IP3
ETHERNET FRAME HEADER
SRC. HW ADDRESS: 53
DEST. HW ADDRESS: 88
IP PACKET HEADER
SOURCE IP ADDRESS: 71
DEST. IP ADDRESS: 91
DISCRIM FIELD: 45
PAYLOAD #3
1104A
1104B
1105A
1105B
1105C
1113
1101A
1101B
1102A
1102B
1102C
1110
1103A
1103B
1103C
1112
1150
ETHERNET FRAME HEADER
SRC. HW ADDRESS: 53
DEST. HW ADDRESS: 88
IP PACKET HEADER
SOURCE IP ADDRESS: 10
DEST. IP ADDRESS: 14
DISCRIM FIELD: 77
PAYLOAD #1
IP PACKET HEADER
SOURCE IP ADDRESS: 13
DEST. IP ADDRESS: 15
DISCRIM FIELD: 13
PAYLOAD #2
1101
1102
1103
IP1
IP2

FIG. 11


1201
1202
1203
USER APPLICATION
1204
ISO STACK
1205
1206
1207
HW
ETHERNET
1214
1215
HW
1216
1217
ISO STACK
1218
USER APPLICATION
IPHOP ALG A
IPHOP ALG B
HWHOP ALG C
HWHOP ALG D
(TX)
(RX)
S D DS
S D
1208X
1209X
1210X
1211X
1221X
1222X
1223X
1224X
1208
1209
1210
1211
1221
1222
1223
1224
W1
W2
W3
W4

FIG. 12A

| MODE OR EMBODIMENT | HARDWARE ADDRESSES | IP ADDRESSES | DISCRIMINATOR FIELD VALUES |
|---|---|---|---|
| 1. PROMISCUOUS | SAME FOR ALL NODES OR COMPLETELY RANDOM | CAN BE VARIED IN SYNC | CAN BE VARIED IN SYNC |
| 2. PROMISCUOUS PER VPN | FIXED FOR EACH VPN | CAN BE VARIED IN SYNC | CAN BE VARIED IN SYNC |
| 3. HARDWARE HOPPING | CAN BE VARIED IN SYNC | CAN BE VARIED IN SYNC | CAN BE VARIED IN SYNC |

FIG. 12B


1301
CLIENT A
1302
ISP #1
1303
ISP #2
1304
CLIENT B
IP SOURCE ADDRESS
IP DEST. ADDRESS
SYNC VALUE (PUBLIC PORTION)
SYNC VALUE (PRIVATE PORTION)
LINK-KEY ENCRYPTED PAYLOAD
1305
1306
DECRYPT
1307
+
1308
COMBINED SYNC
1309
RNG ALG.
1310
MATCH?
1311
YES
PROCESS PACKET
NO
DISCARD PACKET

FIG. 13


IP PAIR 1
IP PAIR 2
IP PAIR W
ckpt_o
ckpt_n
ckpt_r
WINDOW
RECEIVER
CURRENT IP PAIR
ckpt_o
ckpt_n
ckpt_r
TRANSMITTER
RECIPIENT'S ISP
CURRENT IP PAIR
ckpt_o
ckpt_n
ckpt_r
TRANSMITTER
IP PAIR 1
IP PAIR 2
IP PAIR W
ckpt_o
ckpt_n
ckpt_r
WINDOW
RECEIVER
SENDER'S ISP
KEPT IN SYNC FOR SENDER TO RECIPIENT SYNCHRONIZER
KEPT IN SYNC FOR RECIPIENT TO SENDER SYNCHRONIZER

FIG. 14



W
W
SYNC_REQ
SYNC_ACK
*
@
#
* WHEN SYNC_REQ ARRIVES WITH INCOMING HEADER = RECEIVER'S ckpt_n:
• UPDATE WINDOW
• GENERATE NEW CHECKPOINT IP PAIR ckpt_n IN RECEIVER
• GENERATE NEW CHECKPOINT IP PAIR ckpt_r IN TRANSMITTER
• TRANSMIT SYNC_ACK USING NEW CHECKPOINT IP PAIR ckpt_r
@ WHEN SYNCHRONIZATION BEGINS TRANSMIT (RETRANSMIT PERIODICALLY UNTIL ACKed) SYNC_REQ USING NEW TRANSMITTER CHECKPOINT IP PAIR ckpt_n AND GENERATE NEW RECEIVER RESPONSE CHECKPOINT ckpt_r
# WHEN SYNC_ACK ARRIVES WITH INCOMING HEADER = ckpt_r: GENERATE NEW CHECKPOINT IP PAIR ckpt_n IN TRANSMITTER


FIG. 15




FIG. 16




FIG. 17




FIG. 18




FIG. 19


COMPUTER #2
2002
EDGE ROUTER
2004
ISP D
2008
ISP E
2009
ISP F
2010
AD
AE
BD
CD
BE
CE
AF
BF
CF
ISP A
2005
ISP B
2006
ISP C
2007
EDGE ROUTER
2003
COMPUTER #1
2001
2011

FIG. 20


AD TABLE
IP1
IP2
IP3
IP4
2101
AE TABLE
2102
AF TABLE
2103
BD TABLE
2104
BE TABLE
LINK DOWN
2105
BF TABLE
2106
2100
CD TABLE
2107
CE TABLE
2108
CF TABLE
2109

FIG. 21



2201
MEASURE QUALITY OF TRANSMISSION PATH X
2202
MORE THAN ONE TRANSMITTER TURNED ON?
NO
YES
2203
PATH X QUALITY < THRESHOLD?
YES
NO
2207
PATH X WEIGHT > MIN.?
NO
YES
2209
SET WEIGHT TO MIN. VALUE
2204
PATH X WEIGHT LESS THAN STEADY STATE VALUE?
NO
YES
2208
DECREASE WEIGHT FOR PATH X
2205
INCREASE WEIGHT FOR PATH X TOWARD STEADY STATE VALUE
2206
ADJUST WEIGHTS FOR REMAINING PATHS SO THAT WEIGHTS EQUAL ONE


FIG. 22A


2210
(EVENT) TRANSMITTER FOR PATH X TURNS OFF
2211
AT LEAST ONE TRANSMITTER TURNED ON?
NO
2215
DROP ALL PACKETS UNTIL A TRANSMITTER TURNS ON
YES
2212
SET WEIGHT TO ZERO
2213
ADJUST WEIGHTS FOR REMAINING PATHS SO THAT WEIGHTS EQUAL ONE
2214
DONE

FIG. 22B


PATH X1
PATH X2
PATH X3
PATH X4
2301
2306
2305
W(X1) = 0.2
W(X2) = 0.1
W(X3) = 0.6
W(X4) = 0.1
WEIGHT ADJUSTMENT FUNCTION
2307
2302
2303
PACKET TRANSMITTER
PACKET RECEIVER
LINK QUALITY MEASUREMENT FUNCTION
2304
2308
TRANSMIT TABLE
S D
RECEIVE TABLE
S D L
2309
W

FIG. 23


2402
COMPUTER
2404
ROUTER
L1
L2
L3
100 Mb/s MESS T = 32
75 Mb/s MESS T = 24
25 Mb/s MESS T = 8
2403
L1
L2
L3
ROUTER
2401
COMPUTER

FIG. 24




FIG. 25
(PRIOR ART)


2602
2609
2610
DNS SERVER
DNS PROXY
2603
GATE KEEPER
HOPPING
RULES
2604
SECURE TARGET SITE
2608
IP HOPPING
2611
UNSECURE TARGET SITE
2601
2606
IP STACK
2605
WEB BROWSER
2607
IP HOPPING

FIG. 26


2701
RECEIVE DNS REQUEST FOR TARGET SITE
2702
ACCESS TO SECURE SITE REQUESTED?
NO
2703
PASS THRU REQUEST TO DNS SERVER
YES
2704
USER AUTHORIZED TO CONNECT?
NO
2705
RETURN "HOST UNKNOWN" ERROR
YES
2706
ESTABLISH VPN WITH TARGET SITE

FIG. 27


2803
ISP
LINK GUARD
2805
RX TABLE
2810
HIGH BW
INTERNET
LOW BW
2802
EDGE ROUTER
2804
HOST COMPUTER #2
2801
HOST COMPUTER #1

FIG. 28



2911
2901
LINK GUARD
ISP
2910
TX
TX
RX
RX
2908
2907
2909
HIGH BW
INTERNET
LOW BW
EDGE ROUTER
2904
IP TX 100-200
FLOOD IP TX 100-200
HOST COMPUTER #2
RX
TX
2913
2912
HACKER COMPUTER
HOST COMPUTER #1
RX
TX
2906
2905
2900
2902
2903


FIG. 29


TRANSMITTER
TX TABLE
3003
3001
W
GENERATE SYNC_REQ
3010
PROCESS CKPT_N (SYNC_ACK)
3011
N
RECEIVER
RX TABLE
3002
3000
W
RECEIVE SYNC_REQ
3004
DUPLICATE?
3005
Y
N
DISCARD
3006
EXCEEDS RATE R?
3007
DELAY W/R SECONDS
3008
GENERATE CKPT_N
3009

FIG. 30


CLIENT #1
CKPT_N
CKPT_O
CKPT_R
CLIENT #2
HACKER
3103
3106
3104
3105
3111
3114
3115
3113
3112
TX/RX
TX/RX
TX/RX
3210
3209
3208
CKPT_N
CKPT_O
CKPT_R
CKPT_N
CKPT_O
CKPT_R
3101
3106
3107
3102

FIG. 31


CLIENT
SERVER
SEND DATA PACKET
USING CKPT_N
CKPT_O=CKPT_N
GENERATE NEW CKPT_N
START TIMER, SHUT
TRANSMITTER OFF
DATA
PASS DATA UP STACK
CKPT_O=CKPT_N
GENERATE NEW CKPT_N
GENERATE NEW CKPT_R
FOR TRANSMITTER SIDE
TRANSMIT SYNC_ACK
CONTAINING CKPT_O
SYNC_ACK
IF CKPT_O IN SYNC_ACK
MATCHES TRANSMITTER'S
CKPT_O
UPDATE RECEIVER'S
CKPT_R
KILL TIMER, TURN
TRANSMITTER ON
SEND DATA PACKET
USING CKPT_N
CKPT_O=CKPT_N
GENERATE NEW CKPT_N
START TIMER, SHUT
TRANSMITTER OFF
DATA
X
WHEN TIMER EXPIRES
TRANSMIT SYNC_REQ
USING TRANSMITTERS
CKPT_O, START TIMER
SYNC_REQ
CKPT_O=CKPT_N
GENERATE NEW CKPT_N
GENERATE NEW CKPT_R
FOR TRANSMITTER SIDE
TRANSMIT SYNC_ACK
CONTAINING CKPT_O
SYNC_ACK
IF CKPT_O IN SYNC_ACK
MATCHES TRANSMITTER'S
CKPT_O
UPDATE RECEIVER'S
CKPT_R
KILL TIMER, TURN
TRANSMITTER ON

FIG. 32

# AGILE NETWORK PROTOCOL FOR SECURE COMMUNICATIONS WITH ASSURED SYSTEM AVAILABILITY

## CROSS-REFERENCE TO RELATED APPLICATION

This application claims priority from and is a continuation-in-part of previously filed U.S. application Ser. No. 09/429,643, filed on Oct. 29, 1999. The subject matter of that application, which is bodily incorporated herein, derives from provisional U.S. application No. 60/106,261 (filed Oct. 30, 1998) and No. 60/137,704 (filed Jun. 7, 1999).

## BACKGROUND OF THE INVENTION

A tremendous variety of methods have been proposed and implemented to provide security and anonymity for communications over the Internet. The variety stems, in part, from the different needs of different Internet users. A basic heuristic framework to aid in discussing these different security techniques is illustrated in FIG. **1**. Two terminals, an originating terminal **100** and a destination terminal **110** are in communication over the Internet. It is desired for the communications to be secure, that is, immune to eavesdropping. For example, terminal **100** may transmit secret information to terminal **110** over the Internet **107**. Also, it may be desired to prevent an eavesdropper from discovering that terminal **100** is in communication with terminal **110**. For example, if terminal **100** is a user and terminal **110** hosts a web site, terminal **100**'s user may not want anyone in the intervening networks to know what web sites he is "visiting." Anonymity would thus be an issue, for example, for companies that want to keep their market research interests private and thus would prefer to prevent outsiders from knowing which web-sites or other Internet resources they are "visiting." These two security issues may be called data security and anonymity, respectively.

Data security is usually tackled using some form of data encryption. An encryption key **48** is known at both the originating and terminating terminals **100** and **110**. The keys may be private and public at the originating and destination terminals **100** and **110**, respectively or they may be symmetrical keys (the same key is used by both parties to encrypt and decrypt). Many encryption methods are known and usable in this context.

To hide traffic from a local administrator or ISP, a user can employ a local proxy server in communicating over an encrypted channel with an outside proxy such that the local administrator or ISP only sees the encrypted traffic. Proxy servers prevent destination servers from determining the identities of the originating clients. This system employs an intermediate server interposed between client and destination server. The destination server sees only the Internet Protocol (IP) address of the proxy server and not the originating client. The target server only sees the address of the outside proxy. This scheme relies on a trusted outside proxy server. Also, proxy schemes are vulnerable to traffic analysis methods of determining identities of transmitters and receivers. Another important limitation of proxy servers is that the server knows the identities of both calling and called parties. In many instances, an originating terminal, such as terminal A, would prefer to keep its identity concealed from the proxy, for example, if the proxy server is provided by an Internet service provider (ISP).

To defeat traffic analysis, a scheme called Chaum's mixes employs a proxy server that transmits and receives fixed length messages, including dummy messages. Multiple originating terminals are connected through a mix (a server) to multiple target servers. It is difficult to tell which of the originating terminals are communicating to which of the connected target servers, and the dummy messages confuse eavesdroppers' efforts to detect communicating pairs by analyzing traffic. A drawback is that there is a risk that the mix server could be compromised. One way to deal with this risk is to spread the trust among multiple mixes. If one mix is compromised, the identities of the originating and target terminals may remain concealed. This strategy requires a number of alternative mixes so that the intermediate servers interposed between the originating and target terminals are not determinable except by compromising more than one mix. The strategy wraps the message with multiple layers of encrypted addresses. The first mix in a sequence can decrypt only the outer layer of the message to reveal the next destination mix in sequence. The second mix can decrypt the message to reveal the next mix and so on. The target server receives the message and, optionally, a multi-layer encrypted payload containing return information to send data back in the same fashion. The only way to defeat such a mix scheme is to collude among mixes. If the packets are all fixed-length and intermixed with dummy packets, there is no way to do any kind of traffic analysis.

Still another anonymity technique, called 'crowds,' protects the identity of the originating terminal from the intermediate proxies by providing that originating terminals belong to groups of proxies called crowds. The crowd proxies are interposed between originating and target terminals. Each proxy through which the message is sent is randomly chosen by an upstream proxy. Each intermediate proxy can send the message either to another randomly chosen proxy in the "crowd" or to the destination. Thus, even crowd members cannot determine if a preceding proxy is the originator of the message or if it was simply passed from another proxy.

ZKS (Zero-Knowledge Systems) Anonymous IP Protocol allows users to select up to any of five different pseudonyms, while desktop software encrypts outgoing traffic and wraps it in User Datagram Protocol (UDP) packets. The first server in a 2+-hop system gets the UDP packets, strips off one layer of encryption to add another, then sends the traffic to the next server, which strips off yet another layer of encryption and adds a new one. The user is permitted to control the number of hops. At the final server, traffic is decrypted with an untraceable IP address. The technique is called onion-routing. This method can be defeated using traffic analysis. For a simple example, bursts of packets from a user during low-duty periods can reveal the identities of sender and receiver.

Firewalls attempt to protect LANs from unauthorized access and hostile exploitation or damage to computers connected to the LAN. Firewalls provide a server through which all access to the LAN must pass. Firewalls are centralized systems that require administrative overhead to maintain. They can be compromised by virtual-machine applications ("applets"). They instill a false sense of security that leads to security breaches for example by users sending sensitive information to servers outside the firewall or encouraging use of modems to sidestep the firewall security. Firewalls are not useful for distributed systems such as business travelers, extranets, small teams, etc.

## SUMMARY OF THE INVENTION

A secure mechanism for communicating over the internet, including a protocol referred to as the Tunneled Agile

Routing Protocol (TARP), uses a unique two-layer encryption format and special TARP routers. TARP routers are similar in function to regular IP routers. Each TARP router has one or more IP addresses and uses normal IP protocol to send IP packet messages ("packets" or "datagrams"). The IP packets exchanged between TARP terminals via TARP routers are actually encrypted packets whose true destination address is concealed except to TARP routers and servers. The normal or "clear" or "outside" IP header attached to TARP IP packets contains only the address of a next hop router or destination server. That is, instead of indicating a final destination in the destination field of the IP header, the TARP packet's IP header always points to a next-hop in a series of TARP router hops, or to the final destination. This means there is no overt indication from an intercepted TARP packet of the true destination of the TARP packet since the destination could always be next-hop TARP router as well as the final destination.

Each TARP packet's true destination is concealed behind a layer of encryption generated using a link key. The link key is the encryption key used for encrypted communication between the hops intervening between an originating TARP terminal and a destination TARP terminal. Each TARP router can remove the outer layer of encryption to reveal the destination router for each TARP packet. To identify the link key needed to decrypt the outer layer of encryption of a TARP packet, a receiving TARP or routing terminal may identify the transmitting terminal by the sender/receiver IP numbers in the cleartext IP header.

Once the outer layer of encryption is removed, the TARP router determines the final destination. Each TARP packet **140** undergoes a minimum number of hops to help foil traffic analysis. The hops may be chosen at random or by a fixed value. As a result, each TARP packet may make random trips among a number of geographically disparate routers before reaching its destination. Each trip is highly likely to be different for each packet composing a given message because each trip is independently randomly determined. This feature is called agile routing. The fact that different packets take different routes provides distinct advantages by making it difficult for an interloper to obtain all the packets forming an entire multi-packet message. The associated advantages have to do with the inner layer of encryption discussed below. Agile routing is combined with another feature that furthers this purpose; a feature that ensures that any message is broken into multiple packets.

The IP address of a TARP router can be changed, a feature called IP agility. Each TARP router, independently or under direction from another TARP terminal or router, can change its IP address. A separate, unchangeable identifier or address is also defined. This address, called the TARP address, is known only to TARP routers and terminals and may be correlated at any time by a TARP router or a TARP terminal using a Lookup Table (LUT). When a TARP router or terminal changes its IP address, it updates the other TARP routers and terminals which in turn update their respective LUTs.

The message payload is hidden behind an inner layer of encryption in the TARP packet that can only be unlocked using a session key. The session key is not available to any of the intervening TARP routers. The session key is used to decrypt the payloads of the TARP packets permitting the data stream to be reconstructed.

Communication may be made private using link and session keys, which in turn may be shared and used according to any desired method. For example, public/private keys or symmetric keys may be used.

To transmit a data stream, a TARP originating terminal constructs a series of TARP packets from a series of IP packets generated by a network (IP) layer process. (Note that the terms "network layer," "data link layer," "application layer," etc. used in this specification correspond to the Open Systems Intercomection (OSI) network terminology.) The payloads of these packets are assembled into a block and chain-block encrypted using the session key. This assumes, of course, that all the IP packets are destined for the same TARP terminal. The block is then interleaved and the interleaved encrypted block is broken into a series of payloads, one for each TARP packet to be generated. Special TARP headers IPT are then added to each payload using the IP headers from the data stream packets. The TARP headers can be identical to normal IP headers or customized in some way. They should contain a formula or data for deinterleaving the data at the destination TARP terminal, a time-to-live (TTL) parameter to indicate the number of hops still to be executed, a data type identifier which indicates whether the payload contains, for example, TCP or UDP data, the sender's TARP address, the destination TARP address, and an indicator as to whether the packet contains real or decoy data or a formula for filtering out decoy data if decoy data is spread in some way through the TARP payload data.

Note that although chain-block encryption is discussed here with reference to the session key, any encryption method may be used. Preferably, as in chain block encryption, a method should be used that makes unauthorized decryption difficult without an entire result of the encryption process. Thus, by separating the encrypted block among multiple packets and making it difficult for an interloper to obtain access to all of such packets, the contents of the communications are provided an extra layer of security.

Decoy or dummy data can be added to a stream to help foil traffic analysis by reducing the peak-to-average network load. It may be desirable to provide the TARP process with an ability to respond to the time of day or other criteria to generate more decoy data during low traffic periods so that communication bursts at one point in the Internet cannot be tied to communication bursts at another point to reveal the communicating endpoints.

Dummy data also helps to break the data into a larger number of inconspicuously-sized packets permitting the interleave window size to be increased while maintaining a reasonable size for each packet. (The packet size can be a single standard size or selected from a fixed range of sizes.) One primary reason for desiring for each message to be broken into multiple packets is apparent if a chain block encryption scheme is used to form the first encryption layer prior to interleaving. A single block encryption may be applied to portion, or entirety, of a message, and that portion or entirety then interleaved into a number of separate packets. Considering the agile IP routing of the packets, and the attendant difficulty of reconstructing an entire sequence of packets to form a single block-encrypted message element, decoy packets can significantly increase the difficulty of reconstructing an entire data stream.

The above scheme may be implemented entirely by processes operating between the data link layer and the network layer of each server or terminal participating in the TARP system. Because the encryption system described above is insertable between the data link and network layers, the processes involved in supporting the encrypted communication may be completely transparent to processes at the IP (network) layer and above. The TARP processes may also be completely transparent to the data link layer processes as

well. Thus, no operations at or above the Network layer, or at or below the data link layer, are affected by the insertion of the TARP stack. This provides additional security to all processes at or above the network layer, since the difficulty of unauthorized penetration of the network layer (by, for example, a hacker) is increased substantially. Even newly developed servers running at the session layer leave all processes below the session layer vulnerable to attack. Note that in this architecture, security is distributed. That is, notebook computers used by executives on the road, for example, can communicate over the Internet without any compromise in security.

IP address changes made by TARP terminals and routers can be done at regular intervals, at random intervals, or upon detection of "attacks." The variation of IP addresses hinders traffic analysis that might reveal which computers are communicating, and also provides a degree of immunity from attack. The level of immunity from attack is roughly proportional to the rate at which the IP address of the host is changing.

As mentioned, IP addresses may be changed in response to attacks. An attack may be revealed, for example, by a regular series of messages indicating that a router is being probed in some way. Upon detection of an attack, the TARP layer process may respond to this event by changing its IP address. In addition, it may create a subprocess that maintains the original IP address and continues interacting with the attacker in some manner.

Decoy packets may be generated by each TARP terminal on some basis determined by an algorithm. For example, the algorithm may be a random one which calls for the generation of a packet on a random basis when the terminal is idle. Alternatively, the algorithm may be responsive to time of day or detection of low traffic to generate more decoy packets during low traffic times. Note that packets are preferably generated in groups, rather than one by one, the groups being sized to simulate real messages. In addition, so that decoy packets may be inserted in normal TARP message streams, the background loop may have a latch that makes it more likely to insert decoy packets when a message stream is being received. Alternatively, if a large number of decoy packets is received along with regular TARP packets, the algorithm may increase the rate of dropping of decoy packets rather than forwarding them. The result of dropping and generating decoy packets in this way is to make the apparent incoming message size different from the apparent outgoing message size to help foil traffic analysis.

In various other embodiments of the invention, a scalable version of the system may be constructed in which a plurality of IP addresses are preassigned to each pair of communicating nodes in the network. Each pair of nodes agrees upon an algorithm for "hopping" between IP addresses (both sending and receiving), such that an eavesdropper sees apparently continuously random IP address pairs (source and destination) for packets transmitted between the pair. Overlapping or "reusable" IP addresses may be allocated to different users on the same subnet, since each node merely verifies that a particular packet includes a valid source/destination pair from the agreed-upon algorithm. Source/destination pairs are preferably not reused between any two nodes during any given end-to-end session, though limited IP block sizes or lengthy sessions might require it.

Further improvements described in this continuation-in-part application include: (1) a load balancer that distributes packets across different transmission paths according to transmission path quality; (2) a DNS proxy server that transparently creates a virtual private network in response to a domain name inquiry; (3) a large-to-small link bandwidth management feature that prevents denial-of-service attacks at system chokepoints; (4) a traffic limiter that regulates incoming packets by limiting the rate at which a transmitter can be synchronized with a receiver; and (5) a signaling synchronizer that allows a large number of nodes to communicate with a central node by partitioning the communication function between two separate entities

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an illustration of secure communications over the Internet according to a prior art embodiment.

FIG. **2** is an illustration of secure communications over the Internet according to a an embodiment of the invention.

FIG. **3*a*** is an illustration of a process of forming a tunneled IP packet according to an embodiment of the invention.

FIG. **3*b*** is an illustration of a process of forming a tunneled IP packet according to another embodiment of the invention.

FIG. **4** is an illustration of an OSI layer location of processes that may be used to implement the invention.

FIG. **5** is a flow chart illustrating a process for routing a tunneled packet according to an embodiment of the invention.

FIG. **6** is a flow chart illustrating a process for forming a tunneled packet according to an embodiment of the invention.

FIG. **7** is a flow chart illustrating a process for receiving a tunneled packet according to an embodiment of the invention.

FIG. **8** shows how a secure session is established and synchronized between a client and a TARP router.

FIG. **9** shows an IP address hopping scheme between a client computer and TARP router using transmit and receive tables in each computer.

FIG. **10** shows physical link redundancy among three Internet Service Providers (ISPs) and a client computer.

FIG. **11** shows how multiple IP packets can be embedded into a single "frame" such as an Ethernet frame, and further shows the use of a discriminator field to camouflage true packet recipients.

FIG. **12**A shows a system that employs hopped hardware addresses, hopped IP addresses, and hopped discriminator fields.

FIG. **12**B shows several different approaches for hopping hardware addresses, IP addresses, and discriminator fields in combination.

FIG. **13** shows a technique for automatically re-establishing synchronization between sender and receiver through the use of a partially public sync value.

FIG. **14** shows a "checkpoint" scheme for regaining synchronization between a sender and recipient.

FIG. **15** shows further details of the checkpoint scheme of FIG. **14**.

FIG. **16** shows how two addresses can be decomposed into a plurality of segments for comparison with presence vectors.

FIG. **17** shows a storage array for a receiver's active addresses.

FIG. **18** shows the receiver's storage array after receiving a sync request.

FIG. **19** shows the receiver's storage array after new addresses have been generated.

FIG. **20** shows a system employing distributed transmission paths.

FIG. **21** shows a plurality of link transmission tables that can be used to route packets in the system of FIG. **20**.

FIG. **22**A shows a flowchart for adjusting weight value distributions associated with a plurality of transmission links.

FIG. **22**B shows a flowchart for setting a weight value to zero if a transmitter turns off.

FIG. **23** shows a system employing distributed transmission paths with adjusted weight value distributions for each path.

FIG. **24** shows an example using the system of FIG. **23**.

FIG. **25** shows a conventional domain-name look-up service.

FIG. **26** shows a system employing a DNS proxy server with transparent VPN creation.

FIG. **27** shows steps that can be carried out to implement transparent VPN creation based on a DNS look-up function.

FIG. **28** shows a system including a link guard function that prevents packet overloading on a low-bandwidth link LOW BW.

FIG. **29** shows one embodiment of a system employing the principles of FIG. **28**.

FIG. **30** shows a system that regulates packet transmission rates by throttling the rate at which synchronizations are performed.

FIG. **31** shows a signaling server **3101** and a transport server **3102** used to establish a VPN with a client computer.

FIG. **32** shows message flows relating to synchronization protocols of FIG. **31**.

## DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. **2**, a secure mechanism for communicating over the internet employs a number of special routers or servers, called TARP routers **122–127** that are similar to regular IP routers **128–132** in that each has one or more IP addresses and uses normal IP protocol to send normal-looking IP packet messages, called TARP packets **140**. TARP packets **140** are identical to normal IP packet messages that are routed by regular IP routers **128–132** because each TARP packet **140** contains a destination address as in a normal IP packet. However, instead of indicating a final destination in the destination field of the IP header, the TARP packet's **140** IP header always points to a next-hop in a series of TARP router hops, or the final destination, TARP terminal **110**. Because the header of the TARP packet contains only the next-hop destination, there is no overt indication from an intercepted TARP packet of the true destination of the TARP packet **140** since the destination could always be the next-hop TARP router as well as the final destination, TARP terminal **110**.

Each TARP packet's true destination is concealed behind an outer layer of encryption generated using a link key **146**. The link key **146** is the encryption key used for encrypted communication between the end points (TARP terminals or TARP routers) of a single link in the chain of hops connecting the originating TARP terminal **100** and the destination TARP terminal **110**. Each TARP router **122–127**, using the link key **146** it uses to communicate with the previous hop in a chain, can use the link key to reveal the true destination of a TARP packet. To identify the link key needed to decrypt the outer layer of encryption of a TARP packet, a receiving TARP or routing terminal may identify the transmitting terminal (which may indicate the link key used) by the sender field of the clear IP header. Alternatively, this identity may be hidden behind another layer of encryption in available bits in the clear IP header. Each TARP router, upon receiving a TARP message, determines if the message is a TARP message by using authentication data in the TARP packet. This could be recorded in available bytes in the TARP packet's IP header. Alternatively, TARP packets could be authenticated by attempting to decrypt using the link key **146** and determining if the results are as expected. The former may have computational advantages because it does not involve a decryption process.

Once the outer layer of decryption is completed by a TARP router **122–127**, the TARP router determines the final destination. The system is preferably designed to cause each TARP packet **140** to undergo a minimum number of hops to help foil traffic analysis. The time to live counter in the IP header of the TARP message may be used to indicate a number of TARP router hops yet to be completed. Each TARP router then would decrement the counter and determine from that whether it should forward the TARP packet **140** to another TARP router **122–127** or to the destination TARP terminal **110**. If the time to live counter is zero or below zero after decrementing, for an example of usage, the TARP router receiving the TARP packet **140** may forward the TARP packet **140** to the destination TARP terminal **110**. If the time to live counter is above zero after decrementing, for an example of usage, the TARP router receiving the TARP packet **140** may forward the TARP packet **140** to a TARP router **122–127** that the current TARP terminal chooses at random. As a result, each TARP packet **140** is routed through some minimum number of hops of TARP routers **122–127** which are chosen at random.

Thus, each TARP packet, irrespective of the traditional factors determining traffic in the Internet, makes random trips among a number of geographically disparate routers before reaching its destination and each trip is highly likely to be different for each packet composing a given message because each trip is independently randomly determined as described above. This feature is called agile routing. For reasons that will become clear shortly, the fact that different packets take different routes provides distinct advantages by making it difficult for an interloper to obtain all the packets forming an entire multi-packet message. Agile routing is combined with another feature that furthers this purpose, a feature that ensures that any message is broken into multiple packets.

A TARP router receives a TARP packet when an IP address used by the TARP router coincides with the IP address in the TARP packet's IP header $IP_C$. The IP address of a TARP router, however, may not remain constant. To avoid and manage attacks, each TARP router, independently or under direction from another TARP terminal or router, may change its IP address. A separate, unchangeable identifier or address is also defined. This address, called the TARP address, is known only to TARP routers and terminals and may be correlated at any time by a TARP router or a TARP terminal using a Lookup Table (LUT). When a TARP router or terminal changes its IP address, it updates the other TARP routers and terminals which in turn update their respective LUTs. In reality, whenever a TARP router looks up the address of a destination in the encrypted header, it must convert a TARP address to a real IP address using its LUT.

While every TARP router receiving a TARP packet has the ability to determine the packet's final destination, the message payload is embedded behind an inner layer of encryption in the TARP packet that can only be unlocked using a session key. The session key is not available to any of the TARP routers **122**–**127** intervening between the originating **100** and destination **110** TARP terminals. The session key is used to decrypt the payloads of the TARP packets **140** permitting an entire message to be reconstructed.

In one embodiment, communication may be made private using link and session keys, which in turn may be shared and used according any desired method. For example, a public key or symmetric keys may be communicated between link or session endpoints using a public key method. Any of a variety of other mechanisms for securing data to ensure that only authorized computers can have access to the private information in the TARP packets **140** may be used as desired.

Referring to FIG. **3***a*, to construct a series of TARP packets, a data stream **300** of IP packets **207***a*, **207***b*, **207***c*, etc., such series of packets being formed by a network (IP) layer process, is broken into a series of small sized segments. In the present example, equal-sized segments **1**–**9** are defined and used to construct a set of interleaved data packets A, B, and C. Here it is assumed that the number of interleaved packets A, B, and C formed is three and that the number of IP packets **207***a*–**207***c* used to form the three interleaved packets A, B, and C is exactly three. Of course, the number of IP packets spread over a group of interleaved packets may be any convenient number as may be the number of interleaved packets over which the incoming data stream is spread. The latter, the number of interleaved packets over which the data stream is spread, is called the interleave window.

To create a packet, the transmitting software interleaves the normal IP packets **207***a* et. seq. to form a new set of interleaved payload data **320**. This payload data **320** is then encrypted using a session key to form a set of session-key-encrypted payload data **330**, each of which, A, B, and C, will form the payload of a TARP packet. Using the IP header data, from the original packets **207***a*–**207***c*, new TARP headers $IP_T$ are formed. The TARP headers $IP_T$ can be identical to normal IP headers or customized in some way. In a preferred embodiment, the TARP headers $IP_T$ are IP headers with added data providing the following information required for routing and reconstruction of messages, some of which data is ordinarily, or capable of being, contained in normal IP headers:

1. A window sequence number—an identifier that indicates where the packet belongs in the original message sequence.
2. An interleave sequence number—an identifier that indicates the interleaving sequence used to form the packet so that the packet can be deinterleaved along with other packets in the interleave window.
3. A time-to-live (TTL) datum—indicates the number of TARP-router-hops to be executed before the packet reaches its destination. Note that the TTL parameter may provide a datum to be used in a probabilistic formula for determining whether to route the packet to the destination or to another hop.
4. Data type identifier—indicates whether the payload contains, for example, TCP or UDP data.
5. Sender's address—indicates the sender's address in the TARP network.
6. Destination address—indicates the destination terminal's address in the TARP network.
7. Decoy/Real—an indicator of whether the packet contains real message data or dummy decoy data or a combination.

Obviously, the packets going into a single interleave window must include only packets with a common destination. Thus, it is assumed in the depicted example that the IP headers of IP packets **207***a*–**207***c* all contain the same destination address or at least will be received by the same terminal so that they can be deinterleaved. Note that dummy or decoy data or packets can be added to form a larger interleave window than would otherwise be required by the size of a given message. Decoy or dummy data can be added to a stream to help foil traffic analysis by leveling the load on the network. Thus, it may be desirable to provide the TARP process with an ability to respond to the time of day or other criteria to generate more decoy data during low traffic periods so that communication bursts at one point in the Internet cannot be tied to communication bursts at another point to reveal the communicating endpoints.

Dummy data also helps to break the data into a larger number of inconspicuously-sized packets permitting the interleave window size to be increased while maintaining a reasonable size for each packet. (The packet size can be a single standard size or selected from a fixed range of sizes.) One primary reason for desiring for each message to be broken into multiple packets is apparent if a chain block encryption scheme is used to form the first encryption layer prior to interleaving. A single block encryption may be applied to a portion, or the entirety, of a message, and that portion or entirety then interleaved into a number of separate packets.

Referring to FIG. **3***b*, in an alternative mode of TARP packet construction, a series of IP packets are accumulated to make up a predefined interleave window. The payloads of the packets are used to construct a single block **520** for chain block encryption using the session key. The payloads used to form the block are presumed to be destined for the same terminal. The block size may coincide with the interleave window as depicted in the example embodiment of FIG. **3***b*. After encryption, the encrypted block is broken into separate payloads and segments which are interleaved as in the embodiment of FIG. **3***a*. The resulting interleaved packets A, B, and C, are then packaged as TARP packets with TARP headers as in the Example of FIG. **3***a*. The remaining process is as shown in, and discussed with reference to, FIG. **3***a*.

Once the TARP packets **340** are formed, each entire TARP packet **340**, including the TARP header $IP_T$, is encrypted using the link key for communication with the first-hop-TARP router. The first hop TARP router is randomly chosen. A final unencrypted IP header $IP_C$ is added to each encrypted TARP packet **340** to form a normal IP packet **360** that can be transmitted to a TARP router. Note that the process of constructing the TARP packet **360** does not have to be done in stages as described. The above description is just a useful heuristic for describing the final product, namely, the TARP packet.

Note that, TARP header $IP_T$ could be a completely custom header configuration with no similarity to a normal IP header except that it contain the information identified above. This is so since this header is interpreted by only TARP routers.

The above scheme may be implemented entirely by processes operating between the data link layer and the network layer of each server or terminal participating in the TARP system. Referring to FIG. **4**, a TARP transceiver **405** can be an originating terminal **100**, a destination terminal

**110**, or a TARP router **122**–**127**. In each TARP Transceiver **405**, a transmitting process is generated to receive normal packets from the Network (IP) layer and generate TARP packets for communication over the network. A receiving process is generated to receive normal IP packets containing TARP packets and generate from these normal IP packets which are "passed up" to the Network (IP) layer. Note that where the TARP Transceiver **405** is a router, the received TARP packets **140** are not processed into a stream of IP packets **415** because they need only be authenticated as proper TARP packets and then passed to another TARP router or a TARP destination terminal **110**. The intervening process, a "TARP Layer" **420**, could be combined with either the data link layer **430** or the Network layer **410**. In either case, it would intervene between the data link layer **430** so that the process would receive regular IP packets containing embedded TARP packets and "hand up" a series of reassembled IP packets to the Network layer **410**. As an example of combining the TARP layer **420** with the data link layer **430**, a program may augment the normal processes running a communications card, for example, an Ethernet card. Alternatively, the TARP layer processes may form part of a dynamically loadable module that is loaded and executed to support communications between the network and data link layers.

Because the encryption system described above can be inserted between the data link and network layers, the processes involved in supporting the encrypted communication may be completely transparent to processes at the IP (network) layer and above. The TARP processes may also be completely transparent to the data link layer processes as well. Thus, no operations at or above the network layer, or at or below the data link layer, are affected by the insertion of the TARP stack. This provides additional security to all processes at or above the network layer, since the difficulty of unauthorized penetration of the network layer (by, for example, a hacker) is increased substantially. Even newly developed servers running at the session layer leave all processes below the session layer vulnerable to attack. Note that in this architecture, security is distributed. That is, notebook computers used by executives on the road, for example, can communicate over the Internet without any compromise in security.

Note that IP address changes made by TARP terminals and routers can be done at regular intervals, at random intervals, or upon detection of "attacks." The variation of IP addresses hinders traffic analysis that might reveal which computers are communicating, and also provides a degree of immunity from attack. The level of immunity from attack is roughly proportional to the rate at which the IP address of the host is changing.

As mentioned, IP addresses may be changed in response to attacks. An attack may be revealed, for example, by a regular series of messages indicates that a router is being probed in some way. Upon detection of an attack, the TARP layer process may respond to this event by changing its IP address. To accomplish this, the TARP process will construct a TARP-formatted message, in the style of Internet Control Message Protocol (ICMP) datagrams as an example; this message will contain the machine's TARP address, its previous IP address, and its new IP address. The TARP layer will transmit this packet to at least one known TARP router; then upon receipt and validation of the message, the TARP router will update its LUT with the new IP address for the stated TARP address. The TARP router will then format a similar message, and broadcast it to the other TARP routers so that they may update their LUTs. Since the total number of TARP routers on any given subnet is expected to be relatively small, this process of updating the LUTs should be relatively fast. It may not, however, work as well when there is a relatively large number of TARP routers and/or a relatively large number of clients; this has motivated a refinement of this architecture to provide scalability; this refinement has led to a second embodiment, which is discussed below.

Upon detection of an attack, the TARP process may also create a subprocess that maintains the original IP address and continues interacting with the attacker. The latter may provide an opportunity to trace the attacker or study the attacker's methods (called "fishbowling" drawing upon the analogy of a small fish in a fish bowl that "thinks" it is in the ocean but is actually under captive observation). A history of the communication between the attacker and the abandoned (fishbowled) IP address can be recorded or transmitted for human analysis or further synthesized for purposes of responding in some way.

As mentioned above, decoy or dummy data or packets can be added to outgoing data streams by TARP terminals or routers. In addition to making it convenient to spread data over a larger number of separate packets, such decoy packets can also help to level the load on inactive portions of the Internet to help foil traffic analysis efforts.

Decoy packets may be generated by each TARP terminal **100**, **110** or each router **122**–**127** on some basis determined by an algorithm. For example, the algorithm may be a random one which calls for the generation of a packet on a random basis when the terminal is idle. Alternatively, the algorithm may be responsive to time of day or detection of low traffic to generate more decoy packets during low traffic times. Note that packets are preferably generated in groups, rather than one by one, the groups being sized to simulate real messages. In addition, so that decoy packets may be inserted in normal TARP message streams, the background loop may have a latch that makes it more likely to insert decoy packets when a message stream is being received. That is, when a series of messages are received, the decoy packet generation rate may be increased. Alternatively, if a large number of decoy packets is received along with regular TARP packets, the algorithm may increase the rate of dropping of decoy packets rather than forwarding them. The result of dropping and generating decoy packets in this way is to make the apparent incoming message size different from the apparent outgoing message size to help foil traffic analysis. The rate of reception of packets, decoy or otherwise, may be indicated to the decoy packet dropping and generating processes through perishable decoy and regular packet counters. (A perishable counter is one that resets or decrements its value in response to time so that it contains a high value when it is incremented in rapid succession and a small value when incremented either slowly or a small number of times in rapid succession.) Note that destination TARP terminal **110** may generate decoy packets equal in number and size to those TARP packets received to make it appear it is merely routing packets and is therefore not the destination terminal.

Referring to FIG. **5**, the following particular steps may be employed in the above-described method for routing TARP packets.

S0. A background loop operation is performed which applies an algorithm which determines the generation of decoy IP packets. The loop is interrupted when an encrypted TARP packet is received.

S2. The TARP packet may be probed in some way to authenticate the packet before attempting to decrypt it

using the link key. That is, the router may determine that the packet is an authentic TARP packet by performing a selected operation on some data included with the clear IP header attached to the encrypted TARP packet contained in the payload. This makes it possible to avoid performing decryption on packets that are not authentic TARP packets.

S3. The TARP packet is decrypted to expose the destination TARP address and an indication of whether the packet is a decoy packet or part of a real message.

S4. If the packet is a decoy packet, the perishable decoy counter is incremented.

S5. Based on the decoy generation/dropping algorithm and the perishable decoy counter value, if the packet is a decoy packet, the router may choose to throw it away. If the received packet is a decoy packet and it is determined that it should be thrown away (S6), control returns to step S0.

S7. The TTL parameter of the TARP header is decremented and it is determined if the TTL parameter is greater than zero.

S8. If the TTL parameter is greater than zero, a TARP address is randomly chosen from a list of TARP addresses maintained by the router and the link key and IP address corresponding to that TARP address memorized for use in creating a new IP packet containing the TARP packet.

S9. If the TTL parameter is zero or less, the link key and IP address corresponding to the TARP address of the destination are memorized for use in creating the new IP packet containing the TARP packet.

S10. The TARP packet is encrypted using the memorized link key.

S11. An IP header is added to the packet that contains the stored IP address, the encrypted TARP packet wrapped with an IP header, and the completed packet transmitted to the next hop or destination.

Referring to FIG. **6**, the following particular steps may be employed in the above-described method for generating TARP packets.

S20. A background loop operation applies an algorithm that determines the generation of decoy IP packets. The loop is interrupted when a data stream containing IP packets is received for transmission.

S21. The received IP packets are grouped into a set consisting of messages with a constant IP destination address. The set is further broken down to coincide with a maximum size of an interleave window The set is encrypted, and interleaved into a set of payloads destined to become TARP packets.

S22. The TARP address corresponding to the IP address is determined from a lookup table and stored to generate the TARP header. An initial TTL count is generated and stored in the header. The TTL count may be random with minimum and maximum values or it may be fixed or determined by some other parameter.

S23. The window sequence numbers and interleave sequence numbers are recorded in the TARP headers of each packet.

S24. One TARP router address is randomly chosen for each TARP packet and the IP address corresponding to it stored for use in the clear IP header. The link key corresponding to this router is identified and used to encrypt TARP packets containing interleaved and encrypted data and TARP headers.

S25. A clear IP header with the first hop router's real IP address is generated and added to each of the encrypted TARP packets and the resulting packets.

Referring to FIG. **7**, the following particular steps may be employed in the above-described method for receiving TARP packets.

S40. A background loop operation is performed which applies an algorithm which determines the generation of decoy IP packets. The loop is interrupted when an encrypted TARP packet is received.

S42. The TARP packet may be probed to authenticate the packet before attempting to decrypt it using the link key.

S43. The TARP packet is decrypted with the appropriate link key to expose the destination TARP address and an indication of whether the packet is a decoy packet or part of a real message.

S44. If the packet is a decoy packet, the perishable decoy counter is incremented.

S45. Based on the decoy generation/dropping algorithm and the perishable decoy counter value, if the packet is a decoy packet, the receiver may choose to throw it away.

S46. The TARP packets are cached until all packets forming an interleave window are received.

S47. Once all packets of an interleave window are received, the packets are deinterleaved.

S48. The packets block of combined packets defining the interleave window is then decrypted using the session key.

S49. The decrypted block is then divided using the window sequence data and the $IP_T$ headers are converted into normal $IP_C$ headers. The window sequence numbers are integrated in the $IP_C$ headers.

S50. The packets are then handed up to the IP layer processes.

## 1. SCALABILITY ENHANCEMENTS

The IP agility feature described above relies on the ability to transmit IP address changes to all TARP routers. The embodiments including this feature will be referred to as "boutique" embodiments due to potential limitations in scaling these features up for a large network, such as the Internet. (The "boutique" embodiments would, however, be robust for use in smaller networks, such as small virtual private networks, for example). One problem with the boutique embodiments is that if IP address changes are to occur frequently, the message traffic required to update all routers sufficiently quickly creates a serious burden on the Internet when the TARP router and/or client population gets large. The bandwidth burden added to the networks, for example in ICMP packets, that would be used to update all the TARP routers could overwhelm the Internet for a large scale implementation that approached the scale of the Internet. In other words, the boutique system's scalability is limited.

A system can be constructed which trades some of the features of the above embodiments to provide the benefits of IP agility without the additional messaging burden. This is accomplished by IP address-hopping according to shared algorithms that govern IP addresses used between links participating in communications sessions between nodes such as TARP nodes. (Note that the IP hopping technique is also applicable to the boutique embodiment.) The IP agility feature discussed with respect to the boutique system can be

modified so that it becomes decentralized under this scalable regime and governed by the above-described shared algorithm. Other features of the boutique system may be combined with this new type of IP-agility.

The new embodiment has the advantage of providing IP agility governed by a local algorithm and set of IP addresses exchanged by each communicating pair of nodes. This local governance is session-independent in that it may govern communications between a pair of nodes, irrespective of the session or end points being transferred between the directly communicating pair of nodes.

In the scalable embodiments, blocks of IP addresses are allocated to each node in the network. (This scalability will increase in the future, when Internet Protocol addresses are increased to 128-bit fields, vastly increasing the number of distinctly addressable nodes). Each node can thus use any of the IP addresses assigned to that node to communicate with other nodes in the network. Indeed, each pair of communicating nodes can use a plurality of source IP addresses and destination IP addresses for communicating with each other.

Each communicating pair of nodes in a chain participating in any session stores two blocks of IP addresses, called netblocks, and an algorithm and randomization seed for selecting, from each netblock, the next pair of source/destination IP addresses that will be used to transmit the next message. In other words, the algorithm governs the sequential selection of IP-address pairs, one sender and one receiver IP address, from each netblock. The combination of algorithm, seed, and netblock (IP address block) will be called a "hopblock." A router issues separate transmit and receive hopblocks to its clients. The send address and the receive address of the IP header of each outgoing packet sent by the client are filled with the send and receive IP addresses generated by the algorithm. The algorithm is "clocked" (indexed) by a counter so that each time a pair is used, the algorithm turns out a new transmit pair for the next packet to be sent.

The router's receive hopblock is identical to the client's transmit hopblock. The router uses the receive hopblock to predict what the send and receive IP address pair for the next expected packet from that client will be. Since packets can be received out of order, it is not possible for the router to predict with certainty what IP address pair will be on the next sequential packet. To account for this problem, the router generates a range of predictions encompassing the number of possible transmitted packet send/receive addresses, of which the next packet received could leap ahead. Thus, if there is a vanishingly small probability that a given packet will arrive at the router ahead of 5 packets transmitted by the client before the given packet, then the router can generate a series of 6 send/receive IP address pairs (or "hop window") to compare with the next received packet. When a packet is received, it is marked in the hop window as such, so that a second packet with the same IP address pair will be discarded. If an out-of-sequence packet does not arrive within a predetermined timeout period, it can be requested for retransmission or simply discarded from the receive table, depending upon the protocol in use for that communications session, or possibly by convention.

When the router receives the client's packet, it compares the send and receive IP addresses of the packet with the next N predicted send and receive IP address pairs and rejects the packet if it is not a member of this set. Received packets that do not have the predicted source/destination IP addresses falling with the window are rejected, thus thwarting possible hackers. (With the number of possible combinations, even a fairly large window would be hard to fall into at random.) If it is a member of this set, the router accepts the packet and processes it further. This link-based IP-hopping strategy, referred to as "IHOP," is a network element that stands on its own and is not necessarily accompanied by elements of the boutique system described above. If the routing agility feature described in connection with the boutique embodiment is combined with this link-based IP-hopping strategy, the router's next step would be to decrypt the TARP header to determine the destination TARP router for the packet and determine what should be the next hop for the packet. The TARP router would then forward the packet to a random TARP router or the destination TARP router with which the source TARP router has a link-based IP hopping communication established.

FIG. **8** shows how a client computer **801** and a TARP router **811** can establish a secure session. When client **801** seeks to establish an IHOP session with TARP router **811**, the client **801** sends "secure synchronization" request ("SSYN") packet **821** to the TARP router **811**. This SYN packet **821** contains the client's **801** authentication token, and may be sent to the router **811** in an encrypted format. The source and destination IP numbers on the packet **821** are the client's **801** current fixed IP address, and a "known" fixed IP address for the router **811**. (For security purposes, it may be desirable to reject any packets from outside of the local network that are destined for the router's known fixed IP address.) Upon receipt and validation of the client's **801** SSYN packet **821**, the router **811** responds by sending an encrypted "secure synchronization acknowledgment" ("SSYN ACK") **822** to the client **801**. This SSYN ACK **822** will contain the transmit and receive hopblocks that the client **801** will use when communicating with the TARP router **811**. The client **801** will acknowledge the TARP router's **811** response packet **822** by generating an encrypted SSYN ACK ACK packet **823** which will be sent from the client's **801** fixed IP address and to the TARP router's **811** known fixed IP address. The client **801** will simultaneously generate a SSYN ACK ACK packet; this SSYN ACK packet, referred to as the Secure Session Initiation (SSI) packet **824**, will be sent with the first {sender, receiver} IP pair in the client's transmit table **921** (FIG. **9**), as specified in the transmit hopblock provided by the TARP router **811** in the SSYN ACK packet **822**. The TARP router **811** will respond to the SSI packet **824** with an SSI ACK packet **825**, which will be sent with the first {sender, receiver} IP pair in the TARP router's transmit table **923**. Once these packets have been successfully exchanged, the secure communications session is established, and all further secure communications between the client **801** and the TARP router **811** will be conducted via this secure session, as long as synchronization is maintained. If synchronization is lost, then the client **801** and TARP router **802** may re-establish the secure session by the procedure outlined in FIG. **8** and described above.

While the secure session is active, both the client **901** and TARP router **911** (FIG. **9**) will maintain their respective transmit tables **921**, **923** and receive tables **922**, **924**, as provided by the TARP router during session synchronization **822**. It is important that the sequence of IP pairs in the client's transmit table **921** be identical to those in the TARP router's receive table **924**; similarly, the sequence of IP pairs in the client's receive table **922** must be identical to those in the router's transmit table **923**. This is required for the session synchronization to be maintained. The client **901** need maintain only one transmit table **921** and one receive table **922** during the course of the secure session. Each

sequential packet sent by the client **901** will employ the next {send, receive} IP address pair in the transmit table, regardless of TCP or UDP session. The TARP router **911** will expect each packet arriving from the client **901** to bear the next IP address pair shown in its receive table.

Since packets can arrive out of order, however, the router **911** can maintain a "look ahead" buffer in its receive table, and will mark previously-received IP pairs as invalid for future packets; any future packet containing an IP pair that is in the look-ahead buffer but is marked as previously received will be discarded. Communications from the TARP router **911** to the client **901** are maintained in an identical manner; in particular, the router **911** will select the next IP address pair from its transmit table **923** when constructing a packet to send to the client **901**, and the client **901** will maintain a look-ahead buffer of expected IP pairs on packets that it is receiving. Each TARP router will maintain separate pairs of transmit and receive tables for each client that is currently engaged in a secure session with or through that TARP router.

While clients receive their hopblocks from the first server linking them to the Internet, routers exchange hopblocks. When a router establishes a link-based IP-hopping communication regime with another router, each router of the pair exchanges its transmit hopblock. The transmit hopblock of each router becomes the receive hopblock of the other router. The communication between routers is governed as described by the example of a client sending a packet to the first router.

While the above strategy works fine in the IP milieu, many local networks that are connected to the Internet are Ethernet systems. In Ethernet, the IP addresses of the destination devices must be translated into hardware addresses, and vice versa, using known processes ("address resolution protocol," and "reverse address resolution protocol"). However, if the link-based IP-hopping strategy is employed, the correlation process would become explosive and burdensome. An alternative to the link-based IP hopping strategy may be employed within an Ethernet network. The solution is to provide that the node linking the Internet to the Ethernet (call it the border node) use the link-based IP-hopping communication regime to communicate with nodes outside the Ethernet LAN. Within the Ethernet LAN, each TARP node would have a single IP address which would be addressed in the conventional way. Instead of comparing the {sender, receiver} IP address pairs to authenticate a packet, the intra-LAN TARP node would use one of the IP header extension fields to do so. Thus, the border node uses an algorithm shared by the intra-LAN TARP node to generate a symbol that is stored in the free field in the IP header, and the intra-LAN TARP node generates a range of symbols based on its prediction of the next expected packet to be received from that particular source IP address. The packet is rejected if it does not fall into the set of predicted symbols (for example, numerical values) or is accepted if it does. Communications from the intra-LAN TARP node to the border node are accomplished in the same manner, though the algorithm will necessarily be different for security reasons. Thus, each of the communicating nodes will generate transmit and receive tables in a similar manner to that of FIG. **9**; the intra-LAN TARP nodes transmit table will be identical to the border node's receive table, and the intra-LAN TARP node's receive table will be identical to the border node's transmit table.

The algorithm used for IP address-hopping can be any desired algorithm. For example, the algorithm can be a given pseudo-random number generator that generates numbers of the range covering the allowed IP addresses with a given seed. Alternatively, the session participants can assume a certain type of algorithm and specify simply a parameter for applying the algorithm. For example the assumed algorithm could be a particular pseudo-random number generator and the session participants could simply exchange seed values.

Note that there is no permanent physical distinction between the originating and destination terminal nodes. Either device at either end point can initiate a synchronization of the pair. Note also that the authentication/synchronization-request (and acknowledgment) and hopblock-exchange may all be served by a single message so that separate message exchanges may not be required.

As another extension to the stated architecture, multiple physical paths can be used by a client, in order to provide link redundancy and further thwart attempts at denial of service and traffic monitoring. As shown in FIG. **10**, for example, client **1001** can establish three simultaneous sessions with each of three TARP routers provided by different ISPs **1011**, **1012**, **1013**. As an example, the client **1001** can use three different telephone lines **1021**, **1022**, **1023** to connect to the ISPs, or two telephone lines and a cable modem, etc. In this scheme, transmitted packets will be sent in a random fashion among the different physical paths. This architecture provides a high degree of communications redundancy, with improved immunity from denial-of-service attacks and traffic monitoring.

## 2. FURTHER EXTENSIONS

The following describes various extensions to the techniques, systems, and methods described above. As described above, the security of communications occurring between computers in a computer network (such as the Internet, an Ethernet, or others) can be enhanced by using seemingly random source and destination Internet Protocol (IP) addresses for data packets transmitted over the network. This feature prevents eavesdroppers from determining which computers in the network are communicating with each other while permitting the two communicating computers to easily recognize whether a given received data packet is legitimate or not. In one embodiment of the above-described systems, an IP header extension field is used to authenticate incoming packets on an Ethernet.

Various extensions to the previously described techniques described herein include: (1) use of hopped hardware or "MAC" addresses in broadcast type network; (2) a self-synchronization technique that permits a computer to automatically regain synchronization with a sender; (3) synchronization algorithms that allow transmitting and receiving computers to quickly re-establish synchronization in the event of lost packets or other events; and (4) a fast-packet rejection mechanism for rejecting invalid packets. Any or all of these extensions can be combined with the features described above in any of various ways.

### A. Hardware Address Hopping

Internet protocol-based communications techniques on a LAN—or across any dedicated physical medium—typically embed the IP packets within lower-level packets, often referred to as "frames." As shown in FIG. **11**, for example, a first Ethernet frame **1150** comprises a frame header **1101** and two embedded IP packets IP**1** and IP**2**, while a second Ethernet frame **1160** comprises a different frame header **1104** and a single IP packet IP**3**. Each frame header generally includes a source hardware address **1101**A and a destination hardware address **1101**B; other well-known fields in frame headers are omitted from FIG. **11** for clarity. Two

hardware nodes communicating over a physical communication channel insert appropriate source and destination hardware addresses to indicate which nodes on the channel or network should receive the frame.

It may be possible for a nefarious listener to acquire information about the contents of a frame and/or its communicants by examining frames on a local network rather than (or in addition to) the IP packets themselves. This is especially true in broadcast media, such as Ethernet, where it is necessary to insert into the frame header the hardware address of the machine that generated the frame and the hardware address of the machine to which frame is being sent. All nodes on the network can potentially "see" all packets transmitted across the network. This can be a problem for secure communications, especially in cases where the communicants do not want for any third party to be able to identify who is engaging in the information exchange. One way to address this problem is to push the address-hopping scheme down to the hardware layer. In accordance with various embodiments of the invention, hardware addresses are "hopped" in a manner similar to that used to change IP addresses, such that a listener cannot determine which hardware node generated a particular message nor which node is the intended recipient.

FIG. **12**A shows a system in which Media Access Control ("MAC") hardware addresses are "hopped" in order to increase security over a network such as an Ethernet. While the description refers to the exemplary case of an Ethernet environment, the inventive principles are equally applicable to other types of communications media. In the Ethernet case, the MAC address of the sender and receiver are inserted into the Ethernet frame and can be observed by anyone on the LAN who is within the broadcast range for that frame. For secure communications, it becomes desirable to generate frames with MAC addresses that are not attributable to any specific sender or receiver.

As shown in FIG. **12**A, two computer nodes **1201** and **1202** communicate over a communication channel such as an Ethernet. Each node executes one or more application programs **1203** and **1218** that communicate by transmitting packets through communication software **1204** and **1217**, respectively. Examples of application programs include video conferencing, e-mail, word processing programs, telephony, and the like. Communication software **1204** and **1217** can comprise, for example, an OSI layered architecture or "stack" that standardizes various services provided at different levels of functionality.

The lowest levels of communication software **1204** and **1217** communicate with hardware components **1206** and **1214** respectively, each of which can include one or more registers **1207** and **1215** that allow the hardware to be reconfigured or controlled in accordance with various communication protocols. The hardware components (an Ethernet network interface card, for example) communicate with each other over the communication medium. Each hardware component is typically pre-assigned a fixed hardware address or MAC number that identifies the hardware component to other nodes on the network. One or more interface drivers control the operation of each card and can, for example, be configured to accept or reject packets from certain hardware addresses. As will be described in more detail below, various embodiments of the inventive principles provide for "hopping" different addresses using one or more algorithms and one or more moving windows that track a range of valid addresses to validate received packets. Packets transmitted according to one or more of the inventive principles will be generally referred to as "secure" packets or "secure communications" to differentiate them from ordinary data packets that are transmitted in the clear using ordinary, machine-correlated addresses.

One straightforward method of generating non-attributable MAC addresses is an extension of the IP hopping scheme. In this scenario, two machines on the same LAN that desire to communicate in a secure fashion exchange random-number generators and seeds, and create sequences of quasi-random MAC addresses for synchronized hopping. The implementation and synchronization issues are then similar to that of IP hopping.

This approach, however, runs the risk of using MAC addresses that are currently active on the LAN—which, in turn, could interrupt communications for those machines. Since an Ethernet MAC address is at present 48 bits in length, the chance of randomly misusing an active MAC address is actually quite small. However, if that figure is multiplied by a large number of nodes (as would be found on an extensive LAN), by a large number of frames (as might be the case with packet voice or streaming video), and by a large number of concurrent Virtual Private Networks (VPNs), then the chance that a non-secure machine's MAC address could be used in an address-hopped frame can become non-trivial. In short, any scheme that runs even a small risk of interrupting communications for other machines on the LAN is bound to receive resistance from prospective system administrators. Nevertheless, it is technically feasible, and can be implemented without risk on a LAN on which there is a small number of machines, or if all of the machines on the LAN are engaging in MAC-hopped communications.

Synchronized MAC address hopping may incur some overhead in the course of session establishment, especially if there are multiple sessions or multiple nodes involved in the communications. A simpler method of randomizing MAC addresses is to allow each node to receive and process every incident frame on the network. Typically, each network interface driver will check the destination MAC address in the header of every incident frame to see if it matches that machine's MAC address; if there is no match, then the frame is discarded. In one embodiment, however, these checks can be disabled, and every incident packet is passed to the TARP stack for processing. This will be referred to as "promiscuous" mode, since every incident frame is processed. Promiscuous mode allows the sender to use completely random, unsynchronized MAC addresses, since the destination machine is guaranteed to process the frame. The decision as to whether the packet was truly intended for that machine is handled by the TARP stack, which checks the source and destination IP addresses for a match in its IP synchronization tables. If no match is found, the packet is discarded; if there is a match, the packet is unwrapped, the inner header is evaluated, and if the inner header indicates that the packet is destined for that machine then the packet is forwarded to the IP stack—otherwise it is discarded.

One disadvantage of purely-random MAC address hopping is its impact on processing overhead; that is, since every incident frame must be processed, the machine's CPU is engaged considerably more often than if the network interface driver is discriminating and rejecting packets unilaterally. A compromise approach is to select either a single fixed MAC address or a small number of MAC addresses (e.g., one for each virtual private network on an Ethernet) to use for MAC-hopped communications, regardless of the actual recipient for which the message is intended. In this mode, the network interface driver can check each incident

frame against one (or a few) pre-established MAC addresses, thereby freeing the CPU from the task of physical-layer packet discrimination. This scheme does not betray any useful information to an interloper on the LAN; in particular, every secure packet can already be identified by a unique packet type in the outer header. However, since all machines engaged in secure communications would either be using the same MAC address, or be selecting from a small pool of predetermined MAC addresses, the association between a specific machine and a specific MAC address is effectively broken.

In this scheme, the CPU will be engaged more often than it would be in non-secure communications (or in synchronized MAC address hopping), since the network interface driver cannot always unilaterally discriminate between secure packets that are destined for that machine, and secure packets from other VPNs. However, the non-secure traffic is easily eliminated at the network interface, thereby reducing the amount of processing required of the CPU. There are boundary conditions where these statements would not hold, of course-e.g., if all of the traffic on the LAN is secure traffic, then the CPU would be engaged to the same degree as it is in the purely-random address hopping case; alternatively, if each VPN on the LAN uses a different MAC address, then the network interface can perfectly discriminate secure frames destined for the local machine from those constituting other VPNs. These are engineering tradeoffs that might be best handled by providing administrative options for the users when installing the software and/or establishing VPNs.

Even in this scenario, however, there still remains a slight risk of selecting MAC addresses that are being used by one or more nodes on the LAN. One solution to this problem is to formally assign one address or a range of addresses for use in MAC-hopped communications. This is typically done via an assigned numbers registration authority; e.g., in the case of Ethernet, MAC address ranges are assigned to vendors by the Institute of Electrical and Electronics Engineers (IEEE). A formally-assigned range of addresses would ensure that secure frames do not conflict with any properly-configured and properly-functioning machines on the LAN.

Reference will now be made to FIGS. **12**A and **12**B in order to describe the many combinations and features that follow the inventive principles. As explained above, two computer nodes **1201** and **1202** are assumed to be communicating over a network or communication medium such as an Ethernet. A communication protocol in each node (**1204** and **1217**, respectively) contains a modified element **1205** and **1216** that performs certain functions that deviate from the standard communication protocols. In particular, computer node **1201** implements a first "hop" algorithm **1208**X that selects seemingly random source and destination IP addresses (and, in one embodiment, seemingly random IP header discriminator fields) in order to transmit each packet to the other computer node. For example, node **1201** maintains a transmit table **1208** containing triplets of source (S), destination (D), and discriminator fields (DS) that are inserted into outgoing IP packet headers. The table is generated through the use of an appropriate algorithm (e.g., a random number generator that is seeded with an appropriate seed) that is known to the recipient node **1202**. As each new IP packet is formed, the next sequential entry out of the sender's transmit table **1208** is used to populate the IP source, IP destination, and IP header extension field (e.g., discriminator field). It will be appreciated that the transmit table need not be created in advance but could instead be created on-the-fly by executing the algorithm when each packet is formed.

At the receiving node **1202**, the same IP hop algorithm **1222**X is maintained and used to generate a receive table **1222** that lists valid triplets of source IP address, destination IP address, and discriminator field. This is shown by virtue of the first five entries of transmit table **1208** matching the second five entries of receive table **1222**. (The tables may be slightly offset at any particular time due to lost packets, misordered packets, or transmission delays). Additionally, node **1202** maintains a receive window **W3** that represents a list of valid IP source, IP destination, and discriminator fields that will be accepted when received as part of an incoming IP packet. As packets are received, window **W3** slides down the list of valid entries, such that the possible valid entries change over time. Two packets that arrive out of order but are nevertheless matched to entries within window **W3** will be accepted; those falling outside of window **W3** will be rejected as invalid. The length of window **W3** can be adjusted as necessary to reflect network delays or other factors.

Node **1202** maintains a similar transmit table **1221** for creating IP packets and frames destined for node **1201** using a potentially different hopping algorithm **1221**X, and node **1201** maintains a matching receive table **1209** using the same algorithm **1209**X. As node **1202** transmits packets to node **1201** using seemingly random IP source, IP destination, and/or discriminator fields, node **1201** matches the incoming packet values to those falling within window WI maintained in its receive table. In effect, transmit table **1208** of node **1201** is synchronized (i.e., entries are selected in the same order) to receive table **1222** of receiving node **1202**. Similarly, transmit table **1221** of node **1202** is synchronized to receive table **1209** of node **1201**. It will be appreciated that although a common algorithm is shown for the source, destination and discriminator fields in FIG. **12**A (using, e.g., a different seed for each of the three fields), an entirely different algorithm could in fact be used to establish values for each of these fields. It will also be appreciated that one or two of the fields can be "hopped" rather than all three as illustrated.

In accordance with another aspect of the invention, hardware or "MAC" addresses are hopped instead of or in addition to IP addresses and/or the discriminator field in order to improve security in a local area or broadcast-type network. To that end, node **1201** further maintains a transmit table **1210** using a transmit algorithm **1210**X to generate source and destination hardware addresses that are inserted into frame headers (e.g., fields **1101**A and **1101**B in FIG. **11**) that are synchronized to a corresponding receive table **1224** at node **1202**. Similarly, node **1202** maintains a different transmit table **1223** containing source and destination hardware addresses that is synchronized with a corresponding receive table **1211** at node **1201**. In this manner, outgoing hardware frames appear to be originating from and going to completely random nodes on the network, even though each recipient can determine whether a given packet is intended for it or not. It will be appreciated that the hardware hopping feature can be implemented at a different level in the communications protocol than the IP hopping feature (e.g., in a card driver or in a hardware card itself to improve performance).

FIG. **12**B shows three different embodiments or modes that can be employed using the aforementioned principles. In a first mode referred to as "promiscuous" mode, a common hardware address (e.g., a fixed address for source and another for destination) or else a completely random hardware address is used by all nodes on the network, such that a particular packet cannot be attributed to any one node.

Each node must initially accept all packets containing the common (or random) hardware address and inspect the IP addresses or discriminator field to determine whether the packet is intended for that node. In this regard, either the IP addresses or the discriminator field or both can be varied in accordance with an algorithm as described above. As explained previously, this may increase each node's overhead since additional processing is involved to determine whether a given packet has valid source and destination hardware addresses.

In a second mode referred to as "promiscuous per VPN" mode, a small set of fixed hardware addresses are used, with a fixed source/destination hardware address used for all nodes communicating over a virtual private network. For example, if there are six nodes on an Ethernet, and the network is to be split up into two private virtual networks such that nodes on one VPN can communicate with only the other two nodes on its own VPN, then two sets of hardware addresses could be used: one set for the first VPN and a second set for the second VPN. This would reduce the amount of overhead involved in checking for valid frames since only packets arriving from the designated VPN would need to be checked. IP addresses and one or more discriminator fields could still be hopped as before for secure communication within the VPN. Of course, this solution compromises the anonymity of the VPNs (i.e., an outsider can easily tell what traffic belongs in which VPN, though he cannot correlate it to a specific machine/person). It also requires the use of a discriminator field to mitigate the vulnerability to certain types of DoS attacks. (For example, without the discriminator field, an attacker on the LAN could stream frames containing the MAC addresses being used by the VPN; rejecting those frames could lead to excessive processing overhead. The discriminator field would provide a low-overhead means of rejecting the false packets.)

In a third mode referred to as "hardware hopping" mode, hardware addresses are varied as illustrated in FIG. **12**A, such that hardware source and destination addresses are changed constantly in order to provide non-attributable addressing. Variations on these embodiments are of course possible, and the invention is not intended to be limited in any respect by these illustrative examples.

B. Extending the Address Space

Address hopping provides security and privacy. However, the level of protection is limited by the number of addresses in the blocks being hopped. A hopblock denotes a field or fields modulated on a packet-wise basis for the purpose of providing a VPN. For instance, if two nodes communicate with IP address hopping using hopblocks of 4 addresses (2 bits) each, there would be 16 possible address-pair combinations. A window of size 16 would result in most address pairs being accepted as valid most of the time. This limitation can be overcome by using a discriminator field in addition to or instead of the hopped address fields. The discriminator field would be hopped in exactly the same fashion as the address fields and it would be used to determine whether a packet should be processed by a receiver.

Suppose that two clients, each using four-bit hopblocks, would like the same level of protection afforded to clients communicating via IP hopping between two A blocks (24 address bits eligible for hopping). A discriminator field of 20 bits, used in conjunction with the 4 address bits eligible for hopping in the IP address field, provides this level of protection. A 24-bit discriminator field would provide a similar level of protection if the address fields were not hopped or ignored. Using a discriminator field offers the following advantages: (1) an arbitrarily high level of protection can be provided, and (2) address hopping is unnecessary to provide protection. This may be important in environments where address hopping would cause routing problems.

C. Synchronization Techniques

It is generally assumed that once a sending node and receiving node have exchanged algorithms and seeds (or similar information sufficient to generate quasi-random source and destination tables), subsequent communication between the two nodes will proceed smoothly. Realistically, however, two nodes may lose synchronization due to network delays or outages, or other problems. Consequently, it is desirable to provide means for re-establishing synchronization between nodes in a network that have lost synchronization.

One possible technique is to require that each node provide an acknowledgment upon successful receipt of each packet and, if no acknowledgment is received within a certain period of time, to re-send the unacknowledged packet. This approach, however, drives up overhead costs and may be prohibitive in high-throughput environments such as streaming video or audio, for example.

A different approach is to employ an automatic synchronizing technique that will be referred to herein as "self-synchronization." In this approach, synchronization information is embedded into each packet, thereby enabling the receiver to re-synchronize itself upon receipt of a single packet if it determines that is has lost synchronization with the sender. (If communications are already in progress, and the receiver determines that it is still in sync with the sender, then there is no need to re-synchronize.) A receiver could detect that it was out of synchronization by, for example, employing a "dead-man" timer that expires after a certain period of time, wherein the timer is reset with each valid packet. A time stamp could be hashed into the public sync field (see below) to preclude packet-retry attacks.

In one embodiment, a "sync field" is added to the header of each packet sent out by the sender. This sync field could appear in the clear or as part of an encrypted portion of the packet. Assuming that a sender and receiver have selected a random-number generator (RNG) and seed value, this combination of RNG and seed can be used to generate a random-number sequence (RNS). The RNS is then used to generate a sequence of source/destination IP pairs (and, if desired, discriminator fields and hardware source and destination addresses), as described above. It is not necessary, however, to generate the entire sequence (or the first N−1 values) in order to generate the Nth random number in the sequence; if the sequence index N is known, the random value corresponding to that index can be directly generated (see below). Different RNGs (and seeds) with different fundamental periods could be used to generate the source and destination IP sequences, but the basic concepts would still apply. For the sake of simplicity, the following discussion will assume that IP source and destination address pairs (only) are hopped using a single RNG sequencing mechanism.

In accordance with a "self-synchronization" feature, a sync field in each packet header provides an index (i.e., a sequence number) into the RNS that is being used to generate IP pairs. Plugging this index into the RNG that is being used to generate the RNS yields a specific random number value, which in turn yields a specific IP pair. That is, an IP pair can be generated directly from knowledge of the RNG, seed, and index number; it is not necessary, in this

scheme, to generate the entire sequence of random numbers that precede the sequence value associated with the index number provided.

Since the communicants have presumably previously exchanged RNGs and seeds, the only new information that must be provided in order to generate an IP pair is the sequence number. If this number is provided by the sender in the packet header, then the receiver need only plug this number into the RNG in order to generate an IP pair—and thus verify that the IP pair appearing in the header of the packet is valid. In this scheme, if the sender and receiver lose synchronization, the receiver can immediately re-synchronize upon receipt of a single packet by simply comparing the IP pair in the packet header to the IP pair generated from the index number. Thus, synchronized communications can be resumed upon receipt of a single packet, making this scheme ideal for multicast communications. Taken to the extreme, it could obviate the need for synchronization tables entirely; that is, the sender and receiver could simply rely on the index number in the sync field to validate the IP pair on each packet, and thereby eliminate the tables entirely.

The aforementioned scheme may have some inherent security issues associated with it—namely, the placement of the sync field. If the field is placed in the outer header, then an interloper could observe the values of the field and their relationship to the IP stream. This could potentially compromise the algorithm that is being used to generate the IP-address sequence, which would compromise the security of the communications. If, however, the value is placed in the inner header, then the sender must decrypt the inner header before it can extract the sync value and validate the IP pair; this opens up the receiver to certain types of denial-of-service (DoS) attacks, such as packet replay. That is, if the receiver must decrypt a packet before it can validate the IP pair, then it could potentially be forced to expend a significant amount of processing on decryption if an attacker simply retransmits previously valid packets. Other attack methodologies are possible in this scenario.

A possible compromise between algorithm security and processing speed is to split up the sync value between an inner (encrypted) and outer (unencrypted) header. That is, if the sync value is sufficiently long, it could potentially be split into a rapidly-changing part that can be viewed in the clear, and a fixed (or very slowly changing) part that must be protected. The part that can be viewed in the clear will be called the "public sync" portion and the part that must be protected will be called the "private sync" portion.

Both the public sync and private sync portions are needed to generate the complete sync value. The private portion, however, can be selected such that it is fixed or will change only occasionally. Thus, the private sync value can be stored by the recipient, thereby obviating the need to decrypt the header in order to retrieve it. If the sender and receiver have previously agreed upon the frequency with which the private part of the sync will change, then the receiver can selectively decrypt a single header in order to extract the new private sync if the communications gap that has led to lost synchronization has exceeded the lifetime of the previous private sync. This should not represent a burdensome amount of decryption, and thus should not open up the receiver to denial-of-service attack simply based on the need to occasionally decrypt a single header.

One implementation of this is to use a hashing function with a one-to-one mapping to generate the private and public sync portions from the sync value. This implementation is shown in FIG. **13**, where (for example) a first ISP **1302** is the sender and a second ISP **1303** is the receiver. (Other alternatives are possible from FIG. **13**.) A transmitted packet comprises a public or "outer" header **1305** that is not encrypted, and a private or "inner" header **1306** that is encrypted using for example a link key. Outer header **1305** includes a public sync portion while inner header **1306** contains the private sync portion. A receiving node decrypts the inner header using a decryption function **1307** in order to extract the private sync portion. This step is necessary only if the lifetime of the currently buffered private sync has expired. (If the currently-buffered private sync is still valid, then it is simply extracted from memory and "added" (which could be an inverse hash) to the public sync, as shown in step **1308**.) The public and decrypted private sync portions are combined in function **1308** in order to generate the combined sync **1309**. The combined sync (**1309**) is then fed into the RNG (**1310**) and compared to the IP address pair (**1311**) to validate or reject the packet.

An important consideration in this architecture is the concept of "future" and "past" where the public sync values are concerned. Though the sync values, themselves, should be random to prevent spoofing attacks, it may be important that the receiver be able to quickly identify a sync value that has already been sent—even if the packet containing that sync value was never actually received by the receiver. One solution is to hash a time stamp or sequence number into the public sync portion, which could be quickly extracted, checked, and discarded, thereby validating the public sync portion itself.

In one embodiment, packets can be checked by comparing the source/destination IP pair generated by the sync field with the pair appearing in the packet header. If (1) they match, (2) the time stamp is valid, and (3) the dead-man timer has expired, then re-synchronization occurs; otherwise, the packet is rejected. If enough processing power is available, the dead-man timer and synchronization tables can be avoided altogether, and the receiver would simply resynchronize (e.g., validate) on every packet.

The foregoing scheme may require large-integer (e.g., 160-bit) math, which may affect its implementation. Without such large-integer registers, processing throughput would be affected, thus potentially affecting security from a denial-of-service standpoint. Nevertheless, as large-integer math processing features become more prevalent, the costs of implementing such a feature will be reduced.

D. Other Synchronization Schemes

As explained above, if W or more consecutive packets are lost between a transmitter and receiver in a VPN (where W is the window size), the receiver's window will not have been updated and the transmitter will be transmitting packets not in the receiver's window. The sender and receiver will not recover synchronization until perhaps the random pairs in the window are repeated by chance. Therefore, there is a need to keep a transmitter and receiver in synchronization whenever possible and to re-establish synchronization whenever it is lost.

A "checkpoint" scheme can be used to regain synchronization between a sender and a receiver that have fallen out of synchronization. In this scheme, a checkpoint message comprising a random IP address pair is used for communicating synchronization information. In one embodiment, two messages are used to communicate synchronization information between a sender and a recipient:

1. SYNC_REQ is a message used by the sender to indicate that it wants to synchronize; and
2. SYNC_ACK is a message used by the receiver to inform the transmitter that it has been synchronized.

According to one variation of this approach, both the transmitter and receiver maintain three checkpoints (see FIG. **14**):

1. In the transmitter, ckpt_o ("checkpoint old") is the IP pair that was used to re-send the last SYNC_REQ packet to the receiver. In the receiver, ckpt_o ("checkpoint old") is the IP pair that receives repeated SYNC_REQ packets from the transmitter.
2. In the transmitter, ckpt_n ("checkpoint new") is the IP pair that will be used to send the next SYNC_REQ packet to the receiver. In the receiver, ckpt_n ("checkpoint new") is the IP pair that receives a new SYNC_REQ packet from the transmitter and which causes the receiver's window to be re-aligned, ckpt_o set to ckpt_n, a new ckpt_n to be generated and a new ckpt_r to be generated.
3. In the transmitter, ckpt_r is the IP pair that will be used to send the next SYNC_ACK packet to the receiver. In the receiver, ckpt_r is the IP pair that receives a new SYNC_ACK packet from the transmitter and which causes a new ckpt_n to be generated. Since SYNC_ACK is transmitted from the receiver ISP to the sender ISP, the transmitter ckpt_r refers to the ckpt_r of the receiver and the receiver ckpt_r refers to the ckpt_r of the transmitter (see FIG. **14**).

When a transmitter initiates synchronization, the IP pair it will use to transmit the next data packet is set to a predetermined value and when a receiver first receives a SYNC_REQ, the receiver window is updated to be centered on the transmitter's next IP pair. This is the primary mechanism for checkpoint synchronization.

Synchronization can be initiated by a packet counter (e.g., after every N packets transmitted, initiate a synchronization) or by a timer (every S seconds, initiate a synchronization) or a combination of both. See FIG. **15**. From the transmitter's perspective, this technique operates as follows: (1) Each transmitter periodically transmits a "sync request" message to the receiver to make sure that it is in sync. (2) If the receiver is still in sync, it sends back a "sync ack" message. (If this works, no further action is necessary). (3) If no "sync ack" has been received within a period of time, the transmitter retransmits the sync request again. If the transmitter reaches the next checkpoint without receiving a "sync ack" response, then synchronization is broken, and the transmitter should stop transmitting. The transmitter will continue to send sync_reqs until it receives a sync_ack, at which point transmission is reestablished.

From the receiver's perspective, the scheme operates as follows: (1) when it receives a "sync request" request from the transmitter, it advances its window to the next checkpoint position (even skipping pairs if necessary), and sends a "sync ack" message to the transmitter. If sync was never lost, then the "jump ahead" really just advances to the next available pair of addresses in the table (i.e., normal advancement).

If an interloper intercepts the "sync request" messages and tries to interfere with communication by sending new ones, it will be ignored if the synchronization has been established or it it will actually help to re-establish synchronization.

A window is realigned whenever a re-synchronization occurs. This realignment entails updating the receiver's window to straddle the address pairs used by the packet transmitted immediately after the transmission of the SYNC_REQ packet. Normally, the transmitter and receiver are in synchronization with one another. However, when network events occur, the receiver's window may have to be advanced by many steps during resynchronization. In this



case, it is desirable to move the window ahead without having to step through the intervening random numbers sequentially. (This feature is also desirable for the auto-sync approach discussed above).

E. Random Number Generator with a Jump-Ahead Capability

An attractive method for generating randomly hopped addresses is to use identical random number generators in the transmitter and receiver and advance them as packets are transmitted and received. There are many random number generation algorithms that could be used. Each one has strengths and weaknesses for address hopping applications.

Linear congruential random number generators (LCRs) are fast, simple and well characterized random number generators that can be made to jump ahead n steps efficiently. An LCR generates random numbers $X_1$, $X_2$, $X_3$ . . . $X_k$ starting with seed $X_0$ using a recurrence

$$X_i=(aX_{i-1}+b)\bmod c, \quad (1)$$

where a, b and c define a particular LCR. Another expression for $X_i$,

$$X_i=((a^i(X_0+b)-b)/(a-1))\bmod c \quad (2)$$

enables the jump-ahead capability. The factor $a^i$ can grow very large even for modest i if left unfettered. Therefore some special properties of the modulo operation can be used to control the size and processing time required to compute (2). (2) can be rewritten as:

$$X_i=(a^i(X_0(a-1)+b)-b)/(a-1)\bmod c. \quad (3)$$

It can be shown that:

$$(a^i(X_0(a-1)+b)-b)/(a-1)\bmod c=((a^i \bmod((a-1)c)(X_0(a-1)+b)-b)/(a-1))\bmod c \quad (4).$$

$(X_0(a-1)+b)$ can be stored as $(X_0(a-1)+b) \bmod c$, b as b mod c and compute $a^i \bmod((a-1)c)$ (this requires O(log(i)) steps).

A practical implementation of this algorithm would jump a fixed distance, n, between synchronizations; this is tantamount to synchronizing every n packets. The window would commence n IP pairs from the start of the previous window. Using $X_j^w$, the random number at the $j^{th}$ checkpoint, as $X_0$ and n as i, a node can store $a^n \bmod((a-1)c)$ once per LCR and set

$$X_{j+1}^w=X_{n(j+1)}=((a^n \bmod((a-1)c)(X_j^w(a-1)+b)-b)/(a-1))\bmod c, \quad (5)$$

to generate the random number for the $j+1^{th}$ synchronization. Using this construction, a node could jump ahead an arbitrary (but fixed) distance between synchronizations in a constant amount of time (independent of n).

Pseudo-random number generators, in general, and LCRs, in particular, will eventually repeat their cycles. This repetition may present vulnerability in the IP hopping scheme. An adversary would simply have to wait for a repeat to predict future sequences. One way of coping with this vulnerability is to create a random number generator with a known long cycle. A random sequence can be replaced by a new random number generator before it repeats. LCRs can be constructed with known long cycles. This is not currently true of many random number generators.

Random number generators can be cryptographically insecure. An adversary can derive the RNG parameters by examining the output or part of the output. This is true of LCGs. This vulnerability can be mitigated by incorporating an encryptor, designed to scramble the output as part of the random number generator. The random number generator

prevents an adversary from mounting an attack—e.g., a known plaintext attack—against the encryptor.

F. Random Number Generator Example

Consider a RNG where a=31, b=4 and c=15. For this case equation (1) becomes:

$$X_i=(31X_{i-1}+4)\text{mod } 15. \quad (6)$$

If one sets $X_0$=1, equation (6) will produce the sequence 1, 5, 9, 13, 2, 6, 10, 14, 3, 7, 11, 0, 4, 8, 12. This sequence will repeat indefinitely. For a jump ahead of 3 numbers in this sequence $a^n=31^3=29791$, c*(a−1)=15*30=450 and $a^n$ mod((a−1)c)=$31^3$ mod(15*30)=29791 mod(450)=91. Equation (5) becomes:

$$((91(X_i30+4)-4)/30)\text{mod } 15 \quad (7).$$

Table 1 shows the jump ahead calculations from (7) . The calculations start at 5 and jump ahead 3.

TABLE 1

| I | $X_i$ | $(X_i30 + 4)$ | 91 $(X_i30 + 4) - 4$ | ((91 $(X_i30 + 4) - 4)/30$ | $X_{i+3}$ |
|---|---|---|---|---|---|
| 1 | 5 | 154 | 14010 | 467 | 2 |
| 4 | 2 | 64 | 5820 | 194 | 14 |
| 7 | 14 | 424 | 38580 | 1286 | 11 |
| 10 | 11 | 334 | 30390 | 1013 | 8 |
| 13 | 8 | 244 | 22200 | 740 | 5 |

G. Fast Packet Filter

Address hopping VPNs must rapidly determine whether a packet has a valid header and thus requires further processing, or has an invalid header (a hostile packet) and should be immediately rejected. Such rapid determinations will be referred to as "fast packet filtering." This capability protects the VPN from attacks by an adversary who streams hostile packets at the receiver at a high rate of speed in the hope of saturating the receiver's processor (a so-called "denial of service" attack). Fast packet filtering is an important feature for implementing VPNs on shared media such as Ethernet.

Assuming that all participants in a VPN share an unassigned "A" block of addresses, one possibility is to use an experimental "A" block that will never be assigned to any machine that is not address hopping on the shared medium. "A" blocks have a 24 bits of address that can be hopped as opposed to the 8 bits in "C" blocks. In this case a hopblock will be the "A" block. The use of the experimental "A" block is a likely option on an Ethernet because:

1. The addresses have no validity outside of the Ethernet and will not be routed out to a valid outside destination by a gateway.
2. There are $2^{24}$ (~16 million) addresses that can be hopped within each "A" block. This yields >280 trillion possible address pairs making it very unlikely that an adversary would guess a valid address. It also provides acceptably low probability of collision between separate VPNs (all VPNs on a shared medium independently generate random address pairs from the same "A" block).
3. The packets will not be received by someone on the Ethernet who is not on a VPN (unless the machine is in promiscuous mode) minimizing impact on non-VPN computers.

The Ethernet example will be used to describe one implementation of fast packet filtering. The ideal algorithm would quickly examine a packet header, determine whether the packet is hostile, and reject any hostile packets or determine which active IP pair the packet header matches. The problem is a classical associative memory problem. A variety of techniques have been developed to solve this problem (hashing, B-trees etc). Each of these approaches has its strengths and weaknesses. For instance, hash tables can be made to operate quite fast in a statistical sense, but can occasionally degenerate into a much slower algorithm. This slowness can persist for a period of time. Since there is a need to discard hostile packets quickly at all times, hashing would be unacceptable.

H. Presence Vector Algorithm

A presence vector is a bit vector of length $2^n$ that can be indexed by n-bit numbers (each ranging from 0 to $2^n-1$). One can indicate the presence of k n-bit numbers (not necessarily unique), by setting the bits in the presence vector indexed by each number to 1. Otherwise, the bits in the presence vector are 0. An n-bit number, x, is one of the k numbers if and only if the $x^{th}$ bit of the presence vector is 1. A fast packet filter can be implemented by indexing the presence vector and looking for a 1, which will be referred to as the "test."

For example, suppose one wanted to represent the number **135** using a presence vector. The 135th bit of the vector would be set. Consequently, one could very quickly determine whether an address of 135 was valid by checking only one bit: the 135th bit. The presence vectors could be created in advance corresponding to the table entries for the IP addresses. In effect, the incoming addresses can be used as indices into a long vector, making comparisons very fast. As each RNG generates a new address, the presence vector is updated to reflect the information. As the window moves, the presence vector is updated to zero out addresses that are no longer valid.

There is a trade-off between efficiency of the test and the amount of memory required for storing the presence vector (s). For instance, if one were to use the 48 bits of hopping addresses as an index, the presence vector would have to be 35 terabytes. Clearly, this is too large for practical purposes. Instead, the 48 bits can be divided into several smaller fields. For instance, one could subdivide the 48 bits into four 12-bit fields (see FIG. **16**). This reduces the storage requirement to 2048 bytes at the expense of occasionally having to process a hostile packet. In effect, instead of one long presence vector, the decomposed address portions must match all four shorter presence vectors before further processing is allowed. (If the first part of the address portion doesn't match the first presence vector, there is no need to check the remaining three presence vectors).

A presence vector will have a 1 in the $y^{th}$ bit if and only if one or more addresses with a corresponding field of y are active. An address is active only if each presence vector indexed by the appropriate sub-field of the address is 1.

Consider a window of 32 active addresses and 3 checkpoints. A hostile packet will be rejected by the indexing of one presence vector more than 99% of the time. A hostile packet will be rejected by the indexing of all 4 presence vectors more than 99.9999995% of the time. On average, hostile packets will be rejected in less than 1.02 presence vector index operations.

The small percentage of hostile packets that pass the fast packet filter will be rejected when matching pairs are not found in the active window or are active checkpoints. Hostile packets that serendipitously match a header will be rejected when the VPN software attempts to decrypt the header. However, these cases will be extremely rare. There are many other ways this method can be configured to arbitrate the space/speed tradeoffs.

I. Further Synchronization Enhancements

A slightly modified form of the synchronization techniques described above can be employed. The basic principles of the previously described checkpoint synchronization scheme remain unchanged. The actions resulting from the reception of the checkpoints are, however, slightly different. In this variation, the receiver will maintain between OoO ("Out of Order") and 2×WINDOW_SIZE+OoO active addresses (1≦OoO≦WINDOW_SIZE and WINDOW_SIZE≧1). OoO and WINDOW_SIZE are engineerable parameters, where OoO is the minimum number of addresses needed to accommodate lost packets due to events in the network or out of order arrivals and WINDOW_SIZE is the number of packets transmitted before a SYNC_REQ is issued. FIG. **17** depicts a storage array for a receiver's active addresses.

The receiver starts with the first 2×WINDOW_SIZE addresses loaded and active (ready to receive data). As packets are received, the corresponding entries are marked as "used" and are no longer eligible to receive packets. The transmitter maintains a packet counter, initially set to 0, containing the number of data packets transmitted since the last initial transmission of a SYNC_REQ for which SYNC_ACK has been received. When the transmitter packet counter equals WINDOW_SIZE, the transmitter generates a SYNC_REQ and does its initial transmission. When the receiver receives a SYNC_REQ corresponding to its current CKPT_N, it generates the next WINDOW_SIZE addresses and starts loading them in order starting at the first location after the last active address wrapping around to the beginning of the array after the end of the array has been reached. The receiver's array might look like FIG. **18** when a SYNC_REQ has been received. In this case a couple of packets have been either lost or will be received out of order when the SYNC_REQ is received.

FIG. **19** shows the receiver's array after the new addresses have been generated. If the transmitter does not receive a SYNC_ACK, it will re-issue the SYNC_REQ at regular intervals. When the transmitter receives a SYNC_ACK, the packet counter is decremented by WINDOW_SIZE. If the packet counter reaches 2×WINDOW_SIZE—OoO then the transmitter ceases sending data packets until the appropriate SYNC_ACK is finally received. The transmitter then resumes sending data packets. Future behavior is essentially a repetition of this initial cycle. The advantages of this approach are:

1. There is no need for an efficient jump ahead in the random number generator,
2. No packet is ever transmitted that does not have a corresponding entry in the receiver side
3. No timer based re-synchronization is necessary. This is a consequence of 2.
4. The receiver will always have the ability to accept data messages transmitted within OoO messages of the most recently transmitted message.

J. Distributed Transmission Path Variant

Another embodiment incorporating various inventive principles is shown in FIG. **20**. In this embodiment, a message transmission system includes a first computer **2001** in communication with a second computer **2002** through a network **2011** of intermediary computers. In one variant of this embodiment, the network includes two edge routers **2003** and **2004** each of which is linked to a plurality of Internet Service Providers (ISPs) **2005** through **2010**. Each ISP is coupled to a plurality of other ISPs in an arrangement as shown in FIG. **20**, which is a representative configuration only and is not intended to be limiting. Each connection between ISPs is labeled in FIG. **20** to indicate a specific physical transmission path (e.g., AD is a physical path that links ISP A (element **2005**) to ISP D (element **2008**)). Packets arriving at each edge router are selectively transmitted to one of the ISPs to which the router is attached on the basis of a randomly or quasi-randomly selected basis.

As shown in FIG. **21**, computer **2001** or edge router **2003** incorporates a plurality of link transmission tables **2100** that identify, for each potential transmission path through the network, valid sets of IP addresses that can be used to transmit the packet. For example, AD table **2101** contains a plurality of IP source/destination pairs that are randomly or quasi-randomly generated. When a packet is to be transmitted from first computer **2001** to second computer **2002**, one of the link tables is randomly (or quasi-randomly) selected, and the next valid source/destination address pair from that table is used to transmit the packet through the network. If path AD is randomly selected, for example, the next source/destination IP address pair (which is pre-determined to transmit between ISP A (element **2005**) and ISP B (element **2008**)) is used to transmit the packet. If one of the transmission paths becomes degraded or inoperative, that link table can be set to a "down" condition as shown in table **2105**, thus preventing addresses from being selected from that table. Other transmission paths would be unaffected by this broken link.

3. CONTINUATION-IN-PART IMPROVEMENTS

The following describes various improvements and features that can be applied to the embodiments described above. The improvements include: (1) a load balancer that distributes packets across different transmission paths according to transmission path quality; (2) a DNS proxy server that transparently creates a virtual private network in response to a domain name inquiry; (3) a large-to-small link bandwidth management feature that prevents denial-of-service attacks at system chokepoints; (4) a traffic limiter that regulates incoming packets by limiting the rate at which a transmitter can be synchronized with a receiver; and (5) a signaling synchronizer that allows a large number of nodes to communicate with a central node by partitioning the communication function between two separate entities. Each is discussed separately below.

A. Load Balancer

Various embodiments described above include a system in which a transmitting node and a receiving node are coupled through a plurality of transmission paths, and wherein successive packets are distributed quasi-randomly over the plurality of paths. See, for example, FIGS. **20** and **21** and accompanying description. The improvement extends this basic concept to encompass distributing packets across different paths in such a manner that the loads on the paths are generally balanced according to transmission link quality.

In one embodiment, a system includes a transmitting node and a receiving node that are linked via a plurality of transmission paths having potentially varying transmission quality. Successive packets are transmitted over the paths based on a weight value distribution function for each path. The rate that packets will be transmitted over a given path can be different for each path. The relative "health" of each transmission path is monitored in order to identify paths that have become degraded. In one embodiment, the health of each path is monitored in the transmitter by comparing the number of packets transmitted to the number of packet acknowledgements received. Each transmission path may comprise a physically separate path (e.g., via dial-up phone

line, computer network, router, bridge, or the like), or may comprise logically separate paths contained within a broadband communication medium (e.g., separate channels in an FDM, TDM, CDMA, or other type of modulated or unmodulated transmission link).

When the transmission quality of a path falls below a predetermined threshold and there are other paths that can transmit packets, the transmitter changes the weight value used for that path, making it less likely that a given packet will be transmitted over that path. The weight will preferably be set no lower than a minimum value that keeps nominal traffic on the path. The weights of the other available paths are altered to compensate for the change in the affected path. When the quality of a path degrades to where the transmitter is turned off by the synchronization function (i.e., no packets are arriving at the destination), the weight is set to zero. If all transmitters are turned off, no packets are sent.

Conventional TCP/IP protocols include a "throttling" feature that reduces the transmission rate of packets when it is determined that delays or errors are occurring in transmission. In this respect, timers are sometimes used to determine whether packets have been received. These conventional techniques for limiting transmission of packets, however, do not involve multiple transmission paths between two nodes wherein transmission across a particular path relative to the others is changed based on link quality.

According to certain embodiments, in order to damp oscillations that might otherwise occur if weight distributions are changed drastically (e.g., according to a step function), a linear or an exponential decay formula can be applied to gradually decrease the weight value over time that a degrading path will be used. Similarly, if the health of a degraded path improves, the weight value for that path is gradually increased.

Transmission link health can be evaluated by comparing the number of packets that are acknowledged within the transmission window (see embodiments discussed above) to the number of packets transmitted within that window and by the state of the transmitter (i.e., on or off). In other words, rather than accumulating general transmission statistics over time for a path, one specific implementation uses the "windowing" concepts described above to evaluate transmission path health.

The same scheme can be used to shift virtual circuit paths from an "unhealthy" path to a "healthy" one, and to select a path for a new virtual circuit.

FIG. **22**A shows a flowchart for adjusting weight values associated with a plurality of transmission links. It is assumed that software executing in one or more computer nodes executes the steps shown in FIG. **22**A. It is also assumed that the software can be stored on a computer-readable medium such as a magnetic or optical disk for execution by a computer.

Beginning in step **2201**, the transmission quality of a given transmission path is measured. As described above, this measurement can be based on a comparison between the number of packets transmitted over a particular link to the number of packet acknowledgements received over the link (e.g., per unit time, or in absolute terms). Alternatively, the quality can be evaluated by comparing the number of packets that are acknowledged within the transmission window to the number of packets that were transmitted within that window. In yet another variation, the number of missed synchronization messages can be used to indicate link quality. Many other variations are of course possible.

In step **2202**, a check is made to determine whether more than one transmitter (e.g., transmission path) is turned on. If not, the process is terminated and resumes at step **2201**.

In step **2203**, the link quality is compared to a given threshold (e.g., 50%, or any arbitrary number). If the quality falls below the threshold, then in step **2207** a check is made to determine whether the weight is above a minimum level (e.g., 1%). If not, then in step **2209** the weight is set to the minimum level and processing resumes at step **2201**. If the weight is above the minimum level, then in step **2208** the weight is gradually decreased for the path, then in step **2206** the weights for the remaining paths are adjusted accordingly to compensate (e.g., they are increased).

If in step **2203** the quality of the path was greater than or equal to the threshold, then in step **2204** a check is made to determine whether the weight is less than a steady-state value for that path. If so, then in step **2205** the weight is increased toward the steady-state value, and in step **2206** the weights for the remaining paths are adjusted accordingly to compensate (e.g., they are decreased). If in step **2204** the weight is not less than the steady-state value, then processing resumes at step **2201** without adjusting the weights.

The weights can be adjusted incrementally according to various functions, preferably by changing the value gradually. In one embodiment, a linearly decreasing function is used to adjust the weights; according to another embodiment, an exponential decay function is used. Gradually changing the weights helps to damp oscillators that might otherwise occur if the probabilities were abruptly.

Although not explicitly shown in FIG. **22**A the process can be performed only periodically (e.g., according to a time schedule), or it can be continuously run, such as in a background mode of operation. In one embodiment, the combined weights of all potential paths should add up to unity (e.g., when the weighting for one path is decreased, the corresponding weights that the other paths will be selected will increase).

Adjustments to weight values for other paths can be prorated. For example, a decrease of 10% in weight value for one path could result in an evenly distributed increase in the weights for the remaining paths. Alternatively, weightings could be adjusted according to a weighted formula as desired (e.g., favoring healthy paths over less healthy paths). In yet another variation, the difference in weight value can be amortized over the remaining links in a manner that is proportional to their traffic weighting.

FIG. **22**B shows steps that can be executed to shut down transmission links where a transmitter turns off. In step **2210**, a transmitter shut-down event occurs. In step **2211**, a test is made to determine whether at least one transmitter is still turned on. If not, then in step **2215** all packets are dropped until a transmitter turns on. If in step **2211** at least one transmitter is turned on, then in step **2212** the weight for the path is set to zero, and the weights for the remaining paths are adjusted accordingly.

FIG. **23** shows a computer node **2301** employing various principles of the above-described embodiments. It is assumed that two computer nodes of the type shown in FIG. **23** communicate over a plurality of separate physical transmission paths. As shown in FIG. **23**, four transmission paths **X1** through **X4** are defined for communicating between the two nodes. Each node includes a packet transmitter **2302** that operates in accordance with a transmit table **2308** as described above. (The packet transmitter could also operate without using the IP-hopping features described above, but the following description assumes that some form of hopping is employed in conjunction with the path selection mechanism.). The computer node also includes a packet receiver **2303** that operates in accordance with a receive table **2309**, including a moving window W that moves as

valid packets are received. Invalid packets having source and destination addresses that do not fall within window W are rejected.

As each packet is readied for transmission, source and destination IP addresses (or other discriminator values) are selected from transmit table **2308** according to any of the various algorithms described above, and packets containing these source/destination address pairs, which correspond to the node to which the four transmission paths are linked, are generated to a transmission path switch **2307**. Switch **2307**, which can comprise a software function, selects from one of the available transmission paths according to a weight distribution table **2306**. For example, if the weight for path **X1** is 0.2, then every fifth packet will be transmitted on path **X1**. A similar regime holds true for the other paths as shown. Initially, each link's weight value can be set such that it is proportional to its bandwidth, which will be referred to as its "steady-state" value.

Packet receiver **2303** generates an output to a link quality measurement function **2304** that operates as described above to determine the quality of each transmission path. (The input to packet receiver **2303** for receiving incoming packets is omitted for clarity). Link quality measurement function **2304** compares the link quality to a threshold for each transmission link and, if necessary, generates an output to weight adjustment function **2305**. If a weight adjustment is required, then the weights in table **2306** are adjusted accordingly, preferably according to a gradual (e.g., linearly or exponentially declining) function. In one embodiment, the weight values for all available paths are initially set to the same value, and only when paths degrade in quality are the weights changed to reflect differences.

Link quality measurement function **2304** can be made to operate as part of a synchronizer function as described above. That is, if resynchronization occurs and the receiver detects that synchronization has been lost (e.g., resulting in the synchronization window W being advanced out of sequence), that fact can be used to drive link quality measurement function **2304**. According to one embodiment, load balancing is performed using information garnered during the normal synchronization, augmented slightly to communicate link health from the receiver to the transmitter. The receiver maintains a count, MESS_R(W), of the messages received in synchronization window W. When it receives a synchronization request (SYNC_REQ) corresponding to the end of window W, the receiver includes counter MESS_R in the resulting synchronization acknowledgement (SYNC_ACK) sent back to the transmitter. This allows the transmitter to compare messages sent to messages received in order to asses the health of the link.

If synchronization is completely lost, weight adjustment function **2305** decreases the weight value on the affected path to zero. When synchronization is regained, the weight value for the affected path is gradually increased to its original value. Alternatively, link quality can be measured by evaluating the length of time required for the receiver to acknowledge a synchronization request. In one embodiment, separate transmit and receive tables are used for each transmission path.

When the transmitter receives a SYNC_ACK, the MESS_R is compared with the number of messages transmitted in a window (MESS_T). When the transmitter receives a SYNC_ACK, the traffic probabilities will be examined and adjusted if necessary. MESS_R is compared with the number of messages transmitted in a window (MESS_T). There are two possibilities:

1. If MESS_R is less than a threshold value, THRESH, then the link will be deemed to be unhealthy. If the transmitter was turned off, the transmitter is turned on and the weight P for that link will be set to a minimum value MIN. This will keep a trickle of traffic on the link for monitoring purposes until it recovers. If the transmitter was turned on, the weight P for that link will be set to:

$$P'=\alpha\times MIN+(1-\alpha)\times P \quad (1)$$

Equation 1 will exponentially damp the traffic weight value to MIN during sustained periods of degraded service.

2. If MESS_R for a link is greater than or equal to THRESH, the link will be deemed healthy. If the weight P for that link is greater than or equal to the steady state value S for that link, then P is left unaltered. If the weight P for that link is less than THRESH then P will be set to:

$$P'=\beta\times S+(1-\beta)\times P \quad (2)$$

where β is a parameter such that 0<=β<=1 that determines the damping rate of P.

Equation 2 will increase the traffic weight to S during sustained periods of acceptable service in a damped exponential fashion.

A detailed example will now be provided with reference to FIG. **24**. As shown in FIG. **24**, a first computer **2401** communicates with a second computer **2402** through two routers **2403** and **2404**. Each router is coupled to the other router through three transmission links. As described above, these may be physically diverse links or logical links (including virtual private networks).

Suppose that a first link L**1** can sustain a transmission bandwidth of 100 Mb/s and has a window size of 32; link L**2** can sustain 75 Mb/s and has a window size of 24; and link L**3** can sustain 25 Mb/s and has a window size of 8. The combined links can thus sustain 200 Mb/s. The steady state traffic weights are 0.5 for link L**1**; 0.375 for link L**2**, and 0.125 for link L**3**. MIN=1 Mb/s, THRESH=0.8 MESS_T for each link, α=0.75 and β=0.5. These traffic weights will remain stable until a link stops for synchronization or reports a number of packets received less than its THRESH. Consider the following sequence of events:

1. Link L**1** receives a SYNC_ACK containing a MESS_R of 24, indicating that only 75% of the MESS_T (32) messages transmitted in the last window were successfully received. Link **1** would be below THRESH (0.8). Consequently, link L**1**'s traffic weight value would be reduced to 0.12825, while link L**2**'s traffic weight value would be increased to 0.65812 and link L**3**'s traffic weight value would be increased to 0.217938.
2. Link L**2** and L**3** remained healthy and link L**1** stopped to synchronize. Then link L**1**'s traffic weight value would be set to 0, link L**2**'s traffic weight value would be set to 0.75, and link L**33**'s traffic weight value would be set to 0.25.
3. Link L**1** finally received a SYNC_ACK containing a MESS_R of 0 indicating that none of the MESS_T (32) messages transmitted in the last window were successfully received. Link L**1** would be below THRESH. Link L**1**'s traffic weight value would be increased to 0.005, link L**2**'s traffic weight value would be decreased to 0.74625, and link L**3**'s traffic weight value would be decreased to 0.24875.
4. Link L**1** received a SYNC_ACK containing a MESS_R of 32 indicating that 100% of the MESS_T

(32) messages transmitted in the last window were successfully received. Link L1 would be above THRESH. Link L1's traffic weight value would be increased to 0.2525, while link L2's traffic weight value would be decreased to 0.560625 and link L3's traffic weight value would be decreased to 0.186875.

5. Link L1 received a SYNC_ACK containing a MESS_R of 32 indicating that 100% of the MESS_T (32) messages transmitted in the last window were successfully received. Link L1 would be above THRESH. Link L1's traffic weight value would be increased to 0.37625; link L2's traffic weight value would be decreased to 0.4678125, and link L3's traffic weight value would be decreased to 0.1559375.

6. Link L1 remains healthy and the traffic probabilities approach their steady state traffic probabilities.

B. Use of a DNS Proxy to Transparently Create Virtual Private Networks

A second improvement concerns the automatic creation of a virtual private network (VPN) in response to a domain-name server look-up function.

Conventional Domain Name Servers (DNSs) provide a look-up function that returns the IP address of a requested computer or host. For example, when a computer user types in the web name "Yahoo.com," the user's web browser transmits a request to a DNS, which converts the name into a four-part IP address that is returned to the user's browser and then used by the browser to contact the destination web site.

This conventional scheme is shown in FIG. **25**. A user's computer **2501** includes a client application **2504** (for example, a web browser) and an IP protocol stack **2505**. When the user enters the name of a destination host, a request DNS REQ is made (through IP protocol stack **2505**) to a DNS **2502** to look up the IP address associated with the name. The DNS returns the IP address DNS RESP to client application **2504**, which is then able to use the IP address to communicate with the host **2503** through separate transactions such as PAGE REQ and PAGE RESP.

In the conventional architecture shown in FIG. **25**, nefarious listeners on the Internet could intercept the DNS REQ and DNS RESP packets and thus learn what IP addresses the user was contacting. For example, if a user wanted to set up a secure communication path with a web site having the name "Target.com," when the user's browser contacted a DNS to find the IP address for that web site, the true IP address of that web site would be revealed over the Internet as part of the DNS inquiry. This would hamper anonymous communications on the Internet.

One conventional scheme that provides secure virtual private networks over the Internet provides the DNS server with the public keys of the machines that the DNS server has the addresses for. This allows hosts to retrieve automatically the public keys of a host that the host is to communicate with so that the host can set up a VPN without having the user enter the public key of the destination host. One implementation of this standard is presently being developed as part of the FreeS/WAN project(RFC 2535).

The conventional scheme suffers from certain drawbacks. For example, any user can perform a DNS request. Moreover, DNS requests resolve to the same value for all users.

According to certain aspects of the invention, a specialized DNS server traps DNS requests and, if the request is from a special type of user (e.g., one for which secure communication services are defined), the server does not return the true IP address of the target node, but instead automatically sets up a virtual private network between the target node and the user. The VPN is preferably implemented using the IP address "hopping" features of the basic invention described above, such that the true identity of the two nodes cannot be determined even if packets during the communication are intercepted. For DNS requests that are determined to not require secure services (e.g., an unregistered user), the DNS server transparently "passes through" the request to provide a normal look-up function and return the IP address of the target web server, provided that the requesting host has permissions to resolve unsecured sites. Different users who make an identical DNS request could be provided with different results.

FIG. **26** shows a system employing various principles summarized above. A user's computer **2601** includes a conventional client (e.g., a web browser) **2605** and an IP protocol stack **2606** that preferably operates in accordance with an IP hopping function **2607** as outlined above. A modified DNS server **2602** includes a conventional DNS server function **2609** and a DNS proxy **2610**. A gatekeeper server **2603** is interposed between the modified DNS server and a secure target site **2704**. An "unsecure" target site **2611** is also accessible via conventional IP protocols.

According to one embodiment, DNS proxy **2610** intercepts all DNS lookup functions from client **2605** and determines whether access to a secure site has been requested. If access to a secure site has been requested (as determined, for example, by a domain name extension, or by reference to an internal table of such sites), DNS proxy **2610** determines whether the user has sufficient security privileges to access the site. If so, DNS proxy **2610** transmits a message to gatekeeper **2603** requesting that a virtual private network be created between user computer **2601** and secure target site **2604**. In one embodiment, gatekeeper **2603** creates "hopblocks" to be used by computer **2601** and secure target site **2604** for secure communication. Then, gatekeeper **2603** communicates these to user computer **2601**. Thereafter, DNS proxy **2610** returns to user computer **2601** the resolved address passed to it by the gatekeeper (this address could be different from the actual target computer) **2604**, preferably using a secure administrative VPN. The address that is returned need not be the actual address of the destination computer.

Had the user requested lookup of a non-secure web site such as site **2611**, DNS proxy would merely pass through to conventional DNS server **2609** the look-up request, which would be handled in a conventional manner, returning the IP address of non-secure web site **2611**. If the user had requested lookup of a secure web site but lacked credentials to create such a connection, DNS proxy **2610** would return a "host unknown" error to the user. In this manner, different users requesting access to the same DNS name could be provided with different look-up results.

Gatekeeper **2603** can be implemented on a separate computer (as shown in FIG. **26**) or as a function within modified DNS server **2602**. In general, it is anticipated that gatekeeper **2703** facilitates the allocation and exchange of information needed to communicate securely, such as using "hopped" IP addresses. Secure hosts such as site **2604** are assumed to be equipped with a secure communication function such as an IP hopping function **2608**.

It will be appreciated that the functions of DNS proxy **2610** and DNS server **2609** can be combined into a single server for convenience. Moreover, although element **2602** is shown as combining the functions of two servers, the two servers can be made to operate independently.

FIG. **27** shows steps that can be executed by DNS proxy server **2610** to handle requests for DNS look-up for secure

hosts. In step **2701**, a DNS look-up request is received for a target host. In step **2702**, a check is made to determine whether access to a secure host was requested. If not, then in step **2703** the DNS request is passed to conventional DNS server **2609**, which looks up the IP address of the target site and returns it to the user's application for further processing.

In step **2702**, if access to a secure host was requested, then in step **2704** a further check is made to determine whether the user is authorized to connect to the secure host. Such a check can be made with reference to an internally stored list of authorized IP addresses, or can be made by communicating with gatekeeper **2603** (e.g., over an "administrative" VPN that is secure). It will be appreciated that different levels of security can also be provided for different categories of hosts. For example, some sites may be designated as having a certain security level, and the security level of the user requesting access must match that security level. The user's security level can also be determined by transmitting a request message back to the user's computer requiring that it prove that it has sufficient privileges.

If the user is not authorized to access the secure site, then a "host unknown" message is returned (step **2705**). If the user has sufficient security privileges, then in step **2706** a secure VPN is established between the user's computer and the secure target site. As described above, this is preferably done by allocating a hopping regime that will be carried out between the user's computer and the secure target site, and is preferably performed transparently to the user (i.e., the user need not be involved in creating the secure link). As described in various embodiments of this application, any of various fields can be "hopped" (e.g., IP source/destination addresses; a field in the header; etc.) in order to communicate securely.

Some or all of the security functions can be embedded in gatekeeper **2603**, such that it handles all requests to connect to secure sites. In this embodiment, DNS proxy **2610** communicates with gatekeeper **2603** to determine (preferably over a secure administrative VPN) whether the user has access to a particular web site. Various scenarios for implementing these features are described by way of example below:

Scenario #1: Client has permission to access target computer, and gatekeeper has a rule to make a VPN for the client. In this scenario, the client's DNS request would be received by the DNS proxy server **2610**, which would forward the request to gatekeeper **2603**. The gatekeeper would establish a VPN between the client and the requested target. The gatekeeper would provide the address of the destination to the DNS proxy, which would then return the resolved name as a result. The resolved address can be transmitted back to the client in a secure administrative VPN.

Scenario #2: Client does not have permission to access target computer. In this scenario, the client's DNS request would be received by the DNS proxy server **2610**, which would forward the request to gatekeeper **2603**. The gatekeeper would reject the request, informing DNS proxy server **2610** that it was unable to find the target computer. The DNS proxy **2610** would then return a "host unknown" error message to the client.

Scenario #3: Client has permission to connect using a normal non-VPN link, and the gatekeeper does not have a rule to set up a VPN for the client to the target site. In this scenario, the client's DNS request is received by DNS proxy server **2610**, which would check its rules and determine that no VPN is needed. Gatekeeper **2603** would then inform the DNS proxy server to forward the request to conventional DNS server **2609**, which would resolve the request and return the result to the DNS proxy server and then back to the client.

Scenario #4: Client does not have permission to establish a normal/non-VPN link, and the gatekeeper does not have a rule to make a VPN for the client to the target site. In this scenario, the DNS proxy server would receive the client's DNS request and forward it to gatekeeper **2603**. Gatekeeper **2603** would determine that no special VPN was needed, but that the client is not authorized to communicate with non-VPN members. The gatekeeper would reject the request, causing DNS proxy server **2610** to return an error message to the client.

C. Large Link to Small Link Bandwidth Management

One feature of the basic architecture is the ability to prevent so-called "denial of service" attacks that can occur if a computer hacker floods a known Internet node with packets, thus preventing the node from communicating with other nodes. Because IP addresses or other fields are "hopped" and packets arriving with invalid addresses are quickly discarded, Internet nodes are protected against flooding targeted at a single IP address.

In a system in which a computer is coupled through a link having a limited bandwidth (e.g., an edge router) to a node that can support a much higher-bandwidth link (e.g., an Internet Service Provider), a potential weakness could be exploited by a determined hacker. Referring to FIG. **28**, suppose that a first host computer **2801** is communicating with a second host computer **2804** using the IP address hopping principles described above. The first host computer is coupled through an edge router **2802** to an Internet Service Provider (ISP) **2803** through a low bandwidth link (LOW BW), and is in turn coupled to second host computer **2804** through parts of the Internet through a high bandwidth link (HIGH BW). In this architecture, the ISP is able to support a high bandwidth to the internet, but a much lower bandwidth to the edge router **2802**.

Suppose that a computer hacker is able to transmit a large quantity of dummy packets addressed to first host computer **2801** across high bandwidth link HIGH BW. Normally, host computer **2801** would be able to quickly reject the packets since they would not fall within the acceptance window permitted by the IP address hopping scheme. However, because the packets must travel across low bandwidth link LOW BW, the packets overwhelm the lower bandwidth link before they are received by host computer **2801**. Consequently, the link to host computer **2801** is effectively flooded before the packets can be discarded.

According to one inventive improvement, a "link guard" function **2805** is inserted into the high-bandwidth node (e.g., ISP **2803**) that quickly discards packets destined for a low-bandwidth target node if they are not valid packets. Each packet destined for a low-bandwidth node is cryptographically authenticated to determine whether it belongs to a VPN. If it is not a valid VPN packet, the packet is discarded at the high-bandwidth node. If the packet is authenticated as belonging to a VPN, the packet is passed with high preference. If the packet is a valid non-VPN packet, it is passed with a lower quality of service (e.g., lower priority).

In one embodiment, the ISP distinguishes between VPN and non-VPN packets using the protocol of the packet. In the case of IPSEC [rfc 2401], the packets have IP protocols **420** and **421**. In the case of the TARP VPN, the packets will have an IP protocol that is not yet defined. The ISP's link guard, **2805**, maintains a table of valid VPNs which it uses to validate whether VPN packets are cryptographically valid.

According to one embodiment, packets that do not fall within any hop windows used by nodes on the low-bandwidth link are rejected, or are sent with a lower quality of service. One approach for doing this is to provide a copy of the IP hopping tables used by the low-bandwidth nodes to the high-bandwidth node, such that both the high-bandwidth and low-bandwidth nodes track hopped packets (e.g., the high-bandwidth node moves its hopping window as valid packets are received). In such a scenario, the high-bandwidth node discards packets that do not fall within the hopping window before they are transmitted over the low-bandwidth link. Thus, for example, ISP **2903** maintains a copy **2910** of the receive table used by host computer **2901**. Incoming packets that do not fall within this receive table are discarded. According to a different embodiment, link guard **2805** validates each VPN packet using a keyed hashed message authentication code (HMAC) [rfc 2104].

According to another embodiment, separate VPNs (using, for example, hopblocks) can be established for communicating between the low-bandwidth node and the high-bandwidth node (i.e., packets arriving at the high-bandwidth node are converted into different packets before being transmitted to the low-bandwidth node).

As shown in FIG. **29**, for example, suppose that a first host computer **2900** is communicating with a second host computer **2902** over the Internet, and the path includes a high bandwidth link HIGH BW to an ISP **2901** and a low bandwidth link LOW BW through an edge router **2904**. In accordance with the basic architecture described above, first host computer **2900** and second host computer **2902** would exchange hopblocks (or a hopblock algorithm) and would be able to create matching transmit and receive tables **2905**, **2906**, **2912** and **2913**. Then in accordance with the basic architecture, the two computers would transmit packets having seemingly random IP source and destination addresses, and each would move a corresponding hopping window in its receive table as valid packets were received.

Suppose that a nefarious computer hacker **2903** was able to deduce that packets having a certain range of IP addresses (e.g., addresses 100 to 200 for the sake of simplicity) are being transmitted to ISP **2901**, and that these packets are being forwarded over a low-bandwidth link. Hacker computer **2903** could thus "flood" packets having addresses falling into the range 100 to 200, expecting that they would be forwarded along low bandwidth link LOW BW, thus causing the low bandwidth link to become overwhelmed. The fast packet reject mechanism in first host computer **3000** would be of little use in rejecting these packets, since the low bandwidth link was effectively jammed before the packets could be rejected. In accordance with one aspect of the improvement, however, VPN link guard **2911** would prevent the attack from impacting the performance of VPN traffic because the packets would either be rejected as invalid VPN packets or given a lower quality of service than VPN traffic over the lower bandwidth link. A denial-of-service flood attack could, however, still disrupt non-VPN traffic.

According to one embodiment of the improvement, ISP **2901** maintains a separate VPN with first host computer **2900**, and thus translates packets arriving at the ISP into packets having a different IP header before they are transmitted to host computer **2900**. The cryptographic keys used to authenticate VPN packets at the link guard **2911** and the cryptographic keys used to encrypt and decrypt the VPN packets at host **2902** and host **2901** can be different, so that link guard **2911** does not have access to the private host data; it only has the capability to authenticate those packets.

According to yet a third embodiment, the low-bandwidth node can transmit a special message to the high-bandwidth node instructing it to shut down all transmissions on a particular IP address, such that only hopped packets will pass through to the low-bandwidth node. This embodiment would prevent a hacker from flooding packets using a single IP address. According to yet a fourth embodiment, the high-bandwidth node can be configured to discard packets transmitted to the low-bandwidth node if the transmission rate exceeds a certain predetermined threshold for any given IP address; this would allow hopped packets to go through. In this respect, link guard **2911** can be used to detect that the rate of packets on a given IP address are exceeding a threshold rate; further packets addressed to that same IP address would be dropped or transmitted at a lower priority (e.g., delayed).

D. Traffic Limiter

In a system in which multiple nodes are communicating using "hopping" technology, a treasonous insider could internally flood the system with packets. In order to prevent this possibility, one inventive improvement involves setting up "contracts" between nodes in the system, such that a receiver can impose a bandwidth limitation on each packet sender. One technique for doing this is to delay acceptance of a checkpoint synchronization request from a sender until a certain time period (e.g., one minute) has elapsed. Each receiver can effectively control the rate at which its hopping window moves by delaying "SYNC ACK" responses to "SYNC_REQ" messages.

A simple modification to the checkpoint synchronizer will serve to protect a receiver from accidental or deliberate overload from an internally treasonous client. This modification is based on the observation that a receiver will not update its tables until a SYNC_REQ is received on hopped address CKPT_N. It is a simple matter of deferring the generation of a new CKPT_N until an appropriate interval after previous checkpoints.

Suppose a receiver wished to restrict reception from a transmitter to 100 packets a second, and that checkpoint synchronization messages were triggered every 50 packets. A compliant transmitter would not issue new SYNC_REQ messages more often than every 0.5 seconds. The receiver could delay a non-compliant transmitter from synchronizing by delaying the issuance of CKPT_N for 0.5 second after the last SYNC_REQ was accepted.

In general, if M receivers need to restrict N transmitters issuing new SYNC_REQ messages after every W messages to sending R messages a second in aggregate, each receiver could defer issuing a new CKPT_N until $M \times N \times W/R$ seconds have elapsed since the last SYNC_REQ has been received and accepted. If the transmitter exceeds this rate between a pair of checkpoints, it will issue the new checkpoint before the receiver is ready to receive it, and the SYNC_REQ will be discarded by the receiver. After this, the transmitter will re-issue the SYNC_REQ every Ti seconds until it receives a SYNC_ACK. The receiver will eventually update CKPT_N and the SYNC_REQ will be acknowledged. If the transmission rate greatly exceeds the allowed rate, the transmitter will stop until it is compliant. If the transmitter exceeds the allowed rate by a little, it will eventually stop after several rounds of delayed synchronization until it is in compliance. Hacking the transmitter's code to not shut off only permits the transmitter to lose the acceptance window. In this case it can recover the window and proceed only after it is compliant again.

Two practical issues should be considered when implementing the above scheme:

1. The receiver rate should be slightly higher than the permitted rate in order to allow for statistical fluctuations in traffic arrival times and non-uniform load balancing.

2. Since a transmitter will rightfully continue to transmit for a period after a SYNC_REQ is transmitted, the algorithm above can artificially reduce the transmitter's bandwidth. If events prevent a compliant transmitter from synchronizing for a period (e.g. the network dropping a SYNC_REQ or a SYNC_ACK) a SYNC_REQ will be accepted later than expected. After this, the transmitter will transmit fewer than expected messages before encountering the next checkpoint. The new checkpoint will not have been activated and the transmitter will have to retransmit the SYNC_REQ. This will appear to the receiver as if the transmitter is not compliant. Therefore, the next checkpoint will be accepted late from the transmitter's perspective. This has the effect of reducing the transmitter's allowed packet rate until the transmitter transmits at a packet rate below the agreed upon rate for a period of time.

To guard against this, the receiver should keep track of the times that the last C SYNC_REQs were received and accepted and use the minimum of M×N×W/R seconds after the last SYNC_REQ has been received and accepted, 2×M×N×W/R seconds after next to the last SYNC_REQ has been received and accepted, C×M×N×W/R seconds after $(C-1)^{th}$ to the last SYNC_REQ has been received, as the time to activate CKPT_N. This prevents the receiver from inappropriately limiting the transmitter's packet rate if at least one out of the last C SYNC_REQs was processed on the first attempt.

FIG. **30** shows a system employing the above-described principles. In FIG. **30**, two computers **3000** and **3001** are assumed to be communicating over a network N in accordance with the "hopping" principles described above (e.g., hopped IP addresses, discriminator values, etc.). For the sake of simplicity, computer **3000** will be referred to as the receiving computer and computer **3001** will be referred to as the transmitting computer, although full duplex operation is of course contemplated. Moreover, although only a single transmitter is shown, multiple transmitters can transmit to receiver **3000**.

As described above, receiving computer **3000** maintains a receive table **3002** including a window W that defines valid IP address pairs that will be accepted when appearing in incoming data packets. Transmitting computer **3001** maintains a transmit table **3003** from which the next IP address pairs will be selected when transmitting a packet to receiving computer **3000**. (For the sake of illustration, window W is also illustrated with reference to transmit table **3003**). As transmitting computer moves through its table, it will eventually generate a SYNC_REQ message as illustrated in function **3010**. This is a request to receiver **3000** to synchronize the receive table **3002**, from which transmitter **3001** expects a response in the form of a CKPT_N (included as part of a SYNC_ACK message). If transmitting computer **3001** transmits more messages than its allotment, it will prematurely generate the SYNC_REQ message. (If it has been altered to remove the SYNC_REQ message generation altogether, it will fall out of synchronization since receiver **3000** will quickly reject packets that fall outside of window W, and the extra packets generated by transmitter **3001** will be discarded).

In accordance with the improvements described above, receiving computer **3000** performs certain steps when a SYNC_REQ message is received, as illustrated in FIG. **30**. In step **3004**, receiving computer **3000** receives the SYNC_REQ message. In step **3005**, a check is made to determine whether the request is a duplicate. If so, it is discarded in step **3006**. In step **3007**, a check is made to determine whether the SYNC_REQ received from transmitter **3001** was received at a rate that exceeds the allowable rate R (i.e., the period between the time of the last SYNC_REQ message). The value R can be a constant, or it can be made to fluctuate as desired. If the rate exceeds R, then in step **3008** the next activation of the next CKPT_N hopping table entry is delayed by W/R seconds after the last SYNC_REQ has been accepted.

Otherwise, if the rate has not been exceeded, then in step **3109** the next CKPT_N value is calculated and inserted into the receiver's hopping table prior to the next SYNC_REQ from the transmitter **3101**. Transmitter **3101** then processes the SYNC_REQ in the normal manner.

E. Signaling Synchronizer

In a system in which a large number of users communicate with a central node using secure hopping technology, a large amount of memory must be set aside for hopping tables and their supporting data structures. For example, if one million subscribers to a web site occasionally communicate with the web site, the site must maintain one million hopping tables, thus using up valuable computer resources, even though only a small percentage of the users may actually be using the system at any one time. A desirable solution would be a system that permits a certain maximum number of simultaneous links to be maintained, but which would "recognize" millions of registered users at any one time. In other words, out of a population of a million registered users, a few thousand at a time could simultaneously communicate with a central server, without requiring that the server maintain one million hopping tables of appreciable size.

One solution is to partition the central node into two nodes: a signaling server that performs session initiation for user log-on and log-off (and requires only minimally sized tables), and a transport server that contains larger hopping tables for the users. The signaling server listens for the millions of known users and performs a fast-packet reject of other (bogus) packets. When a packet is received from a known user, the signaling server activates a virtual private link (VPL) between the user and the transport server, where hopping tables are allocated and maintained. When the user logs onto the signaling server, the user's computer is provided with hop tables for communicating with the transport server, thus activating the VPL. The VPLs can be torn down when they become inactive for a time period, or they can be torn down upon user log-out. Communication with the signaling server to allow user log-on and log-off can be accomplished using a specialized version of the checkpoint scheme described above.

FIG. **31** shows a system employing certain of the above-described principles. In FIG. **31**, a signaling server **3101** and a transport server **3102** communicate over a link. Signaling server **3101** contains a large number of small tables **3106** and **3107** that contain enough information to authenticate a communication request with one or more clients **3103** and **3104**. As described in more detail below, these small tables may advantageously be constructed as a special case of the synchronizing checkpoint tables described previously. Transport server **3102**, which is preferably a separate computer in communication with signaling server **3101**, contains a smaller number of larger hopping tables **3108**, **3109**, and **3110** that can be allocated to create a VPN with one of the client computers.

According to one embodiment, a client that has previously registered with the system (e.g., via a system administration function, a user registration procedure, or some other method) transmits a request for information from a computer (e.g., a web site). In one variation, the request is

made using a "hopped" packet, such that signaling server **3101** will quickly reject invalid packets from unauthorized computers such as hacker computer **3105**. An "administrative" VPN can be established between all of the clients and the signaling server in order to ensure that a hacker cannot flood signaling server **3101** with bogus packets. Details of this scheme are provided below.

Signaling server **3101** receives the request **3111** and uses it to determine that client **3103** is a validly registered user. Next, signaling server **3101** issues a request to transport server **3102** to allocate a hopping table (or hopping algorithm or other regime) for the purpose of creating a VPN with client **3103**. The allocated hopping parameters are returned to signaling server **3101** (path **3113**), which then supplies the hopping parameters to client **3103** via path **3114**, preferably in encrypted form.

Thereafter, client **3103** communicates with transport server **3102** using the normal hopping techniques described above. It will be appreciated that although signaling server **3101** and transport server **3102** are illustrated as being two separate computers, they could of course be combined into a single computer and their functions performed on the single computer. Alternatively, it is possible to partition the functions shown in FIG. **31** differently from as shown without departing from the inventive principles.

One advantage of the above-described architecture is that signaling server **3101** need only maintain a small amount of information on a large number of potential users, yet it retains the capability of quickly rejecting packets from unauthorized users such as hacker computer **3105**. Larger data tables needed to perform the hopping and synchronization functions are instead maintained in a transport server **3102**, and a smaller number of these tables are needed since they are only allocated for "active" links. After a VPN has become inactive for a certain time period (e.g., one hour), the VPN can be automatically torn down by transport server **3102** or signaling server **3101**.

A more detailed description will now be provided regarding how a special case of the checkpoint synchronization feature can be used to implement the signaling scheme described above.

The signaling synchronizer may be required to support many (millions) of standing, low bandwidth connections. It therefore should minimize per-VPL memory usage while providing the security offered by hopping technology. In order to reduce memory usage in the signaling server, the data hopping tables can be completely eliminated and data can be carried as part of the SYNC_REQ message. The table used by the server side (receiver) and client side (transmitter) is shown schematically as element **3106** in FIG. **31**.

The meaning and behaviors of CKPT_N, CKPT_O and CKPT_R remain the same from the previous description, except that CKPT_N can receive a combined data and SYNC_REQ message or a SYNC_REQ message without the data.

The protocol is a straightforward extension of the earlier synchronizer. Assume that a client transmitter is on and the tables are synchronized. The initial tables can be generated "out of band." For example, a client can log into a web server to establish an account over the Internet. The client will receive keys etc encrypted over the Internet. Meanwhile, the server will set up the signaling VPN on the signaling server.

Assuming that a client application wishes to send a packet to the server on the client's standing signaling VPL:

1. The client sends the message marked as a data message on the inner header using the transmitter's CKPT_N address. It turns the transmitter off and starts a timer **T1** noting CKPT_O. Messages can be one of three types: DATA, SYNC_REQ and SYNC_ACK. In the normal algorithm, some potential problems can be prevented by identifying each message type as part of the encrypted inner header field. In this algorithm, it is important to distinguish a data packet and a SYNC_REQ in the signaling synchronizer since the data and the SYNC_REQ come in on the same address.
2. When the server receives a data message on its CKPT_N, it verifies the message and passes it up the stack. The message can be verified by checking message type and and other information (i.e user credentials) contained in the inner header. It replaces its CKPT_O with CKPT_N and generates the next CKPT_N. It updates its transmitter side CKPT_R to correspond to the client's receiver side CKPT R and transmits a SYNC ACK containing CKPT_O in its payload.
3. When the client side receiver receives a SYNC_ACK on its CKPT_R with a payload matching its transmitter side CKPT_O and the transmitter is off, the transmitter is turned on and the receiver side CKPT_R is updated. If the SYNC_ACK's payload does not match the transmitter side CKPT_O or the transmitter is on, the SYNC_ACK is simply discarded.
4. **T1** expires: If the transmitter is off and the client's transmitter side CKPT_O matches the CKPT_O associated with the timer, it starts timer **T1** noting CKPT_O again, and a SYNC_REQ is sent using the transmitter's CKPT_O address. Otherwise, no action is taken.
5. When the server receives a SYNC_REQ on its CKPT_N it replaces its CKPT_O with CKPT_N and generates the next CKPT_N. It updates its transmitter side CKPT_R to correspond to the client's receiver side CKPT_R and transmits a SYNC_ACK containing CKPT_O in its payload.
6. When the server receives a SYNC_REQ on its CKPT_O, it updates its transmitter side CKPT_R to correspond to the client's receiver side CKPT_R and transmits a SYNC_ACK containing CKPT_O in its payload.

FIG. **32** shows message flows to highlight the protocol. Reading from top to bottom, the client sends data to the server using its transmitter side CKPT_N. The client side transmitter is turned off and a retry timer is turned off The transmitter will not transmit messages as long as the transmitter is turned off. The client side transmitter then loads CKPT_N into CKPT_O and updates CKPT N. This message is successfully received and a passed up the stack. It also synchronizes the receiver i.e, the server loads CKPT_N into CKPT_O and generates a new CKPT_N, it generates a new CKPT_R in the server side transmitter and transmits a SYNC_ACK containing the server side receiver's CKPT_O the server. The SYNC_ACK is successfully received at the client. The client side receiver's CKPT_R is updated, the transmitter is turned on and the retry timer is killed. The client side transmitter is ready to transmit a new data message.

Next, the client sends data to the server using its transmitter side CKPT_N. The client side transmitter is turned off and a retry timer is turned off. The transmitter will not transmit messages as long as the transmitter is turned off. The client side transmitter then loads CKPT_N into CKPT_O and updates CKPT_N. This message is lost. The client side timer expires and as a result a SYNC_REQ is transmitted on the client side transmitter's CKPT_O (this will keep happening until the SYNC_ACK has been received at the client). The SYNC_REQ is successfully received at the server. It synchronizes the receiver i.e, the server loads CKPT_N into CKPT_O and generates a new

CKPT_N. it generates an new CKPT_R in the server side transmitter and transmits a SYNC_ACK containing the server side receiver's CKPT_O the server. The SYNC_ACK is successfully received at the client. The client side receiver's CKPT_R is updated, the transmitter is turned off and the retry timer is killed. The client side transmitter is ready to transmit a new data message.

There are numerous other scenarios that follow this flow. For example, the SYNC_ACK could be lost. The transmitter would continue to re-send the SYNC_REQ until the receiver synchronizes and responds.

The above-described procedures allow a client to be authenticated at signaling server **3201** while maintaining the ability of signaling server **3201** to quickly reject invalid packets, such as might be generated by hacker computer **3205**. In various embodiments, the signaling synchronizer is really a derivative of the synchronizer. It provides the same protection as the hopping protocol, and it does so for a large number of low bandwidth connections.

What is claimed is:

**1**. A method of transparently creating a virtual private network (VPN) between a client computer and a target computer, comprising the steps of:

(1) generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer;

(2) determining whether the DNS request transmitted in step (1) is requesting access to a secure web site; and

(3) in response to determining that the DNS request in step (2) is requesting access to a secure target web site, automatically initiating the VPN between the client computer and the target computer.

**2**. The method of claim **1**, wherein steps (2) and (3) are performed at a DNS server separate from the client computer.

**3**. The method of claim **1**, further comprising the step of:

(4) in response to determining that the DNS request in step (2) is not requesting access to a secure target web site, resolving the IP address for the domain name and returning the IP address to the client computer.

**4**. The method of claim **1**, wherein step (3) comprises the step of, prior to automatically initiating the VPN between the client computer and the target computer, determining whether the client computer is authorized to establish a VPN with the target computer and, if not so authorized, returning an error from the DNS request.

**5**. The method of claim **1**, wherein step (3) comprises the step of, prior to automatically initiating the VPN between the client computer and the target computer, determining whether the client computer is authorized to resolve addresses of non secure target computers and, if not so authorized, returning an error from the DNS request.

**6**. The method of claim **1**, wherein step (3) comprises the step of establishing the VPN by creating an IP address hopping scheme between the client computer and the target computer.

**7**. The method of claim **1**, wherein step (3) comprises the step of using a gatekeeper computer that allocates VPN resources for communicating between the client computer and the target computer.

**8**. The method of claim **1**, wherein step (2) is performed in a DNS proxy server that passes through the request to a DNS server if it is determined in step (3) that access is not being requested to a secure target web site.

**9**. The method of claim **5**, wherein step (3) comprises the step of transmitting a message to the client computer to determine whether the client computer is authorized to establish the VPN target computer.

**10**. A system that transparently creates a virtual private network (VPN) between a client computer and a secure target computer, comprising:

a DNS proxy server that receives a request from the client computer to look up an IP address for a domain name, wherein the DNS proxy server returns the IP address for the requested domain name if it is determined that access to a non-secure web site has been requested, and wherein the DNS proxy server generates a request to create the VPN between the client computer and the secure target computer if it is determined that access to a secure web site has been requested; and

a gatekeeper computer that allocates resources for the VPN between the client computer and the secure web computer in response to the request by the DNS proxy server.

**11**. The system of claim **10**, wherein the gatekeeper computer creates the VPN by establishing an IP address hopping regime that is used to pseudorandomly change IP addresses in packets transmitted between the client computer and the secure target computer.

**12**. The system of claim **10**, wherein the gatekeeper computer determines whether the client computer has sufficient security privileges to create the VPN and, if the client computer lacks sufficient security privileges, rejecting the request to create the VPN.

**13**. A method of establishing communication between one of a plurality of client computers and a central computer that maintains a plurality of authentication tables each corresponding to one of the client computers, the method comprising the steps of:

(1) in the central computer, receiving from one of the plurality of client computers a request to establish a connection;

(2) authenticating, with reference to one of the plurality of authentication tables, that the request received in step (1) is from an authorized client;

(3) responsive to a determination that the request is from an authorized client, allocating resources to establish a virtual private link between the client and a second computer; and

(4) communicating between the authorized client and the second computer using the virtual private link.

**14**. The method of claim **13**, wherein step (4) comprises the step of communicating according to a scheme by which at least one field in a series of data packets is periodically changed according to a known sequence.

**15**. The method of claim **14**, wherein step (4) comprises the step of comparing an Internet Protocol (IP) address in a header of each data packet to a table of valid IP addresses maintained in a table in the second computer.

**16**. The method of claim **15**, wherein step (4) comprises the step of comparing the IP address in the header of each data packet to a moving window of valid IP addresses, and rejecting data packets having IP addresses that do not fall within the moving window.

**17**. The method of claim **13**, wherein step (2) comprises the step of using a checkpoint data structure that maintains synchronization of a periodically changing parameter known by the central computer and the client computer to authenticate the client.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO. : 6,502,135 B1 Page 1 of 1
DATED : December 31, 2002
INVENTOR(S) : Edmund Colby Munger et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page,
Item [56], **References Cited**, OTHER PUBLICATIONS, insert the following:

-- Search Report (dated 8/20/02), International Application No. PCT/US01/04340
Search Report (dated 8/23/02), International Application No. PCT/US01/13260
James E. Bellaire, "New Statement of Rules – Naming Internet Domains", Internet Newsgroup, July 30, 1995, 1 page.
D. Clark, "US Calls for Private Domain-Name System", Computer, IEEE Computer Society, August 1, 1998, pages 22-25.
August Bequai, "Balancing Legal Concerns Over Crime and Security in Cyberspace", Computer & Security, Vol. 17, No. 4, 1998, pages 293-298.
Rich Winkel, "CAQ: Networking With Spooks: The NET & The Control Of Information", Internet Newsgroup, June 21, 1997, 4 pages. --

Column 48,
Line 2, "VPN target computer" has been replaced with -- VPN with the target computer --.

Signed and Sealed this

Ninth Day of September, 2003

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

US006502135C1

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (0271st)

**United States Patent**
**Munger et al.**

(10) **Number: US 6,502,135 C1**
(45) **Certificate Issued: Jun. 7, 2011**

(54) **AGILE NETWORK PROTOCOL FOR SECURE COMMUNICATIONS WITH ASSURED SYSTEM AVAILABILITY**

(75) Inventors: **Edmund Colby Munger**, Crownsville, MD (US); **Douglas Charles Schmidt**, Severna Park, MD (US); **Robert Dunham Short, III**, Leesburg, VA (US); **Victor Larson**, Fairfax, VA (US); **Michael Williamson**, South Riding, VA (US)

(73) Assignee: **Virnetx, Inc.**, Scotts Valley Drive, CA (US)

**Reexamination Request:**
No. 95/001,269, Dec. 8, 2009

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,502,135** |
| Issued: | **Dec. 31, 2002** |
| Appl. No.: | **09/504,783** |
| Filed: | **Feb. 15, 2000** |

Certificate of Correction issued Sep. 9, 2003.

**Related U.S. Application Data**

(63) Continuation of application No. 09/429,643, filed on Oct. 29, 1999, now Pat. No. 7,010,604.

(60) Provisional application No. 60/106,261, filed on Oct. 30, 1998, and provisional application No. 60/137,704, filed on Jun. 7, 1999.

(51) **Int. Cl.**
*G06F 15/173* (2006.01)

(52) **U.S. Cl.** ......................... **709/225**; 709/229; 709/245

(58) **Field of Classification Search** .................. 709/225
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,895,502 | A | 7/1959 | Roper et al. |
| 4,933,846 | A | 6/1990 | Humphrey et al. |
| 4,988,990 | A | 1/1991 | Warrior |
| 5,276,735 | A | 1/1994 | Boebert et al. |
| 5,303,302 | A | 4/1994 | Burrows |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 199 24 575 | 12/1999 |
| EP | 0 814 589 | 12/1997 |
| EP | 836306 A1 | 4/1998 |
| EP | 0 838 930 | 4/1998 |
| EP | 0 858 189 | 8/1998 |

(Continued)

OTHER PUBLICATIONS

Alan O. Frier et al., "The SSL Protocol Version 3.0", Nov. 18, 1996, printed from http://www.netscape.com/eng/ss13/draft302.txt on Feb. 4, 2002, 56 pages.

(Continued)

*Primary Examiner*—Andrew L Nalven

(57) **ABSTRACT**

A plurality of computer nodes communicate using seemingly random Internet Protocol source and destination addresses. Data packets matching criteria defined by a moving window of valid addresses are accepted for further processing, while those that do not meet the criteria are quickly rejected. Improvements to the basic design include (1) a load balancer that distributes packets across different transmission paths according to transmission path quality; (2) a DNS proxy server that transparently creates a virtual private network in response to a domain name inquiry; (3) a large-to-small link bandwidth management feature that prevents denial-of-service attacks at system chokepoints; (4) a traffic limiter that regulates incoming packets by limiting the rate at which a transmitter can be synchronized with a receiver; and (5) a signaling synchronizer that allows a large number of nodes to communicate with a central node by partitioning the communication function between two separate entities.



U.S. PATENT DOCUMENTS

5,311,593 A 5/1994 Carmi
5,329,521 A 7/1994 Walsh et al.
5,341,426 A 8/1994 Barney et al.
5,367,643 A 11/1994 Chang et al.
5,384,848 A 1/1995 Kikuchi
5,511,122 A 4/1996 Atkinson
5,559,883 A 9/1996 Williams
5,561,669 A 10/1996 Lenney et al.
5,588,060 A 12/1996 Aziz
5,625,626 A 4/1997 Umekita
5,629,984 A 5/1997 McManis
5,654,695 A 8/1997 Olnowich et al.
5,682,480 A 10/1997 Nakagawa
5,689,566 A 11/1997 Nguyen
5,740,375 A 4/1998 Dunne et al.
5,764,906 A 6/1998 Edelstein et al.
5,771,239 A 6/1998 Moroney et al.
5,774,660 A 6/1998 Brendel et al.
5,787,172 A 7/1998 Arnold
5,796,942 A 8/1998 Esbensen
5,805,801 A 9/1998 Holloway et al.
5,805,803 A 9/1998 Birrell et al.
5,822,434 A 10/1998 Caronni et al.
5,842,040 A 11/1998 Hughes et al.
5,845,091 A 12/1998 Dunne et al.
5,864,666 A 1/1999 Shrader
5,867,650 A 2/1999 Osterman
5,870,610 A 2/1999 Beyda et al.
5,878,231 A 3/1999 Baehr et al.
5,892,903 A 4/1999 Klaus
5,898,830 A 4/1999 Wesinger et al.
5,905,859 A 5/1999 Holloway et al.
5,918,019 A 6/1999 Valencia
5,950,195 A 9/1999 Stockwell et al.
5,996,016 A 11/1999 Thalheimer et al.
6,006,259 A 12/1999 Adelman et al.
6,006,272 A 12/1999 Aravamudan et al.
6,016,318 A 1/2000 Tomoike
6,016,512 A 1/2000 Huitema
6,041,342 A 3/2000 Yamaguchi
6,052,788 A 4/2000 Wesinger et al.
6,055,574 A 4/2000 Smorodinsky et al.
6,061,346 A 5/2000 Nordman
6,061,736 A 5/2000 Rochberger et al.
6,079,020 A 6/2000 Liu
6,081,900 A 6/2000 Subramaniam et al.
6,092,200 A 7/2000 Muniyappa et al.
6,101,182 A 8/2000 Sistanizadeh et al.
6,119,171 A 9/2000 Alkhatib
6,119,234 A 9/2000 Aziz et al.
6,147,976 A 11/2000 Shand et al.
6,157,957 A 12/2000 Berthaud
6,158,011 A 12/2000 Chen et al.
6,168,409 B1 1/2001 Fare
6,173,399 B1 1/2001 Gilbrech
6,175,867 B1 1/2001 Taghadoss
6,178,409 B1 1/2001 Weber et al.
6,178,505 B1 1/2001 Schneider et al.
6,179,102 B1 1/2001 Weber et al.
6,199,112 B1 3/2001 Wilson
6,202,081 B1 3/2001 Naudus
6,222,842 B1 4/2001 Sasyan et al.
6,223,287 B1 4/2001 Douglas et al.
6,226,748 B1 5/2001 Bots et al.
6,226,751 B1 5/2001 Arrow et al.
6,233,618 B1 5/2001 Shannon
6,243,360 B1 6/2001 Basilico
6,243,749 B1 6/2001 Sitaraman et al.
6,243,754 B1 6/2001 Guerin et al.
6,246,670 B1 6/2001 Karlsson et al.
6,256,671 B1 7/2001 Strentzsch et al.
6,262,987 B1 7/2001 Mogul
6,263,445 B1 7/2001 Blumenau
6,286,047 B1 9/2001 Ramanathan et al.
6,298,341 B1 10/2001 Mann et al.
6,301,223 B1 10/2001 Hrastar et al.
6,308,274 B1 10/2001 Swift
6,311,207 B1 10/2001 Mighdoll et al.
6,314,463 B1 11/2001 Abbott et al.
6,324,161 B1 11/2001 Kirch
6,330,562 B1 12/2001 Boden et al.
6,332,158 B1 12/2001 Risley et al.
6,333,272 B1 12/2001 McMillin et al.
6,338,082 B1 1/2002 Schneider
6,353,614 B1 3/2002 Borella et al.
6,430,155 B1 8/2002 Davie et al.
6,430,610 B1 8/2002 Carter
6,487,598 B1 11/2002 Valencia
6,502,135 B1 12/2002 Munger et al.
6,505,232 B1 1/2003 Mighdoll et al.
6,510,154 B1 1/2003 Mayes et al.
6,549,516 B1 4/2003 Albert et al.
6,557,037 B1 4/2003 Provino
6,571,296 B1 5/2003 Dillon
6,571,338 B1 5/2003 Shaio et al.
6,581,166 B1 6/2003 Hirst et al.
6,618,761 B2 9/2003 Munger et al.
6,671,702 B2 12/2003 Kruglikov et al.
6,687,551 B2 2/2004 Steindl
6,687,746 B1 2/2004 Shuster et al.
6,701,437 B1 3/2004 Hoke et al.
6,714,970 B1 3/2004 Fiveash et al.
6,717,949 B1 4/2004 Boden et al.
6,752,166 B2 6/2004 Lull et al.
6,757,740 B1 6/2004 Parekh et al.
6,760,766 B1 7/2004 Sahlqvist
6,826,616 B2 11/2004 Larson et al.
6,839,759 B2 1/2005 Larson et al.
6,937,597 B1 8/2005 Rosenberg et al.
7,010,604 B1 3/2006 Munger et al.
7,039,713 B1 5/2006 Van Gunter et al.
7,072,964 B1 7/2006 Whittle et al.
7,133,930 B2 11/2006 Munger et al.
7,167,904 B1 1/2007 Devarajan et al.
7,188,175 B1 3/2007 McKeeth
7,188,180 B2 3/2007 Larson et al.
7,197,563 B2 3/2007 Sheymov et al.
7,353,841 B2 4/2008 Kono et al.
7,461,334 B1 12/2008 Lu et al.
7,490,151 B2 2/2009 Munger et al.
7,493,403 B2 2/2009 Shull et al.
2001/0049741 A1 12/2001 Skene et al.
2002/0004898 A1 1/2002 Droge
2004/0199493 A1 10/2004 Ruiz et al.
2004/0199520 A1 10/2004 Ruiz et al.
2004/0199608 A1 10/2004 Rechterman et al.
2004/0199620 A1 10/2004 Ruiz et al.
2005/0055306 A1 3/2005 Miller et al.
2007/0208869 A1 9/2007 Adelman et al.
2007/0214284 A1 9/2007 King et al.
2007/0266141 A1 11/2007 Norton
2008/0235507 A1 9/2008 Ishikawa et al.

FOREIGN PATENT DOCUMENTS

GB 2 317 792 4/1998
GB 2 334 181 A 8/1999
JP 62-214744 9/1987
JP 04-363941 12/1992
JP 09-018492 1/1997
JP 10-070531 3/1998
WO WO 9827783 A 6/1998

| | | |
|---|---|---|
| WO | WO 98/27783 | 6/1998 |
| WO | WO 98 55930 | 12/1998 |
| WO | WO 98 59470 | 12/1998 |
| WO | WO 99 38081 | 7/1999 |
| WO | WO 99 48303 | 9/1999 |
| WO | WO 00/17775 | 3/2000 |
| WO | WO 001/17775 | 3/2000 |
| WO | WO 00/70458 | 11/2000 |
| WO | WO 01/016766 | 3/2001 |
| WO | WO 01 50688 | 7/2001 |

OTHER PUBLICATIONS

August Bequai, "Balancing Legal Concerns Over Crime and Security in Cyberspace", Computer & Security, vol. 17, No. 4, 1998, pp. 293–298.

D. B. Chapman et al., "Building Internet Firewalls", Nov. 1995, pp. 278–375.

D. Clark, "US Calls for Private Domain–Name System", Computer, IEEE Computer Society, Aug. 1, 1998, pp. 22–25.

Davila J et al, "Implementation of Virtual Private Networks at the Transport Layer", Information Security, Second International Work–shop, ISW'99. Proceedings (Lecture Springer–Verlag Berlin, Germany, [Online] 1999, pp. 85–102, XP002399276, ISBN 3–540–666.

Dolev, Shlomi and Ostrovsky, Rafil, "Efficient Anonymous Multicast and Reception" (Extended Abstact), 16 pages.

Donald E. Eastlake, 3rd, "Domain Name System Security Extensions", Internet Draft, Apr. 1998, pp. 1–51.

F. Halsall, "Data Communications, Computer Networks and Open Systems", Chapter 4, Protocol Basics, 1996, pp. 198–203.

Fasbender, Kesdogan, and Kubitz: "Variable and Scalable Security" Protection of Location Information in Mobile IP, IEEE publication, 1996, pp. 963–967.

Glossary for the Linux FreeS/WAN project, printed from http://liberty.freeswan.org/freeswan__trees/freeswan–1.3/doc/glossary.html on Feb. 21, 2002, 25 pages.

J. Gilmore, "Swan: Securing the Internet against Wiretapping", printed from http://liberty.freeswan.org/freeswan__trees/freeswan–1.3/doc/rationale.html on Feb. 21, 2002, 4 pages.

James E. Bellaire, "New Statement of Rules–Naming Internet Domains", Internet Newsgroup, Jul. 30, 1995, 1 page.

Jim Jones et al., "Distributed Denial of Service Attacks: Defenses", Global Integrity Corporation. 2000, pp. 1–14.

Laurie Wells (LANCASTERBIBELMAIL MSN COM); "Subject: Security Icon" USENET Newsgroup, Oct. 19, 1998, XP002200606, 1 page.

Linux FreeS/WAN Index File, printed from http://liberty.freewan.org/freeswan__trees/freeswan–1.3/doc/ on Feb. 21, 2002, 3 Pages.

P. Srisuresh et al., "DNS extensions to Network address Translators (DNS__ALG)", Internet Draft, Jul. 1998, pp. 1–27.

RFC 2401 (dated Nov. 1998) Security Architecture for the Internet Protocol (RTP).

RFC 2543–SIP (dated Mar. 1999): Session Initiation Protocol (SIP or SIPS).

Rich Winkel, "CAQ: Networking With Spooks: The NET & The Control Of information", Internet Newsgroup, Jun. 21, 1997, 4 pages.

Rubin, Aviel D., Geer, Daniel, and Ranum, Marcus J. (Wiley Computer Publishing), "Web Security Sourcebook", pp. 82–94.

Search Report (dated Aug. 20, 2002), International Application No. PCT/US01/04340.

Search Report (dated Aug. 23, 2002), International Application No. PCT/US01/13260.

Search Report (dated Oct. 7, 2002), International Application No. PCT/US01/13261.

Search Report, IPER (dataed Nov. 13, 2002), International Application No. PCT/US01/04340.

Search Report, IPER (dated Feb.6, 2002), International Application No. PCT/US01/13261.

Search Report, IPER (dated Jan. 14, 2003), International Application No. PCT/US01/13260.

Sankar, A.U. "A verified sliding window protocol with variable flow control". Proceedings of ACM SIGCOMM conferece on Communications architectures & protocols. pp. 84–91, ACM Press, NY, NY 1986.

Shree Murthy et al., "Congestion–Oriented Shortest Multi–path Routing", Proceedings of IEEE INFOCOM, 1996, pp. 1028–1036.

W. Stallings, "Cryptography And Network Security", 2nd, Edition, Chapter 13, IP Security, Jun. 8, 1998, pp. 399–440.

Fasbender, A. et al., Variable and Scalable Security: Protection of Location Information in Mobile IP, IEEE VTS, 46th, 1996, 5 pp.

156. Finding Your Way Through the VPN Maze (1999) ("PGP").

WatchGuard Technologies, Inc., WatchGuard LiveSecurity for MSS Powerpoint (Feb. 14 2000) (resubmitted).

WatchGuard Technologies, Inc., MSS Version 2.5, Add–On for WatchGuard SOHO Release Notes (Jul. 21, 2000).

Yuan Dong Feng, "A novel scheme combining interleaving technique with cipher in Rayleigh fading channels," Proceedings of the International Conference on Communication technology, 2:S47–02–1–S47–02–4 (1998).

D.W. Davies and W.L. Price, edited by Tadahiro Uezona, "Network Security", Japan, Nikkei McGraw–Hill, Dec. 5, 1958, First Edition, first copy, p. 102–108.

U.S. Appl. No. 60/134,547 filed May 17, 1999, Victor Sheymov.

U.S. Appl. No. 60/151,563 filed Aug. 31, 1999, Bryan Whittles.

U.S. Appl. No. 09/399,753 filed Sep. 22, 1998, Graig Miller et al.

Microsoft Corporation's Fourth Amended Invalidity Contentions dated Jan. 5, 2009, *VirnetX Inc. and Science Applications International Corp.* v. *Microsoft Corporation.*

Appendix A of the Microsoft Corporation's Fourth Amended Invalidity Contentions dated Jan. 5, 2009.

Concordance Table For the References Cited in Tables on pp. 6–15, 71–80 and 116–124 of the Microsoft Corporation's Fourth Amended Invalidity Contentions dated Jan. 5, 2009.

I. P. Mockapetris, "DNS Encoding of Network Names and Other Types," Network Working Group, RFC 1101 (Apr. 1989) (RFC1101, DNS SRV).

DNS–related corresponding dated Sep. 7, 1993 to Sep. 20, 1993. (Pre KX, KX Records).

R. Atkinson, "An Internetwork Authentication Architecture," Naval Research Laboratory, Center for High Assurance Computing Systems (Aug. 5, 1993). (Atkinson NRL, KX Records).

Henning Schulzrinne, *Personal Mobility For Multimedia Services In The Internet,* Proceedings of the Interactive Distributed Multimedia Systems and Services European Workshop at 143 (1996) (Schulzrinne 96).

Microsoft Corp., *Microsoft Virtual Private Networking: Using Point–to–Point Tunneling Protocol for Low–Cost, Secure, Remote Access Across the Internet* (1996) (printed from 1998 PDC DVD–ROM) (Point to Point, Microsoft Prior Art VPN Technology).

"Safe Surfing: How to Build a Secure World Wide Web Connection," IBM Technical Support Organization, (Mar. 1996). (Safe Surfing, Website Art).

Goldschlag, et al., "Hiding Routing Information," Workshop on Information Hiding, Cambridge, UK (May 1996). (Goldschlag II, Onion Routing).

"IPSec Minutes From Montreal", IPSEC Working Group Meeting Notes, http://www.sandleman.ca/ipsec/1996/08/msg00018.html (Jun. 1996). (IPSec Minutes, FreeS/WAN).

J.M. Galvin, "Public Key Distribution with Secure DNS," Proceedings of the Sixth USENIX UNIX Security Symposium, San Jose, California, Jul. 1996. (Galvin, DNSSEC).

J. Gilmore, et al. "Re: Key Management, anyone? (DNS Keying)," IPSec Working Group Mailing List Archives (Aug. 1996). (Gilmore DNS, FreeS/WAN).

H. Orman, et al."Re: Re: DNS? was Re: Key Management, anyone?" IETF IPSec Working Group Mailing List Archive (Aug. 1996/Sep. 1996). (Orman DNS, FreeS/WAN).

Arnt Gulbrandsen & Paul Vixie, *A DNS RR for specifying the location of services* (*DNS SRV*), IETF RFC 2052 (Oct. 1996). (RFC 2052, DNS SRV).

Freier, et al. "The SSL Protocol Version 3.0," Transport Layer Security Working Group (Nov. 18, 1996). (SSL, Underlying Security Technology).

M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Dec. 2, 1996). (RFC 2543 Internet Draft 1).

M.G. Reed, et al. "Proxies for Anonymous Routing," 12th Annual Computer Security Applications Conference, San Diego, CA, Dec. 9–13, 1996. (Reed, Onion Routing).

Kenneth F. Alden & Edward P. Wobber, *The AltaVista Tunnel: Using the Internet to Extend Corporate Networks,* Digital Technical Journal (1997) (Alden, AltaVista.

Automative Industry Action Group, "ANX Release 1 Document Publication," AIAG (1997). (AIAG, ANX).

Automative Industry Action Group, "ANX Release 1 Draft Document Publication," AIAG Publications (1997). (AIAG Release, ANX).

Aventail Corp., "AutoSOCKS v. 2.1 Datasheet," available at http://www.archive.org/web/19970212013409/www.aventail.com/prod/autosk2ds.html (1997). (AutoSOCKS, Aventail).

Aventail Corp. "Aventail VPN Data Sheet," available at http://www.archive.org/web/19970212013043/www.aventail.com/prod/vpndata.html (1997). (Data Sheet, Aventail).

Aventail Corp., "Directed VPN Vs. Tunnel," available at http://web.archive.org/web/19970620030312/www.aventail.com/educate/directvpn.html (1997). (Directed VPN, Aventail).

Aventail Corp., "Managing Corporate Access to the Internet," Aventail AutoSOCKS White Paper available at http://web.archive.org/web/19970620030312/www.aventail.com/educate/whitepaper/ipmwp.html (1997). (Corporate Access, Aventail).

Aventail Corp., "Socks Version 5," Aventail Whitepaper, available at http://web.archive.org/web/19970620030312/www.aventail.com/educate/whitepaper/sockswp.html (1997). (Socks, Aventail).

Aventail Corp., "VPN Server V2.0 Administration Guide," (1997). (VPN, Aventail).

Goldschlag, et al. "*Privacy on the Internet,*" Naval Research Laboratory, Center for High Assurance Computer Systems (1997). (Goldschlag I, Onion Routing).

Microsoft Corp., *Installing Configuring and Using PPTP with Microsoft Clients and Servers* (1997). (Using PPTP, Microsoft Prior Art VPN Technology).

Microsoft Corp., *IP Security for Microsoft Windows NT Server 5.0* (1997) (printed from 1998 PDC DVD–ROM). (IP Security, Microsoft Prior Art VPN Technology).

Microsoft Corp., *Microsoft Windows NT Active Directory: An Introduction to the Next Generation Directory Services* (1997) (printed from 1998 PDC DVD–ROM). (Directory, Microsoft Prior Art VPN Technology).

Microsoft Corp. *Routing and Remote Access Service for Windows NT Server NewOpportunities Today and Looking Ahead* (1997) (printed from 1998 PDC DVD–ROM). (Routing, Microsoft Prior Art VPN Technology).

Microsoft Corp., *Understanding Point–to–Point Tunneling Protocol PPTP* (1997) (printed from 1998 PDC DVD–ROM). (Understanding PPTP, Microsoft Prior Art VPN Technology).

J. Mark Smith et al., *Protecting a Private Network: The AltaVista Firewall,* Digital Technical Journal (1997). (Smith, AltaVista).

Naganand Doraswamy *Implementation of Virtual Private Networks* (*VPNs*) *with IPSecurity*, <draft–ietf–ipsec–vpn–00.txt> (Mar. 12, 1997). (Doraswamy).

M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Mar. 27, 1997). (RFC 2543 Internet Draft 2).

Aventail Corp., "Aventail and Cybersafe to Provide Secure Authentication For Internet and Intranet Communication," Press Release, Apr. 3, 1997. (Secure Authentication, Aventail).

D. Wagner, et al. "Analysis of the SSL 3.0 Protocol," (Apr. 15, 1997). (Analysis, Underlying Security Technologies).

Automotive Industry Action Group, "ANXO Certification Authority Service and Directory Service Definition for ANX Release 1," AIAG Telecommunications Project Team and Bellcore (May 9, 1997). (AIAG Definition, ANX).

Automotive Industry Action Group, "ANXO Certification Process and ANX Registration Process Definition for ANX Release 1," AIAG Telecommunications Project Team and Bellcore (May 9, 1997). (AIAG Certification, ANX).

Aventail Corp. "Aventail Announces the First VPN Solution to Assure Interoperability Across Emerging Security Protocols," Jun. 2, 1997. (First VPN, Aventail).

Syverson, et al. "Private Web Browsing," Naval Research Laboratory, Center for High 8 Assurance Computer Systems (Jun. 2, 1997). (Syverson, Onion Routing).

Bellcore, "Metrics, Criteria, and Measurement Technique Requirements for ANX Release 1," AIAG Telecommunications Project Team and Bellcore (Jun. 16, 1997). (AIAG Requirements, ANX).

M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Jul. 31, 1997). (RFC 2543 Internet Draft 3).

R. Atkinson, "Key Exchange Delegation Record for the DNS," Network Working Group, RFC 2230 (Nov. 1997). (RFC 2230, KX Records).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Nov. 11, 1997). (RFC 2543 Internet Draft 4).
1998 Microsoft Professional Developers Conference DVD ("1998 PDC DVD–ROM") (including screenshots captured therefrom and produced as MSFTVX 00018827–00018832). (Conference, Microsoft Prior Art VPN Technology).
Microsoft Corp., *Virtual Private Networking An Overview* (1998) (printed from 1998 PDC DVD–ROM) (Overview, Microsoft Prior Art VPN Technology).
Microsoft Corp., *Windows NT 5.0 Beta Has Public Premiere at Seattle Mini–Camp Seminar attendees get first look at the performance and capabilities of Windows NT 5.0* (1998) (available at hap //www.microsoft.com/presspass/features/1998/10–19nt5.mspxpftrue). (NT Beta, Microsoft Prior Art VPN Technology).
"What ports does SSL use" available at stason.org/TULARC/security/ssl–talk/3–4–What–ports–does–ssl–use.html (1998). (Ports, DNS SRV).
Aventail Corp., "Aventail VPN V2.6 Includes Support for More Than Ten Authentication Methods Making Extranet VPN Development Secure and Simple," Press Release, Jan. 19, 1998. (VPN V2.6, Aventail).
R. G. Moskowitz, "Network Address Translation Issues with IPsec," Internet Draft, Internet Engineering Task Force, Feb. 6, 1998. (Moskowitz).
H. Schulzrinne, et al, "Internet Telephony Gateway Location," Proceedings of IEEE INfocom '98, The Conference on Computer Communications, vol. 2 (Mar. 29–Apr. 2, 1998). (Gateway, Schulzrinne).
C. Huitema, 45 al. "Simple Gateway Control Protocol," Version 1.0 (May 5, 1998). (SGCP).
DISA "Secret Internet Protocol Router Network," SIPRNET Program Management Office (D3113) DISN Networks, DISN Transmission Services (May 8, 1998). (DISA, SIPRNET).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (May 14, 1998). (RFC 2543 Internet Draft 5).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Jun. 17, 1998). (RFC 2543 Internet Draft 6).
D. McDonald, et al. "PF_KEY Management API, Version 2," Network Working Group, RFC 2367 (Jul. 1998). (RFC 2367).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Jul. 16, 1998). (RFC 2543 Internet Draft 7).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Aug. 7, 1998). (RFC 2543 Internet Draft 8).
Microsoft Corp., *Company Focuses on Quality and Customer Feedback* (Aug. 18, 1998). (Focus, Microsoft Prior Art VPN Technology).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Sep 18, 1998). (RFC 2543 Internet Draft 9).
Atkinson, et al. "Security Architecture for the Internet Protocol," Network Working Group, RFC 2401 (Nov. 1998). (RFC 2401, Underlying Security Technologies).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Nov. 12, 1998). (RFC 2543 Internet Draft 10) 9.
Donald Eastlake, *Domain Name System Security Extensions,* IETF–DNS Security Working Group (Dec. 1998). (DNSSEC–7).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Dec. 15, 1998). (RFC 2543 Internet Draft 11).
Aventail Corp., "Aventail Connect 3.1/2.6Administrator's Guide," (1999). (Aventail Administrator 3.1, Aventail).
Aventail Corp., "Aventail Connect 3.1/2.6 User's Guide," (1999). (Aventail Administrator 3.1, Aventail).
Aventail Corp., "Aventail ExtraWeb Server v3.2 Administrator's Guide," (1999). (Aventail ExtraWeb 3.2, Aventail).
Kaufman et al, "Implementing IPsec," (Copyright 1999). (Implementing IPSEC, VPN References).
Network Solutions, Inc. "Enabling SSL," NSI Registry (1999). (Enabling SSL, Underlying Security Technologies).
Check Point Software Technologies Ltd. (1999) (Check Point, Checkpoint FW).
Arnt Gulbrandsen & Paul Vixie, *A DNS RR for specifying the location of services* (*DNS SRV*), <draft–ietf–dnsind–frc2052bis–02.txt> (Jan. 1999). (Gulbrandsen 99, DNS SRV).
C. Scott, et al. *Virtual Private Networks,* O'Reilly and Associates, Inc., 2nd ed. (Jan. 1999). (Scott VPNs).
M. Handley, H. Schulzrinne, E. Schooler, Internet Engineering Task Force, Internet Draft, (Jan. 15, 1999). (RFC 2543 Internet Draft 12).
Goldschlag, et al., "Onion Routing for Anonymous and Private Internet Connections," Naval Research Laboratory, Center for High Assurance Computer Systems (Jan. 28, 1999). (Goldschlag III, Onion Routing).
H. Schulzrinne, "Internet Telephony: architecture and protocols—an IETF perspective," Computer Networks, vol. 31, No. 3 (Feb. 1999). (Telephony, Schulzrinne).
M. Handley, et al, "SIP: Session Initiation Protocol," Network Working Group, RFC 2543 and Internet Drafts (Dec. 1996–Mar. 1999). (Handley, RFC 2543).
FreeS/WAN Project, *Linux FreeS/WAN Compatibility Guide* (Mar. 4, 1999). (FreeS/WAN Compatibility Guide, FreeS/WAN).
Telcordia Technologies, "ANX Release 1 Document Corrections," AIAG (May 11, 1999). (Telcordia, ANX).
Ken Hornstein & Jeffrey Altman, *Distributing Kerberos KDC and Realm Information with DNS* <draft–eitf–cat–krb–dns–locate–oo.txt> (Jun. 21, 1999). (Hornstein, DNS SRV).
Bhattacharya et al. "An LDAP Schema for Configuration and Administration of IPSec Based Virtual Private Networks (VPNs)", IETF Internet Draft (Oct. 1999). (Bhattcharya LDAP VPN).
B. Patel, et al, "DHCP Configuration of IPSEC Tunnel Mode," IPSEC Working Group, Internet Draft 02 (Oct. 15, 1999). (Patel).
Goncalves, et al. Check Point FireWall—1 Administration Guide, McGraw–Hill Companies (2000). (Goncalves, Checkpoint FW).
"Building a Microsoft VPN: A Comprehensive Collection of Microsoft Resources," FirstVPN, (Jan. 2000). (FirstVPN Microsoft).

Gulbrandsen, Vixie & Esibov, *A DNS RR for specifying the location of services* (*DNS SRV*), IETF RFC 2782 (Feb. 2000). (RFC 2782, DNS SRV).

Mitre Organization, "Technical Description," Collaborative Operations in Joint Expeditionary Force Experiment (JEFX) 99 (Feb. 2000). (Mitre, SIPRNET).

H. Schulzrinne, et al. "Application–Layer Mobility Using SIP," Mobile Computing and Communications Review, vol. 4, No. 3, pp. 47–57 (Jul. 2000). (Application, SIP).

Kindred et al, "Dynamic VPN Communities: Implementation and Experience," DARPA Information Survivability Conference and Exposition II (Jun. 2001). (DARPA, VPN Systems).

ANX 101: Basic ANX Service Outline. (Outline, ANX).

ANX 201: Advanced ANX Service. (Advanced, ANX).

Appendix A: Certificate Profile for ANX IPsec Certificates. (Appendix, ANX).

Assured Digital Products. (Assured Digital).

Aventail Corp., "Aventail AutoSOCKS the Client Key to Network Security," Aventail Corporation White Paper. (Network Security, Aventail).

Cindy Moran, "DISN Data Networks: Secret Internet Protocol Router Network (SIPRNet)." (Moran, SIPRNET).

Data Fellows F–Secure VPN+ (F–Secure VPN+).

Interim Operational Systems Doctrine for the Remote Access Security Program (RASP) Secret Dial–In Solution. (RASP, SIPRNET).

*Onion Routing,* "Investigation of Route Selection Algorithms," available at http://www.onion–router.net/Archives/Route/Index.html. (Route Selection, Onion Routing).

Secure Computing, "Buttet–Proofing an Army Net," Washington Technology. (Secure, SIPRNET).

Sparta "Dynamic Virtual Private Network," (Sparta, VPN Systems).

Standard Operation Procedure for Using the 1910 Secure Modems. (Standard, SIPRNET).

Publically available emails relating to FreeS/WAN (MSFTVX00018833–MSFTVX00019206). (FreeS/WAN emails, FreeS/WAN).

Kaufman et al., "implementing IPsec," (Copyright 1999) (Implementing IPsec).

Network Associates *Gauntlet Firewall For Unix User's Guide Version 5.0* (1999). (Gauntlet User's Guide—Unix, Firewall Products).

Network Associates *Gauntlet Firewall For Windows NT Getting Started Guide Version 5.0* (1999) (Gauntlet Getting Started Guide—NT, Firewall Products).

Network Associates *Gauntlet Firewall For Unix Getting Started Guide Version 5.0* (1999) (Gauntlet Unix Getting Started Guide, Firewall Products).

Network Associates *Release Notes Gauntlet Firewall for Unix 5.0* (Mar. 19, 1999) (Gauntlet Unix Release Notes, Firewall Products).

Network Associates *Gauntlet Firewall For Windows NT Administrator's Guide Version 5.0* (1999) (Gauntlet NT Administrator's Guide, Firewall Products).

Trusted Information Systems, Inc. *Gauntlet Internet Firewall Firewall–to–Firewall Encryption Guide Version 3.1* (1996) (Gauntlet Firewall–to–Firewall, Firewall Products).

Network Associates *Gauntlet Firewall Global Virtual Private Network User's Guide for Windows NT Version 5.0* (1999) (Gauntlet NT GVPN, GVPN).

Network Associates *Gauntlet Firewall For Unix Global Virtual Private Network User's Guide Version 5.0* (1999) (Gauntlet Unix GVPN, GVPN)

Dan Sterne *Dynamic Virtual Private Networks* (May 23, 2000) (Sterne DVPN, DVPN).

Darrell Kindred *Dynamic Virtual Private Networks* (*DVPN*) (Dec. 21, 1999) (Kindred DVPN, DVPN).

Dan Sterne et al. *TIS Dynamic Security Perimeter Research Project Demonstration* (Mar. 9, 1998) (Dynamic Security Perimeter, DVPN).

Darrell Kindred *Dynamic Virtual Private Networks Capability Description* (Jan. 5, 2000) (Kindred DVPN Capability, DVPN) 11.

Oct. 7, and 28 1997 email from Domenic J. Turchi Jr. (SPARTA00001712–1714, 1808–1811) (Turchi DVPN email, DVPN).

James Just & Dan Sterne *Security Quickstart Task Update* (Feb. 5, 1997) (Security Quickstart, DVPN).

Virtual Private Network Demonstration dated Mar. 21, 1998 (SPARTA00001844–54) (DVPN Demonstration, DVPN).

GTE Internetworking & BBN Technologies *DARPA Information Assurance Program Integrated Feasibility Demonstration* (IFD) 1.1 Plan (Mar. 10, 1998) (IFD 1.1, DVPN).

Microsoft Corp. Windows NT Server Product Documentation: Administration Guide—Connection Point Services, available at http://www.microsoft.com/technet/archive/winntas/proddocs/inetconctservice/cpsops.mspx (Connection Point Services) (Although undated, this reference refers to the operation of prior art versions of Microsoft Windows. Accordingly, upon information and belief, this reference is prior art to the patents–insuit).

Microsoft Corp. Windows NT Servier Product Documentation: Administration Kit Guide—Connection Manager, available at http://www.microsoft.com/technet/archive/winntas/proddocs/inetconctservice/cmak.mspx (Connection Manager) (Although undated, this reference refers to the operation of prior art versions of Microsoft Windows such as Windows NT 4.0. Accordingly, upon information and belief, this reference is prior art to the patents–in–suit.).

Microsoft Corp. Autodial Heuristics, available at http://support.microsoft.com/kb/164249 (Autodial Heuristics) (Although undated, this reference refers to the operation of prior art versions of Microsoft Windows such as Windows NT 4.0. Accordingly, upon information and belief, this reference is prior art to the patents–in–suit.).

Microsoft Corp., Cariplo: Distributed Component Object Model, (1996) available at http://msdn2.microsoft.com/en–us/library/ms809332(printer).aspx (Cariplo I).

Marc Levy, COM Internet Services (Apr. 23, 1999), available at http://msdn2.microsoft.com/en–us/library/ms809302(printer).aspx (Levy).

Markus Horstmann and Mary Kirtland, DCOM Architecture (Jul. 23, 1997), available at http://msdn2.microsoft.com/en–us/library/ms809311(printer).aspx (Horstmann).

Microsoft Corp., DCOM: A Business Overview (Apr. 1997), available at http://msdn2.microsoft.com/en–us/library/ms809320(printer).aspx (DCOM Business Overview I).

Microsoft Corp., DCOM Technical Overview (Nov. 1996), available at http://msdn2.microsoft.com/en–us/library/ms809340(printer).aspx (DCOM Technical Overview I).

Microsoft Corp., DCOM Architecture White Paper (1998) available in PDC DVD–ROM (DCOM Architecture).

Microsoft Corp, DCOM—The Distributed Component Object Model, A Business Overview White Paper (Microsoft 1997) available in PDC DVD–ROM (DCOM Business Overview II).
Microsoft Corp., DCOM—Cariplo Home Banking Over The Internet White Paper (Microsoft 1996) available in PDC DVD–ROM (Cariplo II).
Microsoft Corp., DCOM Solutions in Action White Paper (Microsoft 1996) available in PDC DVD–ROM (DCOM Solutions in Action).
Microsoft Corp., DCOM Technical Overview White Paper (Microsoft 1996) available 12 in PDC DVD–ROM (DCOM Technical Overview II).
125. Scott Suhy & Glenn Wood, DNS and Microsoft Windows NT 4.0 (1996) available at http://msdn2.microsoft.com/en–us/library/ms810277(printer).aspx (Suhy).
126. Aaron Skonnard, *Essential Winlnet* 313–423 (Addison Wesley Longman 1998) (Essential Winlnet).
Microsoft Corp. Installing, Configuring, and Using PPTP with Microsoft Clients and Servers, (1998) available at http://msdn2.microsoft.com/enus/library/ms811078 (printer).aspx (Using PPTP).
Microsoft Corp. Internet Connection Services for MS RAS, Standard Edition, http://www.microsoft.com/technet/archive/winntas/proddocs/inetconctservice/bcgstart.mspx (Internet Connection Services I).
Microsoft Corp. Internet Connection Services for RAS, Commercial Edition, available athttp://www.microsoft.com/technet/archive/winntas/proddocs/inetconctservice/bcgstrtc.mspx (Internet Connection Services II).
Microsoft Corp., Internet Explorer 5 Corporate Deployment Guide—Appendix B:Enabling Connections with the Connection Manager Administration Kit, available at http://www.microsoft.com/technet/prodtechnol/ie/deploy/deploy5/appendb.mspx (IE5 Corporate Development).
Mark Minasi, *Mastering Windows NT Server 4* 1359–1442 (6th ed., Jan. 15, 1999)(Mastering Windows NT Server).
*Hands On, Self–Paced Training for Supporting Verion 4.0* 371–473 (Microsoft Press 1998) (Hands On).
Microsoft Corp., MS Point–to–Point Tunneling Protocol (Windows NT 4.0), available at http://www.microsoft.com/technet/archive/winntas/maintain/featusability/pptpwp3.mspx (MS PPTP).
Kenneth Gregg, et al., *Microsoft Windows NT Server Administrator's Bible* 173–206, 883–911, 974–1076 (IDG Books Worldwide 1999) (Gregg).
Microsoft Corp., Remote Access (Windows), available at http://msdn2.microsoft.com/en–us/library/bb545687 (VS.85,printer).aspx (Remote Access).
Microsoft Corp., Understanding PPTP (Windows NT 4.0), available at http://www.microsoft.com/technet/archive/winntas/plan/pptpudst.mspx (Understanding PPTP NT 4) (Although undated, this reference refers to the operation of prior art versions of Microsoft Windows such as Windows NT 4.0. Accordingly, upon information and belief, this reference is prior art to the patents–in–suit.).
Microsoft Corp., Windows NT 4.0: Virtual Private Networking, available at http://www.microsoft.com/technet/archive/winntas/deploy/confeat/vpntwk.mspx (NT4 VPN) (Although undated, this reference refers to the operation of prior art versions of Microsoft Windows such as Windows NT 4.0. Accordingly, upon information and belief, this reference is prior art to the patents–in–suit.).
Anthony Northrup, *NT Network Plumbing: Routers, Proxies, and Web Services* 299–399 (IDG Books Worldwide 1998) (Network Plumbing).
Microsoft Corp., Chapter 1—Introduction to Windows NT Routing with Routing and Remote Access Service, Available at http://www.microsoft.com/technet/archive/winntas/proddocs/ rras40/rrasch01.mspx (Intro to RRAS) (Although undated, this reference refers to the operation of prior art versions of Microsoft Windows such as Windows NT 4.0. Accordingly, upon information and belief, this reference is prior art to the patents–in–suit.) 13.
Microsoft Corp., Windows NT Server Product Documentation: Chapter 5—Planning for Large–Scale Configurations, available at http://www.microsoft.com/technet/archive/winntas/proddocs/rras40/rrasch05.mspx (Large–Scale Configurations) (Although undated, this reference refers to the operation of prior art versions of Microsoft Windows such as Windows NT 4.0. Accordingly, upon information and belief, this reference is prior art to the patents–in–suit.).
F–Secure, F–Secure Evaluation Kit (May 1999) (FSECURE 00000003) (Evaluation Kit 3).
F–Secure, F–Secure NameSurfer (May 1999) (FSECURE 00000003) (NameSurfer 3).
F–Secure, F–Secure VPN Administrator's Guide (May 1999) (from FSECURE 00000003) (F–Secure VPN 3).
F–Secure, F–Secure SSH User's & Administrator's Guide (May 1999) (from FSECURE 00000003) (SSH Guide 3).
F–Secure, *F–Secure SSH2.0 for Windows NT and 95* (May 1999) (from FSECURE 00000003) (SSH 2.0 Guide 3).
F–Secure, *F–Secure VPN+ Administrator's Guide* (May 1999) (from FSECURE 00000003) (VPN+ Guide 3).
F. Secure, *F–Secure VPN+ 4.1* (1999) (from FSECURE 00000006) (VPN+ 4.1 Guide 6).
F–Secure, *F–Secure SSH* (1996) (from FSECURE 00000006) (F–Secure SSH 6).
F–Secure, *F–Secure SSH 2.0 for Windows NT and 95* (1998) (from FSECURE 00000006) (F–Secure SSH 2.0 Guide 6).
F–Secure, *F–Secure Evaluation Kit* (Sep. 1998) (FSECURE 00000009) (Evaluation Kit 9).
F–Secure, *F–Secure SSH User's & Administrator's Guide* (Sep. 1998) (from FSECURE 00000009) (SSH Guide 9).
F–Secure, *F–Secure SSH 2.0 for Windows NT and 95* (Sep. 1998) (from FSECURE 00000009) (F–secure SSH 2.0 Guide 9).
F–Secure, *F–Secure VPN+* (Sep. 1998) (from FSECURE 00000009) (VPN+ Guide 9).
F–Secure, *F–Secure Management Tools Administrator's Guide* (1999) (from FSECURE 00000003) (F–secure Management Tools).
F–Secure, *F–Secure Desktop, User's Guide* (1997) (from FSECURE 00000009) (F–secure Desktop User's Guide).
SafeNet, Inc., *VPN Policy Manager* (Jan. 2000) (VPN Policy Manager).
F–Secure, *F–Secure VPN+ for Windows NT 4.0* (1998) (from FSECURE 00000009) (F–secure VPN+).
IRE, Inc., *SafeNet/Soft–PK Version 4* (Mar. 28, 2000) (Soft–PK Version 4).
IRE/SafeNet Inc., *VPN Technologies Overview* (Mar. 28, 2000) (Safenet VPN Overview).
IRE, Inc., *SafeNet/Security Center Technical Reference Addendum* (Jun. 22, 1999) (Safenet Addendum).
IRE, Inc., *System Description for VPN Policy Manager and SafeNet/SoftPK* (Mar. 30, 2000) (VPN Policy Manager System Description).

IRE, Inc., About SafeNet/VPN Policy Manager (1999) (About Safenet VPN Policy Manager).
IRE, Inc., *SafeNet/VPN Policy Manager Quick Start Guide Version 1* (1999) (SafeNet VPN Policy Manager).
Trusted Information Systems, Inc., *Gauntlet Internet Firewall, Firewall Product Functional Summary* (Jul. 22, 1996) (Gauntlet Functional Summary).
Trusted Information Systems, Inc., *Running the Gauntlet Internet Firewall, An Administrator's Guide to Gauntlet Version 3.0* (May 31, 1995) (Running the Gauntlet Internet Firewall).
Ted Harwood, *Windows NT Terminal Server and Citrix Metaframe* (New Riders 1999) (Windows NT Harwood) 79.
Todd W. Matehrs and Shawn P. Genoway, *Windows NT Thing Client Solutions: Implemetning Terminal Server and Citrix MetaFrame* (Macmillan Technical Publishing 1999) (Windows NT Mathers).
Bernard Aboba et al., *Securing L2TP using IPSEC* (Feb. 2, 1999).
156. *Finding Your Way Through the VPN Maze* (1999) ("PGP").
Linux FreeS/WAN Overview (1999) (Linux FreeS/WAN) Overview).
TimeStep, *The Business Case for Secure VPNs* (1998) ("TimeStep").
WatchGuard Technologies, Inc., *WatchGuard Firebox System Powerpoint* (2000).
WatchGuard Technologies, Inc., *MSS Firewall Specifications* (1999).
WatchGuard Technologies, Inc., *Request for Information, Security Services* (2000).
WatchGuard Technologies, Inc., *Protecting the Internet Distributed Enterprise, White Paper* (Feb. 2000).
WatchGuard Technologies, Inc., *WatchGuard LiveSecurity for MSS Powerpoint* (Feb. 14, 2000).
WatchGuard Technologies, Inc., *MSS Version 2.5, Add–On for WatchGuard SOHO Releaset Notes* (Jul. 21, 2000).
Air Force Research Laboratory, *Statement of Work for Information Assurance System Architecture and Integration, PR No. N–8–6106* (Contract No. F30602–98–C–0012) (Jan. 29, 1998).
GTE Internetworking & BBN Technologies DARPA *Information Assurance Program Integrated Feasibility Demonstration* (*IFD*) 1.2 Report, Rev. 1.0 (Sep. 21, 1998).
BBN Information Assurance Contract, *TIS Labs Monthly Status Report* (Mar. 16–Apr. 30, 1998).
DARPA, *Dynamic Virtual Private Network* (*VPN*) *Powerpoint*.
GTE Internetworking, *Contractor's Program Progress Report* (Mar. 16–Apr. 30, 1998).
Darrell Kindred, *Dynamic Virtual Private Networks* (*DVPN*) *Countermeasure Characterization* (Jan. 30, 2001).
*Virtual Private Networking Countermeasure Characterization* (Mar. 30, 2000).
*Virtual Private Network Demonstration* (Mar. 21, 1998).
Information Assurance/NAI Labs, *Dynamic Virtual Private Networks* (*VPNs*) *and Integrated Security Management* (2000).
Information Assurance/NAI Labs, *Create/Add DVPN Enclave*(2000).
NAI Labs, *IFE 3.1 Integration Demo* (2000).
Information Assurance, *Science Fair Agenda* (2000).
Darrell Kindred et al., *Proposed Threads for IFE 3.1* (Jan. 13, 2000).
*IFE 3.1 Technology Dependencies* (2000).
*IFE 3.1 Topology* (Feb. 9, 2000).
Information Assurance, *Informatiion Assurance Integration: IFE 3.1, Hypothesis & Thread Development* (Jan. 10–11, 2000).
Information Assurance/NAI Labs, *Dynamic Virtual Private Networks Presentation* (2000).
Information Assurance/NAI Labs, *Dynamic Virtual Private Networks Presentation v.2* (2000).
Information Assurance/NAI Labs, *Dynamic Virtual Private Networks Presentation v.3* (2000).
T. Braun et al., *Virtual Private Network Architecture,* Charging and Accounting Technology for the Internet (Aug. 1, 1999) (VPNA).
Network Associates Products—*PGP Total Network Security Suite, Dynamic Virtual Private Networks* (1999).
Microsoft Corporation, Microsoft Proxy Server 2.0 (1997) (Proxy Server 2.0, Microsoft Prior Art VPN Technology).
David Johnson et al., *A Guide To Microsoft Proxy Server 2.0* (1999) (Johnson, Microsoft Prior Art VPN Technology).
Microsoft Corporation, *Setting Server Parameters* (1997 (Proxy Server 2.0 CD labeled MSFTVX00157288) (Setting Server Parameters, Microsoft Prior Art VPN Technology).
Kevin Schuler, *Microsoft Proxy Server 2* (1998) (Schuler, Microsoft Prior Art VPN Technology).
Erik Rozell et al., *MCSE Proxy Server 2 Study Guide* (1998) (Rozell, Microsoft Prior 15 Art VPN Technology.
M. Shane Stigler & Mark A. Linsenbardt, *IIS 4 and Proxy Server 2* (1999) (Stigler, Microsoft Prior Art VPN Technology).
David G. Schaer, *MCSE Test Success: Proxy Server 2* (1998) (Schaer, Microsoft Prior Art VPN Technology).
John Savill, *The Windows NT and Windows 2000 Answer Book* (1999) (Savill, Microsoft Prior Art VPN Technology).
Network Associates *Gauntlet Firewall Global Virtual Private Network User's Guide for Windows NT Version 5.0* (1999) (Gauntlet NT GVPN, GVPN).
Network Associates *Gauntlet Firewall For UNIX Global Virtual Private Network User's Guide Version 5.0* (1999) (Gauntlet Unix GVPN, GVPN).
File History for U.S. Appl. No. 09/653,201, Applicant(s): Whittle Bryan, et al., filed Aug. 31, 2000.
*AutoSOCKS v2.1,* Datasheet, http://web.archive.org/web/19970212013409/www.aventail.com/prod/autoskds.html.
Ran Atkinson, *Use of DNS to Distribute Keys,* Sep. 7, 1993, http://ops.ietf.org/lists/namedroppers/namedroppers.199x/msg00945.html.
FirstVPN Enterprise Networks, Overview.
Chapter 1: Introduction to Firewall Technology, Administration Guide: Dec. 19, 2007, http://www.books24x7.com/book/id_762/viewer_r.asp?bookid=762&chunked=41065062.
The TLS Protocol Version 1.0; Jan. 1999; p. 65 of 71.
Elizabeth D. Zwicky, et al., Building Internet Firewalls, 2nd Ed.
Virtual Private Networks—Assured Digital Incorporated—ADI 4500; http://web.archive.org/web/1990224050035/www.assured–digital.com/products/prodvpn/adia4500.htm.
Accessware—The Third Wave in Network Security, Conclave from Internet Dynamics; http://web.archive.org/web/11980210013830/interdyn.com/Accessware.html.
Extended System Press Release, Sep. 2, 1997; *Extended VPN Uses The Internet to Create Virtual Private Networks,* www.extendedsystems.com.

Socks Version 5; Executive Summary; http://web.archive.org/web/199970620031945/www.aventail.com/educate/whitepaper/sockswp.html.
Internet Dynamics First to Ship Integrated Security Solutions for Enterprise Intranets and Extranets; Sep. 15, 1997; http://web.archive.org/web/19980210014150/interdyn.com.
E–mails from various individuals to Linux IPsec re:DNS–LDAP Splicing.
Microsoft Corporation's Fifth Amended Invalidity Contentions dated Sep. 18, 2009, *VirnetX Inc. and Science Applications International Corp.* v. *Microsoft Corporation* and invalidity claim charts for U.S. Patent Nos. 7,188,180 and 6,839,759.
The IPSEC Protocol as described in Atkinson, et al., "Security Architecture for the Internet Protocol," Networking Working Group, RFC 2401 (Nov. 1998) ("RFC 2401"); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
S. Kent and R. Atkinson, "IP Authentication Header," RFC 2402 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
C. Madson and R. Glenn, "The Use of HMAC–MD5–96 within ESP and AH," RFC 2403 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
C. Madson and R. Glenn, "The Use HMAC–SHA–1–96 with ESP and AH," RFC 2404 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
C. Madson and N. Doraswamy, "The ESP DES–CBC Cipher Algorithm With Explicit IV", RFC 2405 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
S.Kent and R. Atkinson, "IP Encapsulating Security Payload (ESP)," RFC 2406 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
Derrell Piper, "The Internet IP Security Domain of Interpretation for ISAKMP," RFC 2407 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
Douglas Maughan, et al, "Internet Security Association and Key Management Protocol (ISAKMP)," RFC 2408 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
D. Harkins and D. Carrell, "The Internet Key Exchange (IKE)," RFC 2409 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
R. Glenn and S. Kent, "The NULL Encryption Algorithm and Its Use With IPsec," RFC 2410 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
R. Thayer, et al., "IP Security Document Roadmap," RFC 2411 (Nov. 1998); http://web.archive.org/web/19991007070353/http://www.imib.med.tu–dresden.de/imib/Internet/Literatur/ipsec–docu_eng.html.
Hilarie K. Orman, "The Oakley Key Determination Protocol," RFC 2412 (Nov. 1998) in combination with J.M. Galvin, "Public Key Distribution with Secure DNS," Proceedings of the Sixth USENIX UNIX Security Symposium, San Jose California (Jul. 1996) ("Galvin").
David Kosiur, "Building and Managing Virtual Private Networks" (1998).
P. Mockapetris, "Domain Names—Implementation and Specification," Network Working Group, RFC 1035 (Nov. 1987).
Request for Inter Partes Reexamination of Patent No. 7,188,180, dated Nov. 25, 2009.
Exhibit 2 "Aventail Connect v3.1/v2.6 Administrator's Guide", 120 pages, 1996–1999.
Exhibit 3A, "Gauntlet Firewall for Windows", pp. 1–137, 1998–1999.
Exhibit 3B, "Gauntlet Firewall for Windows", pp. 138–275, 1998–1999.
Exhibit 4, "Kosiur", Building and Managing VPNs, pp. 1–396, 1998.
Exhibit 5, Building a Microsoft VPN; A comprehensive Collection of Microfoft Resources, pp. 1–216.
Exhibit 6, Windows NT Server, Virtual Private Network; An Overview, pp. 1–26, 1998.
Exhibit 7, "Networking Working Group Request for Comments: 1035" pp. 1–56, 1987.

# INTER PARTES REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 316

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **1-10** and **12** is confirmed.

New claim **18** is added and determined to be patentable.

Claims **11** and **13-17** were not reexamined.

*18. A method of transparently creating a virtual private network (VPN) between a client computer and a target computer, comprising the steps of:*



*(1) generating from the client computer a Domain Name Service (DNS) request that requests an IP address corresponding to a domain name associated with the target computer;*

*(2) determining whether the DNS request transmitted in step (1) is requesting access to a secure web site; and*

*(3) in response to determining that the DNS request in step (2) is requesting access to a secure target web site, automatically initiating the VPN between the client computer and the target computer, wherein:*

*steps (2) and (3) are performed at a DNS server separate from the client computer, and step (3) comprises the step of, prior to automatically initiating the VPN between the client computer and the target computer, determining whether the client computer is authorized to resolve addresses of non secure target computers and, if not so authorized, returning an error from the DNS request.*

* * * * *

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32 and Federal Circuit Rule 28.1(b)(1)(A).

The brief contains 10,908 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

The brief has been prepared in a proportionally spaced typeface using MS Word 2013 in a 14 point Times New Roman font.

Date: June 23, 2022 BY: /s/Naveen Modi

Naveen Modi
PAUL HASTINGS LLP
2050 M St., N.W.
Washington, D.C. 20036
Tel.: (202) 551-1700
Fax: (202) 551-1705